UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM M. McDERMOTT            )
      PLAINTIFF            )
VS                              )            No. 1:09-cv-10159-MBB
MARCUS, ERRICO, EMMER & BROOKS, P.C.   )
  DEFENDANT                     )

PLAINTIFF'S TRIAL BRIEF
SUMMARY

The evidence shows that for over a three year period, the defendant Marcus, Errico,

Emmer & Brooks, P.C.'s ("MEEB") main objective in its actions to collect condominium

assessments from the plaintiff William M. McDermott ("McDermott") for Pondview

Condominium Association ("Pondview") was to run up its attorneys fees to Pondview, which

Pondview then assessed to McDermott, and which MEEB then collected from McDermott's

mortgagees in part.  MEEB accomplished its objective in diverse deceptive, confusing, abusive,

unfair, and unconscionable ways, all in violation of the Fair Debt Collection Practices Act, 15

U.S.C. §§ 1692–1692p ("FDCPA").  In violation of 15 U.S.C. §§ 1692d and 1692f (1) it engaged

in a convoluted collection procedure which inevitably caused miscommunication, lack of

communication, confusion, and acrimony that escalated litigation costs and served as a pretext

for MEEB to evade its obligation under 15 U.S.C. § 1692h to apply payments of McDermott's

debts as he directed and not to debts he disputed, i.e its attorneys fees, and for MEEB to provide

McDermott with communications which were illegible, deceptive, and incomprehensible in

violation of 15 U.S.C. §§ 1692d, 1692e, and 1692f; (2) it consistently communicated to

McDermott and to his mortgagees in a deceptive, confusing, and false manner in violation of 15

U.S.C. § 1692e; (3) it repeatedly communicated with McDermott's mortgagees without his

1

permission in violation of 15 U.S.C. § 1692c(b) and deliberately withheld from him any information concerning these communications which compounded the confusion and acrimony; (4) it failed to provide pre-suit notices to McDermott's mortgagees in compliance with G.L. c. 183A, § 6(c) which were intended to limit litigation costs prior to suit, particularly attorneys fees; and (5) it repeatedly bullied McDermott by filing multiple lawsuits to collect the same debt, threatening him personally, and continuing to communicate directly with him when it knew him to be represented by an attorney in violation of 15 U.S.C. § 1692d, 1692f, and 1692c(a)(2).

MEEB's collection actions were abusive and unfair not only to McDermott, but to his mortgagees, and to Pondview in violation of 15 U.S.C. §§ 1692d and 1692f and were therefore unfair and deceptive acts in violation of G.L. c. 93A, § 2.  They caused Pondview to incur substantial liability to MEEB; McDermott's mortgagees to make substantial payments towards MEEB's attorneys fees; and McDermott to incur substantial liabilities to his mortgagees and to Pondview which contributed to his eventual loss of his two units at Pondview to foreclosure and caused him substantial emotional and psychological distress and anguish.  McDermott is entitled under G.L. c. 93A, § 9(1) to have MEEB disgorge all of its ill-gotten attorneys fees and costs and to compensate him for his emotional distress recoverable under 15 U.S.C. § 1692k(a)(1) and G.L. c. 93A, § 9(1).  He is also entitled to $1,000 in statutory damages under 15  U.S.C. § 1692k(a)(2)(A).  He is also entitled to up to three and not less than two times his damages under G.L. 93A, § 9(3) and to his reasonable attorneys fees and costs under  G.L. 93A, § 9(3) and 15 U.S.C. § 1692k(a)(3).

## GENERAL PRINCIPLES OF LAW[1]
### FDCPA

---

[1] There have been substantial recitations of law by both parties in various trial motions and oppositions, the pretrial memorandum, and the requests for jury instructions which McDermott will avoid repeating herein, except when helpful for clarity or emphasis.  To the extent necessary, McDermott incorporates herein all his arguments and statements of law previously submitted.

The FDCPA seeks to protect persons from "abusive, deceptive, and unfair debt collection practices," 15 U.S.C. § 1692.  It is to be liberally construed to effect its purpose.  "We construe consumer protection statutes liberally in favor of consumers."  Barnes v. Fleet Nat. Bank, NA, 370 F. 3d 164, 171 (1st.Cir.2004);  Zimmerman v. Puccio, 613 F. 3d 60, 71 (1st.Cir.2010).  Accordingly, "[t]he FDCPA 'imposes strict liability on debt collectors for its violations,'"  Som v. Daniels Law Offices, PC, 573 F.Supp.2d 349, 356 (D.Mass.2008) quoting Harrington v. CACV of Colorado, LLC, 508 F.Supp.2d 128, 132 (D.Mass. 2007), and "courts usually look to whether the objective 'least sophisticated debtor' would find [a] notice improperly threatening or misleading."  Martin v. Sands, 62 F.2d 196, 198 (D.Mass.1999).  "[W]hether the debt at issue is legitimately owed has no bearing of the validity of a FDCPA action."  Harrington, supra 573 F.Supp.2d at 356 quoting Pettway v Harmon Law Offices, P.C, 2005 WL 2365331 at *3.  Debt Intent and knowledge of the debt collector is generally not relevant to liability.  Turner v. JVDB & Associates, Inc., 330 F. 3d 991, 995 (7th.Cir.2003) (debt collector strictly liable for seeking to collect debt that client knew had been discharged in bankruptcy).  To avoid liability, the burden is on the debt collector to "prove by a preponderance of the evidence 1) that the violation was not intentional, 2) that it resulted from a bona fide error, and 3) that they maintained "procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c).  However, this 'bona fide error' defense is not available for mistakes of law.  Jerman v. Carlisle, McNellie, Rini, Kramer, 130 S.Ct. 1605 1608 (2010)[2].

---

[2]   Although the Court in Jerman specifically held that the bona fide error defense did not apply to "a violation resulting from a debt collector's mistaken interpretation of the legal requirements of the FDCPA," the reasoning of the decision is applicable to any mistake of law.  The majority opinion, J. Sotomayer,  observed that "legal reasoning is not a mechanical or strictly linear process" and accordingly, that the statute's obligation to implement "procedures reasonably adapted to avoid" error refers to procedures "that help to avoid errors like clerical or factual mistakes" as opposed to errors of legal reasoning.  Jerman v. Carlisle McNellie Rini, Kramer, 130 S.Ct at 1614-1615.  The Court further observed that "We have long recognized the "common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally." Id at 1611 quoting Barlow v. United States, 7 Pet. 404, 411, 8 L.Ed. 728 (1833).

"Communication" is broadly defined under the FDCPA as "the conveying of information regarding a debt directly or indirectly to any person through any medium," 15 U.SC. § 1692a(2); and "debt" is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes," 5 U.SC. § 1692a(5)  "[T]he FDCPA's definition of 'debt collector' includes lawyers who regularly, through litigation, attempt to collect consumer debts." Jerman, supra 130 S.Ct at 1618.  And condominium assessments are 'debts' under the FDCPA.  Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d 477, 481 (7th Cir. 1997).  "Since [Newman], nearly every court, state or federal, that has considered the issue has concluded that association dues, assessments, and rent are properly classified as debt. See, e.g., Romea v. Heiberger & Assocs., 163 F.3d 111 (2d Cir.1998); Ladick v. Gemert, 146 F.3d 1205 (10th Cir.1998); Garner v. Kansas, No. 98-1274, 1999 WL 262100 (E.D.La.1999); Caron v. Charles E. Maxwell, P.C., 48 F.Supp.2d 932 (D.Ariz.1999); Taylor v. Mount Oak Manor Homeowners Ass'n, 11 F.Supp.2d 753 (D.Md.1998); Thies v. Law Offices of William A. Wyman, 969 F.Supp. 604 (S.D.Cal.1997); Loigman v. Kings Landing Condominium Ass'n, 324 N.J.Super. 97, 734 A.2d 367 (Ch. Div.1999)."  Reid v. Ayers, 531 SE 2d 231, 234 (NC, 2000) (homeowners' association dues and assessments are debt within the meaning of the North Carolina Debt Collection Act).

### Massachusetts Condominium Law, G.L. c. 183A

There are different  types of charges a condominium association may assess to a unit owner which have different rules for assessment and enforcement:  "regularly recurring budgeted common expenses," G.L. c. 183A, § 6(c), ¶ 4, assessed on the basis of a mandated annual budget, G.L. c. 183A, § 6(a)(i), special assessments, attorneys fees and costs, and fines and

penalties, G.L. c. 183A, § 6(a)(ii). Common expenses and special assessments are generally assessed to all unit owners on a pro rata basis. Id. Attorneys fees and costs are also assessed to all unit owners on a pro rata basis, and may also be assessed entirely to a single unit owner, G.L. c. 183A, § 6(a)(ii). Fines and penalties are generally assessed only to the individual unit owner. Id. The evidence shows that whatever MEEB charged Pondview, Pondview assessed to McDermott.

There is an automatic lien on a condominium unit for all charges assessed against it by the condominium association, G. L. c. 183A, § 6(a), which is enforced by filing a lawsuit pursuant to G.L c. 254, §§ 5, 5A ("enforcement lawsuit"). G. L. c. 183A, § 6(c), ¶ 2. Certain portions of the lien are prior to the first mortgage[1]; specifically, the lien for up to six months of the regularly recurring budgeted common expenses assessed before filing an enforcement lawsuit and, if the association complies with certain pre-suit notice requirements to the mortgagee, the lien for "costs and reasonable attorneys' fees incurred in the action to enforce the lien". G. L. c. 183A, § 6(c), ¶ 2. Specifically, for attorneys fees and costs to be prior to the first mortgage, the association must mail to the mortgagee a notice that it intends to file an enforcement lawsuit "**thirty days prior to the filing of an action,**" 6(c), ¶ 1 (emphasis added).[2] G.L. c. 183A, § 6(c), ¶ 5.

<div align="center">FACTS</div>

1) At the time of trial, McDermott was approximately 52 years old, (Tr. 5, McDermott direct, p 2, lines 16-19), and living in one of his former units, unit 104, in Pondview, a 19 unit

---

[1]   The lien for special assessments, late charges and penalties, and on-going common expense assessments accruing after an enforcement lawsuit is filed are never prior to the first mortgage. G. L. c. 183A, § 6(c), ¶ 2.

[2]   The association must also send the mortgagee and the unit owner notices whenever some portion of the assessments is at least sixty days overdue ("delinquency notice"). G.L. c. 183A, § 6(c), ¶ 1. No time frame prior to suit is given for these notices, but the failure to send one to the mortgagee prior to suit will also cause the lien for attorneys fees and costs not to be prior to the mortgage. The association may also send to a unit owner who rents a unit a notice of intent to collect the rent ("notice of intent to collect rent"), G.L. c. 183A, § 6(c), ¶ 6.

condominium association located at 605 Eastern Ave, Lynn, Massachusetts.  (Tr. 5[1], McDermott direct, p 6, line 6 - p 7, line 10).  McDermott had lived at Pondview since 1995 when he moved into unit 105, which was owned by his parents who lived across the hall in unit 104.  From that time until July, 2007, except for one year, he lived in one or the other of the units and his tenant Sandra Halbich ("Halbich") lived in the other.[2]  After she left, he occupied unit 105 from July, 2007 until he was evicted in 2008 by his mortgagee who had foreclosed in October, 2007 (Tr. 5, McDermott direct, p 69, line 11 – p 70, line 17, p 87, line 15); and from that time until present occupies unit 104 as a tenant at sufferance as a result of the foreclosure on that unit by his mortgagee in October, 2008 (Tr. 5, McDermott direct, p 71, line 17 – p 72, line 11; p 109, line 15 – 17; p 110, lines 1 – 5 and 9 – 11).

2)  MEEB is a professional corporation consisting of 31 attorneys formed in 1993. (Tr. 1, Brooks direct, p 21, lines 2-7), which represents approximately 3500 condominium associations in Massachusetts, New Hampshire, and Rhode Island.  (Tr. 1, Brooks direct, p 22, lines 18-22). MEEB admits that to the extent that condominium charges are debts under the FDCPA, MEEB is a debt collector under the Act.  (Tr. 1, Brooks direct, p 24, line 22 – p. 25, line 6).

3)  Richard E. Brooks ("Brooks") is a Massachusetts attorney, a principal of MEEB, has concentrated in condominium law for approximately 22 years, and is one of the two principals managing the collection department within MEEB. (Tr. 1, Brooks direct, p 21, lines 8-15 and lines 21-p 22, line 5; Tr. 4, Brooks direct, p 6, line 22 – p 8, line 8).

---

[1]   There were six days of trial and thus six transcripts.  The reference to the transcripts will be to the numbered day of the trial rather than to the date in order to simplify notation.

[2]   He lived in unit 105 from 1995 to 2001 (Tr. 4, McDermott direct, p. 91, lines 8 – p. 92, line 10; Tr. 6, Halbich direct, p 55, line 11 – 16); in unit 104 in 2002, the year that both his parents passed (Tr. 4, McDermott direct, p. 92, line 11 – p. 93, line 13); in unit 105 after they deceased and he became sole owner by purchasing his half-brother Edward William's share (Tr. 5, McDermott direct, p. 2, lines 22-25; Tr. 4, McDermott direct, p. 95, lines 9-13, p 98) from 2003 to 2005 (Tr. 4, McDermott direct, p. 24, line 13, p. 96, lines 3-p. 97, line 1); in unit 104 from 2005 to July 2007 when Halbich, his tenant, left Pondview (Tr. 6, Halbich direct, p. 54, lines 17-18, p 55, line 19 – p. 56, line 8);.

4)  McDermott gained an ownership interest in both units 104 and 105 in 2002 when his mother deeded them to him and his half-brother Edward Williams just prior to her death.  After his mother passed in 2002, McDermott became the sole owner of units 104 and 105 by buying out his half-brother Edward Williams' interest in both. (Tr. 5, McDermott direct, p. 2, lines 22-25; Tr. 4, McDermott direct, p. 95, lines 9-13, p. 98)  He did so in order that he could continue to live at Pondview.  (Tr. 5, McDermott direct, P 9, lines 5-6.  lines 23 – p 10, line 2.)

5)  Pondview's long-standing policies at the time concerning late fees and enforcement actions for overdue assessments were stated in three letters from Dawn-Marie Bailey ("Bailey"), Pondview's accountant/bookkeeper, which were given to McDermott in September, 2004.  (Ex's 1, 2, and 3; Tr. 1, Brooks direct, p 31, line 15 – p 32, line 5; p 33, lines 6-21; line 24 – p 34, line 7; and p 38, lines 2- 20)  The association charged one late fee per unit per month irrespective of the number of assessments and after three consecutive months of missed payments would take the unit owner to small claims court (a department within the District Court) and seek to recover the filing costs as well.  Id.  The policy had been effective.  From at least 1992 to 2005, Pondview had been solvent, (Tr. 6, Halbich direct, p 56, lines 12 – p 57, line 10 and p 57, 23 – p 58, line 8), with no more than two collection law suits during that time.  (Tr. 6, Halbich direct, p 63, lines 4-23).  The association paid no attorney's fees in 2003 and 2004, (Tr. 5, McDermott direct, p 20, lines 8-18), and there had been no enforcement lawsuits during that time nor had one been required for McDermott's overdue assessments.

6)  McDermott never missed an assessment payment from 1994 until 2004, (Tr. 5, McDermott direct, p. 4, lines 3 – 7 and 20 – 23, p. p 8, line 6), when he missed the July, August, and September payments (Tr. 5, McDermott direct, p 10, line 5 – 13).  McDermott and the association amicably resolved the matter when McDermott agreed to pay all amounts due plus all

late fees that had been assessed in late September, 2004.  (Tr. 5, McDermott direct, p 10, lines 14 – p 11, line 17; p 12, lines 1-21;  p. 14, lines 3-15)

7)  In approximately November, 2004, Pondview considered whether to engage MEEB as its attorney.  (Tr. 5, McDermott direct, p 16, line 5 – 23; ex 82).  Thereafter, in December, 2004, McDermott received correspondence from Pondview claiming he owed additional late fees of $150 for the missed summer payments.  (Tr. 5, McDermott direct, p 20, lines 19 – 22.  ex 4).  McDermott disputed the additional late fees and tendered a check for an amount which did not include them.  Pondview refused to negotiate the check, telling McDermott that it did so on "advise of counsel."  (Tr. 5, McDermott direct, p 21, line 11 – p 22, line 11).

8)  McDermott tendered no further payments of assessments from that time until April, 2005 because Pondview refused to accept his checks unless he paid the disputed $150 late fees. (Tr. 5, McDermott direct, p 25, line 12).  On or about April 16, 2005, Pondview sent him two notices detailing the amounts due for each unit, including the disputed $150 late fees: $1,507.37 for unit 104, (ex 19), and $1,319.94 for unit 105, (Tr. 5, McDermott direct, p 28, line 8 – 16).

9)  Sometime prior to this, MEEB had been engaged to collect McDermott's assessments.[1]  When MEEB is engaged to collect assessments, it attempts to collect all accruing assessments as well as past due assessments, (Tr. 1, Brooks direct, p 89, lines 1-21; Tr. 3, Brooks direct, p 43, lines 21 – p 44, line 11) and that was what it did with McDermottt. ( Ex's 21, 22, 38, 44, 45, 55,  56, ex 63, docket nos. 16-18, ex 84).  It also advises its client to cease communications with the unit owner.  (Tr. 2, Brooks direct, p 8, lines 15-19; p 59, lines 14 – p 60).  And consistent with that policy, Pondview had no further communications with McDermott

---

[1]    The evidence is that MEEB began to render advice to Pondview as early as December, 2004 when he was charged the additional late fees which precipitated the original dispute and subsequently when Pondview refused his checks in January "on the advice of counsel." which caused him to become delinquent.  MEEB's invoices begin in the month of March, 2005.  (Ex 23).

concerning his assessments after the April 16, 2005 letters.  (Tr. 5, McDermott direct, p 37, lines 8-19;  p. 40, line 18 – p 41, line 15).  Pondview would not even speak with him when he attempted to discuss his assessments.  (Tr. 5, McDermott direct, p 48, lines 13 – p 49, line 15).  And it didn't inform him that an additional monthly assessment, beginning in June, 2005, had been voted on in May.  (Tr. 5, McDermott direct, p 37, lines 8-19).  Only MEEB and not Pondview communicated with McDermott[1] and his mortgagees[2] thereafter about his assessments and MEEB's communications to McDermott consisted only of pre-suit notices[3] and pleadings filed in court,  (Ex's 25, 26, 40, 44, 49,  50, and 76 and ex. 84).  As a result of this lack of communication  McDermott didn't know from one moment to the other whether any checks he gave to Pondview would be negotiated or how they would be applied, despite his express directions, or whether he would be accused of withholding payment as was done with his April checks.  (Tr 5, McDermott direct, p 45, line 15 – p 47, line 9).

      10)  Yet Pondview continued to collect McDermott's payments of his accruing assessments.  (Ex's 30 and 35).  MEEB collected payments from McDermott's mortgagees, made payable to Pondview.  (Ex's 17, 41, 54, 60, 48, and 81).  And Pondview prepared ledgers accounting for the accruing assessments, late charges, and payments which were communicated to McDermott only by MEEB with the pre-suit notices and affidavits it filed in court.  (Ex's 25, 26, 40, 44, 49,  50, and 76 and ex. 84).

      11)  In March, 2005, MEEB commissioned and reviewed a title examiner's report for each unit.[4]  (Ex 23, p. 1 (3/23/2005 and 3/22/2005)[5].  Brooks testified that MEEB usually does

---

[1]   Tr. 5, McDermott direct, p 37, lines 8-19;  p. 40, line 18 – p 41, line 15; p 38, lines 16-p 39, line 28-19;  p 48, lines 13 – p 49, line 15

[2]   Ex 11, 12, 13, 17, 38, 41, 42, 45, 46, 47, 48, 51, 52, 53, 54, 55, 57, 58, 59, 60, 68, 69, 70, 71, 74, 75, and 77.

[3]   Except for the first few letters from Brooks, ex 21 and 22.

[4]   Which was also consistent with MEEB's usual practice when it undertakes collection of assessments. (Tr. 1, Brooks direct, p. 95, line 19 – p. 96, line 3; Tr. 3, Brooks direct, p 7, lines 2-13),

[5]   References to entries in MEEB's invoices, (ex 23), will be to the page and the date of the entry on that page.

this because the mortgagees and other lienholders are required to be named as a party in an

enforcement lawsuit.  (Tr. 3, Brooks direct, p 7, lines 18 – p 8, line 13; see G.L. c. 254, § 5).

MEEB was to commission and review a title examiner's report prior to filing each of the nine

enforcement lawsuits[6] it was eventually to file.  (Tr. 1, Brooks direct, p. 63, lines 16 – p 64, line.

10.[7]  Ex 23, p 1 (3/23/2005 and 3/22/2005); p 17 (10/4/2005); p 35 (6/20/2006); p 36

(6/20/2006); p 63 (5/30/2007); p 74 (9/28/2007); and p 92 (6/30/2008)).   Yet not once before the

nine enforcement lawsuits it eventually filed did MEEB send McDermott's mortgagees a thirty

day notice of intent at least thirty days prior to filing the action.  Except for the first 104 lawsuit,

when it sent the mortgagee no pre-suit notices, (ex 23, pp 1-5), MEEB always drafted and mailed

both the delinquency notice and the thirty day notice of intent at or about the same time that it

drafted the complaint and mailed it to the court.  (Ex., 23, p. 3 (4/25/2005);  p. 17 (10/27/2005);

p  36-37 (6/21/2006 and 6/23/2006) (6/22/2006 and 6/22/2006); p 63 (5/30/2007 and 5/31/2007);

p 77 (10/10/2007 and 10/11/2007); and p 93 (6/30/2008); ex's 11, 12, 13, 51, 52, 57, 58, 70, 74,

75; Tr. 3, Brooks direct, 9, line 24 – p 10, line 5,  p 11, lines 1-2, line 17 - p 12, line 22).

12)  On or about April 20, 2005, McDermott tendered two checks to Pondview for the

amounts stated in its April letters, including the disputed late fees:  $1,507.37 for unit 104 and

$1,319.94 for unit 105.  (Ex. 20)  At the time, McDermott had two mortgages, one on each unit,

---

[6]  The invoices for unit 104 relating to the last enforcement lawsuit, the fourth 104 lawsuit filed in September, 2008, invoices for September and October, 2008, are missing. (See ex 23, pp 96 – 99).

[7]  Lynn District Court, No. 05130511, dated April 26, 2005 ("first 104 lawsuit"). (Ex. 15).
Lynn District Court, No. 0513cv0508 dated April 26, 2005 ("first 105 lawsuit"). (Ex. 16).
Lynn District Court, No. 0513cv1482 dated October 27, 2005 ("second 105 lawsuit"). (Ex. 10).
Complaint dated June 23, 2006  ("second 104 lawsuit"). (Ex. 23, p 36).
Lynn District Court, No. 0613cv938 dated June 29, 2006 ("third 105 lawsuit"). ( Ex. 14).
Lynn District Court, No. 0713cv0943 dated June 1, 2007  ("fourth 105 lawsuit"). (Ex. 65) (multiple)
Lynn District Court, No. 0713cv 1802 dated October 10, 2007  ("fifth 105 lawsuit") - Ex. Z
Lynn District Court, No. 0813cv1380 dated June 30, 2008  ("third 104 lawsuit"). ( Ex. 72).
Essex Superior Court, No. 2008-1839 dated September 16, 2008  ("fourth 104 lawsuit"). (Ex. 78).

which had been recorded in the registry of deeds.  (Ex's 27 and 28; Tr. 3, Brooks direct, p 5, line 25 – p. 7, line 17).

13)  Brooks advised Pondview not to cash McDermott's April checks,  (Tr. 2, Brooks direct, p 59, lines 14 – p 60, line 1 and ex 85) and without telling McDermott drafted and mailed the first two enforcement lawsuits.  (Ex's 15 and 16).   McDermott never received his tendered April checks back.  (Tr. 5, McDermott direct, p 38, lines 16-p 39, line 28-19).   MEEB provided constant advice to Pondview concerning all aspects of the collection process.  (Tr. 4, Brooks redirect, p 83, lines 22 – p 84, line 8; communications reflected in invoices.[1]).   Brooks also drafted and mailed the thirty day notice of intent but not the delinquency notice to McDermott's 105 mortgagee and sent no pre-suit notices to McDermott's 104 mortgagee.  (Ex. 23, pp. 1-5). He did not mail a copy of the complaints to McDermott.

14)  Brooks thereafter mailed a letter dated May 2, 2005 to McDermott.  Ex 20.  This was the first communication that McDermott received from MEEB.[2]  McDermott telephoned Brooks to obtain an explanation and made it clear to him in the conversation that he disputed MEEB's

---

[1]  Ex 23, p 1 (3/30/2005 - telephone conference with client relating to fines and violations), p. 5 (5/2/2005), p. 6 (5/8/2005, 5/16/2005, 5/24/2005, 5/2/2005, 5/9/2005), p. 7 (5/18/2005), p 8 (6/10/2005 "Telephone conference with Trustee regarding collection; payment by Bank and strategy," 6/16/2005 "Telephone conference with Trustee regarding payemnts by unit owner and case strategy," 6/23/2005 "Prepare Affidavit of Accountant") p. 9, (6/10/05, 6/16/05 "Telephone conference with Trustee regarding payments by unit owner"), p. 10 (7/5/2005 "Correspondence with Trustee regarding Motion for Summary Judgment and delinquency", 7/19/2005 "Correspondence with client regarding arrearages"), p 14 (9/2/2005 "Telephone conference with Trustee regarding payment by unit owner"), p 15 (9/23/2005 "Telephone conference with Trustee regarding payment"; 9/29/2005 two entries "Telephone conference with Trustee Regarding collection".

[2]  Brooks' testimony that there were two prior sets of letters, ex's x,y,z, and a, was not credible.  Not once in the trial did Brooks offer any corroborative evidence, documentary or testamentary, for any of his testimony although he had the habit of referring to alleged notes and documents not in evidence.  Although all ex's x, y, and z purport to have been mailed by certified mail, Brooks adduced no evidence proving the mailing, let alone the receipt of same.  Moreover, his explanation for why there were two sets of letters, that a title examination showed additional ownership, was not supported by the evidence.  MEEB's invoices evidence that the title report was examined at the time of the first alleged letters, March 23, 2005, ex 23, p. 1, and both sets of letters were addressed to the same individuals.  The first set of letters also have the same certified mail number at the top. The evidence is that both these sets were drafts of letters that MEEB never sent.  The first drafts included ledgers, which unfortunately never got into evidence, which MEEB determined not to send when it prepared the second drafts which contained no ledgers and were dated the day before another month's worth of assessments would become due.

legal fees.[1]  (Tr. 6, McDermott cross, p 12, lines 18-24; ex 23, p. 6; Tr. 6, McDermott cross, p 12, lines 18-24;  Ex 23, p. 6 (two entries dated 5/9/2009 stating "Telephone conference with owner; Telephone conference with client" totaling 24 minutes)).[2]   Brooks offered no explanation for the legal fees and instead simply threatened McDermott that unless he paid them, MEEB would run them up and own both of McDermott's units by the end of the year.   Tr. 5, McDermott direct, p 30, line 21-p 32, line 20.

15)  As with all of MEEBs' communications and pleadings to McDermott and to his mortgagees thereafter, Brooks' May 2, 2005 letter was vague, ambiguous, and misleading and stated false amounts due for MEEB's attorneys fees and costs.  (See Argument, p 21, et seq, infra).  McDermott thereafter received the complaints, (ex's 15 and 16), when they were taped to the front door of Pondview, (Tr. 1, McDermott direct, p. 35, lines 3-10;  McDermott cross, p  35, lines 3-10).  Brooks' next letter to McDermott simply enclosed two ledgers prepared by Pondview.  (Ex 21).  These were the first of the ledgers that MEEB would thereafter enclose with its pre-suit notices or in pleadings sent to McDermott.   (Ex's 25, 26, 40, 44, 49,  50, and 76 and ex. 84).  They were in a form that Pondview had never used prior to MEEB's collection actions,[3] partially illegible, contained conflicting and confusing bookkeeping conventions,

---

[1]   Brooks can not claim to be unaware that McDermott disputed MEEB's attorneys fees, irrespective of the dispute concerning his and McDermott's conversation.  His May 2, 2005 letter states, albeit in an obscure, vague manner, that McDermott's checks were not cashed because he had withheld payment of attorneys fees.

[2]   Brooks' testimony that there was no conversation but rather that McDermott called and left a lengthy message and that Brooks returned the call and left a lengthy message was not credible. (Tr. 3, Brooks direct, p 25, lines 11-13).  First, MEEB's own contemporaneous invoice to Pondview clearly indicated that there had been a "[t]elephone conference with owner" on May 9, 2005, (ex. 23, p. 6), and these entries were apparently made by someone with the same initials as Richard E. Brooks.  (Ex. 85, p. 4).  Second, Brooks personally answered interrogatories in discovery concerning the call by stating that he denied the **substance of the alleged conversation as set forth by McDermott in the complaint,** not the call.  (Tr. 3, Brooks direct, p. 21, lines 8-10; p. 22, lines 1-4).  The "substance of the conversation" had been alleged in paragraph 41 of the Complaint which stated:  During the course of the conversation, McDermott made it clear to Brooks that he disputed his being charged legal fees to collect an amount he had already paid."  (Ex. 31).  Third, Brooks himself twice referred to the May 2, 2005 letter as his first correspondence to McDermott.  Tr. 2, Brooks direct, p. 22, lines 1-4 and 8-10.  And fourth, again Brooks' testimony was uncorroborated by any evidence at trial, such as an alleged transcript he claimed MEEB had made of McDermott's message.

[3]   Compare ex's 1, 2, 3, 4, and 7 to the ledgers with exhibits  25, 26, 40, 44, 49, 50, 76..

contained entries which were difficult to understand, were frequently out of date, and contained long lists of figures which considering their partial illegibility were excessively burdensome if not impossible to calculate, and which, in subsequent ledgers, showed the application of payments of McDermott's assessments which were bizarre, contrary to his directions in his conversation with Brooks and in his subsequent payments, and maximized his incursion of late charges.  Id.

16)  After filing suit, MEEB sent communications to McDermott's 105 mortgagee seeking to collect payment of his assessments, the late charges, special assessments, and all of its attorneys fees and costs resulting in a payment by same of $3,800.27 on or about May 20, 2005, (ex 17)  and MEEB thereafter filed a voluntary dismissal of the first 105 lawsuit, (Tr. 2 p 58, line 14-19, ex 23, p. x; Tr. 4, Brooks cross, p 55, lines 2-15).  Notwithstanding the payment and the dismissal, MEEB continued to charge attorneys fees for collection services for unit 105. ( Ex. 23, pp 8 and 12).  For over the next three years MEEB had extensive communications with McDermott's mortgagees after filing enforcement lawsuits.  Ex's 17, 38 41, 42, 45, 46, 47, 48, 53, 54, 55,  59, 60, 68, 69, 71 and 77.  McDermott was given no notice of these communications, did not give his permission, for same, and the communications did not notify the mortgagees that McDermott disputed MEEB's attorneys fees.  (Id; Tr. 5, McDermott direct, p. 91, line 19 – p. 92, line 21; Tr. 3, Brooks direct, p 78, lines 7-9, p. 79, lines 20-24).   In addition to the May, 2005 payment, MEEB's 105 mortgagee made two more payments shortly after receiving MEEB's post-suit communications which included not only the amounts it would have been responsible for under G.L. c. 183A, § 6(c) but all of the special assessments, late charges, and MEEB's attorneys fees and costs for preparing and filing the lawsuits.[1]  MEEB had no permission from McDermott

---

[1]   A payment of $3,015.55 on December 15, 2005 (ex 41) and a payment of $3,545.00 on August 18, 2005 (ex 54).   Although the second payment was made by the mortgagee on unit 105, (Tr. 5, McDermott direct, p. 60, lines 15-21), the payment was applied to McDermott's 104 assessments, (ex x).

for these communications, did not give him copies of the communications or otherwise notify him of same or of the mortgagees' payments, and did not notify the mortgagees that McDermott disputed its attorneys fees and costs.  The only notice that MEEB gave McDermott of these payments was when it sent him the ledgers which showed their application to his account.  The payments were applied to MEEB's attorneys fees contrary to McDermott's directions to Brooks. MEEB deliberately withheld from McDermott the first $3,800.27 payment for over one year by excluding the first page of the ledger it sent to him on October 4, 2005.[1]

17)  Notwithstanding the fact that Pondview refused to communicate with him; that he never received his April checks back; that he knew from his 105 mortgagee of the $3,800.27 payment in May, 2005 (ex 17; Tr. 1, McDermott direct, p. 35, lines 20 – p. 36, line 6) and the $3,015.55 payment in December, 2005 (ex 41), that he had received no statements concerning his assessments other than two affidavits filed in court in the first 104 enforcement lawsuit,[2] and an illegible, incomprehensible ledger MEEB enclosed with the October 4, 2005 pre-suit notices, (exs 25 and 26) which was missing the first page; and that MEEB's aggressive actions in the first 104 enforcement lawsuit[3] had run up legal fees of $5,840.70 by the end of August, 2005[4],

[1] The first accounting that MEEB provided to McDermott which included a credit for the $3,800.27 payment was over one year letter in a ledger included with a letter dated June 23, 2006 sent to him just prior to filing the third 105 lawsuit.  Ex. 40; Tr. 3, Brooks direct, p 79, lines 15 – p. 71, line 5.  A prior ledger MEEB sent to McDermott with its October 4, 2005 letter prior to the second 105 lawsuit did not have an entry crediting the $3,800.27 payment.  Ex 26.  In fact, the ledger was missing the first page entirely, where the credit for the $3,800.27 payment was entered, which was one of the reasons the ledger was incomprehensible.  Compare ledgers at ex's 26 and 40.

[2] An affidavit from Pondview's bookkeeper with an illegible ledger attached filed in August, (ex 84), and an affidavit from a MEEB attorney filed in November, (ex 85),

[3] By the end of August, 2005, the docket sheet for the first 104 enforcement lawsuit, ex 63, shows that in the first 104 lawsuit MEEB filed 1) an application to enter default against Edward Williams, (ex 63, docket no 13); 2) an application to enter default judgment against Edward Williams, (ex 63, docket no. 15) which was allowed after hearing on July 22, 2005, (ex 63, docket nos. 22, 23, 26, and 27); 3) an application to enter default judgment against McDermott, (ex 63, docket no. 16), despite the fact that McDermott had not been previously defaulted and had filed an answer, (ex 63, docket no. 7);  4) a motion to assess damages (ex 63, docket no. 17); 5) a motion for summary judgment (ex 63, docket no 18);  6) an application for issuance of execution, (ex 63, docket 27); 7) a motion to amend the complaint, (ex 63, docket nos 28 and 29); and 8) a motion to vacate the default judgment (ex 63, docket no. 30).

[4] MEEB's invoices for unit 104 show charges of $348 +$790 + $555.70 + $931 + $1,547 + $1,669 = $5,840.70 through August 31, 2005, (ex 23).

14

$9,092.40 by November 8, 2005, (ex 85), and $19,056.70[1] by the end of February, 2006,

McDermott continued to tender payment of more than he had been informed was due for his

monthly assessments for nine months following the first two enforcement lawsuits.   (Ex's 30 and

35). The payments exceeded the amounts he had been notified were due because he wanted

ensure that he would not incur additional costs and legal fees, (Tr. 6, McDermott cross, p 20,

lines 12-24; p 21, lines 10 – p 22, line 11; Ex's 30 and 35).   Directions McDermott wrote on the

checks and in correspondence accompanying same made it clear that the payments were to be

applied only to the current months and were not to be applied to attorneys fees and late charges.

(Ex's 30 and 35).

18)   The payments made toward McDermott's assessments were not applied as he

directed.    McDermott's payments were not applied to current months and some of his first

payment was applied to MEEB's attorneys fees. (Ex's 25, 26, 40, 44, 49,  50, and 76 and ex. 84).

His mortgagees payments were applied to MEEB's attorneys fees.  Id.

19)   MEEB filed multiple enforcement lawsuits to collect the same assessments.  (Ex. 65;

Tr. 4, Brooks cross, p. 25, lines 2 – p. 26, line 6).   It also continued to communicate directly with

McDermott after it knew that he was represented by an attorney when counsel entered an

appearance on his behalf in the two pending enforcement lawsuits for each unit.  (Ex's 63 (docket

for first 104 enforcement lawsuit), p 7, docket no. 112 and 64 (docket for third 105 enforcement

lawsuit), p 5, docket no. 72 and ex's 49, 50, 76).

20)   For over the next three years, MEEB sent monthly invoices to Pondview for its

services,  (Ex 23,  Tr. 2, Brooks direct, p 96, lines 23-25).   Every one of these without adjustment

would eventually appear on the ledgers that MEEB sent to McDermott.  (Compare invoices in ex

---

[1]   MEEB's invoices for unit 104 show charges of $348 +$790 + $555.70 + $931 + $1,547 + $1,669 + $597 + $
        1,526 + $2,702 + $872 + $1,173 + $6,346 = $19,056.70 through February, 2006, (ex 23).

23 with ledgers in ex's 25, 26, 40, 44, 49,  50, and 76 and ex. 84).  McDermott had no other

notice of these charges.  MEEB's invoices[1] show that by the end of August, 2008, MEEB had

charged at least $33,224.[2] for collection services for unit 104 and $30,949.74[3] for collection

services for unit 105 up to June 30, 2007 when Halbich resided there and $20,114.75[4] for

collection services for unit 105 thereafter; and by the end of June, 2009, it had collected

payments of at least $39,441.23[5] from McDermott's 104 mortgagee and at least $35,769.82[6] from

McDermott's 105 mortgagee for a total of $75,211.05.   Brooks claimed that MEEB's total bills

for collection services were $83,552, (Tr. 3, Brooks direct, p 85, line 10 – p. 86, line 1), and that

it had collected $55,581.20 by the time of discovery, (Tr. 3, Brooks direct, p. 83, lines 5-11),

Pondview still owing it money, (Tr. 4, Brooks redirect, p 79, lines 7-20).

21)  From the time that he had first started living at Pondview in 1995, McDermott had

enjoyed living there because it was a very pleasant, friendly place to live, (Tr. 4, McDermott

direct, p. 91, line 7; Tr. 5, McDermott direct, p 7, lines 11 – 15).  He had agreed to buy out his

brother's interest in both units in 2003 after their mother's death so that he could continue to live

there.  From 1995 until the time of his parents' deaths in 2002, he was generally happy and had

an upbeat, happy-go-lucky, do-for everybody kind of personality.  (Tr. 6, Halbich direct, p 61,

lines 1-14; Tr. 6, Testa direct, p 65, lines 13-19).

---

[1]   The invoice for the month of December, 2007 was missing.
[2]   MEEB's invoices for unit 104 show charges of $348 +$790 + $555.70 + $931 + $1,547 + $1,669 + $597 + $
      1,526 + $2,702 + $872 + $1,173 + $6,346 + $1,993 + $38 + $19 + $1,508 + $95 + $138 + $114 + $901 + $0 +
      $281 + 630 + $476 + $410 + $1,380 + $1,204 + $0 + $72 + $968 + $504 + $48 + $576 + $25 + $215 + $50 +
      $111 + $1,601 + $356 + $455 = $33,224.70 through August, 2008, (ex 23).
[3]   MEEB's invoices for unit 105 show charges of $536 + $1,013 + $753.74 + $253 + $0 + $79 + $0 + $1,440 +
      $543 + $146 + $543 + $146 + $186 + $266 + $38 + $0 + $0 + $1,454 + $418 + $665 + $1,486 + $623 + $1,806
      + $648 + $830 + $1,152 + $1,570 + $9,664 + $3,380 + $1,311 = $30,949.70 for charges through June 30, 2007,
      (ex 23).
[4]   MEEB's invoices for unit 105 show charges of $536 + $1,013 + $753.74 + $253 + $0 + $79 + $0 + $1,440 +
      $543 + $146 + $543 + $146 + $186 + $266 + $38 + $0 + $0 + $1,454 + $418 + $665 + $1,486 + $623 + $1,806
      + $648 + $830 + $1,152 + $1,570 + $9,664 + $3,380 + $1,311 + $426.70 + $856 + $411 + $1,644 + $1,896 +
      $589 + $1,716 + $8,536.05 + $712 + $2,537 + $368 + $295 + $128 = $20,114.75 after June 30, 2007, (ex 23).
[5]   $2,226.83 (ex 60) + $34,813.40 (ex 48) +  $2,401 (ex x) =  $39,441.23
[6]   $3,800.27 (ex 17) + $3,015.55 (ex 41) + $3,454.00 (ex 54)  + $25,500.00 (ex 81) = $35,769.82

22)  However he became severely depressed as a result of their passing.  He became

withdrawn and would rarely leave his unit.  (Tr. 6, Testa direct, p 65, lines 20 – p. 66, line 7; Tr.

6, Halbich direct, p 61, line 1-14).  By the late winter/early Spring, 2005,  McDermott's

depression had diminished enough that he became employed for the first time since the death of

his parents, as a general laborer at Testa Corporation.  (Tr. 5, McDermott direct, p 22, line 18 – p

23, line 12; Tr. 6, McDermott cross, p 34, line 7).  At that time he was becoming more outgoing,

sociable, and like his personality prior to his parents' death.  (Tr. 6, Testa direct, p 66, lines 8-18).

23)  The stress caused by MEEB's collection actions caused McDermott to regress back

to his depressed state emotionally.  (Tr. 6, Testa direct, p 68, lines 10-25).  He could not find an

attorney to represent or otherwise advise him for a long time,  (Tr. 5, McDermott direct, p 48,

lines 2-14).  In late summer/early fall, 2005 McDermott became so stressed by MEEB's

collection actions that he quit his job at Testa to concentrate full time on defending himself from

MEEB's actions.   (Tr. 5, McDermott direct, p 47, line 19).  MEEB's collection actions changed

the atmosphere and McDermott's relations with his neihboring unit owners considerable.  They

had become hostile and threatening which further aggravated his feelings of isolation as well as

caused him some fear for his safety.  Tr. 6, McDermott redirect, p 46, line 20 – p. 47, line 25.

The stress and anxiety eventually became so severe that Mcdermott went to Union Hospital

because he thought he was having a heart attack, where he was diagnosed with hypertension and

high blood pressure which he had not suffered from before.  Tr. 5, McDermott direct, p. 76, line

23 – p. 77, line 16.  He became anxious and couldn't sleep and was prescribed valium.  Tr. 5,

McDermott direct, p 89, lines 4 – 20.

24)  On December 11, 2008, McDermott sent to MEEB by first class and certified mail a

demand for relief under G.L. c. 93A.  (Ex 79)  MEEB responded by letter dated January 16, 2009

denying any liability and making no offer of settlement.  (Ex 80)

<div align="center">ARGUMENT</div>

**1.  All of MEEB's collection actions violating the FDCPA were intended to escalate its attorneys fees.**

The mind-numbingly convoluted and confusing manner in which MEEB collected

McDermott's accruing and overdue assessments was abusive and oppressive in violation of 15

U.S.C. § 1692d and unfair and unconscionable in violation of 15 U.S.C. § 1692f.  It inevitably

escalated the litigation costs.  Pondview did not communicate with McDermott about his

accruing assessments, only MEEB did, (F. 9)[1]; MEEB's  communications were not regular

monthly statements but pre-suit notices and pleadings filed in nine enforcement lawsuits (Id);

Pondview continued to collect payments from McDermott while MEEB collected payments from

McDermott's mortgagees (F. 10 and 15) without McDermott's knowledge or consent (F. 16) in

violation of 15 U.S.C. § 1692c(b); and the only statements McDermott ever received showing his

accruing assessments, late charges, attorneys fees, and payments were illegible,

incomprehensible ledgers that MEEB had Pondview prepare for MEEB's pre-suit notices to

McDermott or for affidavits it filed in court. (F. 9, 10 and 15)

The entire process was designed to make it appear that McDermott was receiving

comprehensive information when the reality was that he was left completely in the dark.

McDermott was never notified of the additional monthly assessment in June, 2005 or received

his April checks back,   (F. 9 and 13)  He didn't know from one moment to the other whether any

checks he gave to Pondview would be negotiated or how they would be applied, despite his

---

[1]    "F" refers to the numbered paragraphs under the FACTS section of the Trial Brief starting at page 6, supra.

express directions, or whether he would be accused of withholding payment as was done with his April checks.  (F. 9).  He didn't know from one moment to the next whether any of his mortgagees had made payments without his permission or consent.  (F. 16).  And he had no notice of accruing late charges or attorneys fees other than as they appeared on the ledgers MEEB sent with the pre-suit notices. (F. No. 9), .

The convoluted process also served as a bad faith pretext for MEEB to avoid its obligation under 15 U.S.C. § 1692h to account for and apply payments of McDermott's assessments in accordance with McDermott's directions and not to debts he disputed.  MEEB was well aware of this obligation.  (Tr. 3, Brooks direct, p 41, lines 1-6).  MEEB also knew that McDermott disputed its legal fees.  McDermott's oral communication to Brooks on May 9, 2005, that he disputed the attorneys fees (F. 14) was sufficient notice of the dispute under 15 U.S.C. § 1692h.  Camacho v. Bridgeport Financial Inc., 430 F. 3d 1078, 1080-1081 (9th.Cir.2005).  And McDermott also made it clear in the checks and the accompanying correspondence he gave to Pondview that the payments were to be applied to the current months and not to past due assessments or attorneys fees and late charges.  (F. 17)[1].  It is clear that MEEB carefully contrived to have Pondview collect McDermott's payments, to have the mortgagees' payments made out to Pondview, and to show the application of the payments only on ledgers that it had Pondview prepare for the pre-suit notices and affidavits in order to evade this obligation.  Brooks' testimony that MEEB preferred that associations directly receive payments of debts that MEEB collects "because they get there faster," (Tr. 3, Brooks direct, p 42, lines 4-19),  was disingenuous.

---

[1]   Brooks testimony that MEEB was unaware of McDermott's directions was not credible.  MEEB's invoices evidence that Pondview discussed the June payment with MEEB for nearly an hour, (ex 23, pp 7 and 8), and the August payment for at least ten minutes, (ex 23, pp 14 and 15).

In addition, the ledgers that MEEB had Pondview prepare for its pre-suit notices to McDermott (F. 10) were so illegible and incomprehensible that they clearly violated MEEB's obligation under 15 U.S.C. §§ 1692d, 1692e, and 1692f to be fair and clear in its communications to McDermott concerning his assessments.   Prior to MEEB's engagement, Pondview's  communications to McDermott were in a completely different format and much clearer than the ledgers that it subsequently prepared for communication to McDermott by MEEB.  (F. 15)  Again, by having Pondview prepare these ledgers, MEEB sought to evade its obligation to be fair and clear to McDermott.

The evidence is that MEEB's confusing, conflicting collection procedure was deliberate and that the escalating litigation costs it created were intended.    Pondview relied and acted upon MEEB's advice concerning the collection procedure to follow.  (F 9 and 13),  Moreover, that MEEB orchestrated the collection process it had been engaged to undertake is presumed by law. It has long been recognized in Massachusetts as elsewhere that "the attorney, and not his client, is in charge of litigation" and "[t]he attorney usually determines what steps are to be taken in his client's interest."  Burt v. Gahan 351 Mass. 340, 342-343 (1966).  That presumption is grounded on common sense and by the ethical obligations of lawyers to adequately apprise themselves of the facts in order to fulfill their fiduciary duties to their clients.

However, even if MEEB did not deliberately orchestrate this abusive, unfair, and unconscionable collection process, it is nonetheless strictly liable for the escalation in litigation costs caused thereby because it is strictly liable for all the direct and indirect communications and  actions taken to collect McDermott's assessments, whether by Pondview, McDermott's mortgagees, or anyone else, 15 U.S.C. § 1692a(2) and 15 U.S.C. § 1692a(6).  Sayyed v. Wolpoff & Abramson, 485 F. 3d 226, 233 (4th.Cir.2007) (communications to debtor's attorney are indirect

communications to debtor and therefore held to the same standards of compliance as communications to the debtor); accord Allen v. LaSalle Bank, (3rd.Cir.2011).  This liability is consistent with the liberal construction of the FDCPA which holds debt collectors strictly liable for their actions irrespective of their intent or knowledge, Turner v. JVDB & Associates, Inc., 330 F. 3d 991, 995 (7th.Cir.2003) (debt collector strictly liable for seeking to collect debt that client knew had been discharged in bankruptcy), and with the principle that debt collectors can be held strictly liable vicariously for the acts of others.  Pollice v. National Tax Funding, LP, 225 F. 3d 379, (3td.Cir.2000); Fox v. Citicorp Credit Services, Inc., 15 F. 3d 1507, 1516 (9th.Cir.1994).  MEEB's status as an attorney is irrelevant.  Heintz v. Jenkins, 514 US 291, 295 (1995), ("Congress intended that lawyers be subject to the Act whenever they meet the general 'debt collector' definition,")    MEEB could only avoid liability if it proved  by a preponderance of the evidence that the unfair, abusive collection process was unintentional, that it resulted from bona fide error, and that MEEB maintained "procedures reasonably adapted to avoid" such an abusive, confusing process. 15 U.S.C. § 1692k(c).  This MEEB failed to do.  MEEB made no effort and undertook no measures to prevent the lack of communication, miscommunication, confusion, and misapplication of the payments of McDermott's debts.   (Tr. 2 Brooks direct. p. 75, line 14 – p. 77, line 4, p. 80 , line 14 – p. 82, line 22; Tr. 4, Brooks cross, p. 49, line 8; Tr. 4, Brooks redirect, p 85, lines 12- p. 86, lines 1-5. ).  Moreover, it was MEEB who communicated to McDermott the illegible, incomprehensible ledgers which misapplied the payments of his assessments.  (F. 9, 10, and 15).

    **a.  Further evidence of MEEB's bad faith intention to deceive and confuse were its direct communications to McDermott and to his mortgagees which consistently stated false amounts due for its attorneys fees and which were otherwise vague, ambiguous, confusing, and deceptive.**

As evidenced by its first three extra-judicial communications to McDermott, MEEB consistently stated false amounts due for MEEB's attorneys fees and costs.  Such "false representation[s] of . . . the . . . amount" of MEEB's legal fees obviously violated 15 U.S.C. §§ 1692e(2)(A) and 1692g(a)(1). The first communication that McDermott received from MEEB, the May 2, 2005 letter from Brooks, (ex  21), stated that he owed legal fees of  $1,389 for unit 104 and $1,772 for unit 105.  However, MEEB's own invoices 63879, 64563, and 65684 to Pondview (ex. 23, pp 1, 3, and 5) show that MEEB's legal fees and costs through May 2, 2005 were $1,194 for unit 104 and $1,953 for unit 105.  The second extra-judicial communication McDermott received from MEEB was a letter dated May 17, 2005, from Brooks which stated simply "[e]nclosed please find copies of your current ledgers relative to Unit 104 and 105 at the Pondview Condominium."  (Ex 22).  Enclosed were two faxed copies of ledgers which were not current but dated May 10, 2005 and therefore did not include the late fees for May, 2005 due at the time the May 17 letter was drafted and sent.  Id.  At the bottom of the two ledgers were entries for legal fees typed on by MEEB which contained numerous false statements of the amounts of MEEB's legal fees.  The legal fees for March for both units were added twice.  The typed amounts stated due for "LEGAL THROUGH 5/17/05" were also false according to MEEB's invoice 65684, (Ex 23, p 5), which shows that MEEB's May legal fees and costs through May 17, 2005 for unit 104 were $443.70 not the $317 stated on the ledger and for unit 105 was $566.74, not the $488 stated on the ledger .  Both ledgers also included a typed charge of $150 for a "DISMISSAL FEE" when, as indicated in Brooks' May 2, 2005 letter and as eventually charged, the dismissal fee MEEB charged was $75 per unit, not $150.  (See Ex. 23, p 5).  And both ledgers contained typed charges of $100 for "EST OUTSTANDING SHERIFF BILLS" despite the fact that the sheriffs' fees for both units appear on MEEB's invoices five days

earlier and were $78.74 for unit 105 and $70.70 for unit 104.  (Ex. 23, p 5).  The third extra-judicial correspondence that McDermott received from MEEB were two two pre-suit notices concerning unit 105 dated October 4, 2005.  Ex's 25 and 26.  Included with these were two ledgers which were missing the first page showing the application of the $3,800.27 payment made by McDermott's 105 mortgagee in May, 2005.  The letters stated an amount due as of October 4, 2005 based on legal fees of $95 reflected on the ledgers.  However, MEEB's October 31, 2005 invoice shows MEEB's fees that date to be $377 with another $75 charged later for a title examination ordered that date.  (Ex 23, p. 17)

In addition to stating false amounts due, MEEB's communications to McDermott were consistently vague, ambiguous, misleading, and confusing.  In the May 2, 2005 letter, Brooks falsely inferred that McDermott's checks were not accepted because he had failed to pay legal fees of $1,389 for unit 104 and $1,772 for unit 105 when these amounts were largely charged for preparing, filing, and recording the complaints MEEB filed.[1]  Brooks falsely and confusingly accused McDermott of withholding and not paying his "condominium fees" knowing that McDermott had tendered payment and although the May condominium assessments were due at the time the letter was drafted and sent, the amounts stated which Brooks stated "are due" did not include them.[2]  Compounding the misleading character of the letter was the failure to include copies of the complaints referred to and the failure to include McDermott's tendered April checks, which McDermott never received.

The complaints in the first two enforcement lawsuit were forms that MEEB uses in almost every lawsuit it files, (Tr. 2, Brooks direct, p 73, lines 3-7), and contain virtually identically worded allegations except for such matters as the identification of the properties and

---

[1]   Brooks did not explain that the "Dismissal Fee" of $150 was for MEEB's legal fees as well.

[2]   Stating an amount is due which did not include charges due at the time stated violated 15 U.S.C. § 1692g(a)(1). Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, 214 F. 3d 872, 875 (7th.Cir.2000).

parties.  (Compare ex's 15 and 16).  In particular the first three paragraphs under the section titled "<u>FACTS</u>" in each complaint are identical except for the amounts alleged due.[1]  The first fact paragraph of both complaints stated that McDermott "has been duly assessed common expenses and charges in the amount of [$2,567.37 for unit 104, ex 15, p. 2, para. 5, and $2,694.94 for unit 105, ex 16, p. 2 para 6] (hereinafter 'common expenses'), which have not been paid when due."  Brooks, who signed the complaints, admitted that these amounts included attorneys fees and costs for preparing and filing the complaints, which Brooks knew McDermott had received no notice of, (Tr. 2, Brooks direct, p 60, lines 9- p 61, line 5;  p 61, lines 6-8, 10), and that consequently McDermott had not been assessed and failed to pay when due.  Therefore, the first fact paragraph was a knowingly false statement of the "character . . . [and] legal status" of the debt allegedly due from McDermott in violation of 15 U.S.C. § 1692e(2)(A).  The inclusion of legal fees and costs in the amount alleged due without specifying their inclusion was also a false representation of the "character" of the debt alleged.[2]  The second fact paragraph of both complaints, was ambiguous and confusing because it was unclear whether late fees due at the time the complaint was filed had been included in the first fact paragraph.  The vagueness, ambiguity, and confusion of what was and was not included in the stated amounts due were compounded by the failure to specify the amounts of the different charges, i.e. common expenses, late fees, and attorneys fees, due at the time the complaint was drafted anywhere in the complaint.  The third fact paragraph was simply false.  It stated that the amounts alleged as due had been delinquent "for at least sixty days" and that Pondview had given McDermott notice "of the aforesaid delinquency," again, a clear violation of 15 U.S.C. § 1692e(A)(2)  As Brooks

---

[1]    Paragraphs 5 6 and 7 of the first 104 complaint and paragraphs 5, 7, and 8 of the first 105 complaint.  These paragraphs will be referred to as first fact paragraph, second fact paragraph, and third fact paragraph unless otherwise indicated.

[2]    Brooks testified that they were indicated by the use of the term "charges"

admitted, McDermott had received no notice that the alleged amount was due, and it clearly had

not been delinquent for at least sixty days.

> b. **Further evidence of MEEB's bad faith were its secret communications with McDermott's mortgagees without McDermott's consent or permission in violation of 15 U.S.C. §§ 1692c(b) and 1692(e)(8) which were also also deceptive and misleading concerning the character and legal status of the debt in violation of 15 U.S.C. § 1692(e)(A) and extortive and abusive in violation of 15 U.S.C. §§ 1692d and 1692f.**

McDermott's mortgagees are not on the list of third parties debt collectors are permitted

to communicate with under 15 U.S.C. § 1692c(b).[1]  Although the pre-suit notices to the

mortgagees required under G.L. c. 183A, § 6(c) are likely permissible under 15 U.S.C. § 1692n

because "the protection [they] afford[] any consumer is greater than the protection provided by

[the FDCPA]," the same is obviously not true with respect to secret communications seeking

payments of disputed debts.   Not only did MEEB seek to collect disputed debts from

McDermott's mortgagees without McDermott's knowledge, much less permission, in violation of

1692c(b), it routinely failed to notify the mortgagees that McDermott disputed its attorneys fees

in violation of 15 U.S.C. § 1692e(8).  (F. 16).  These sub rosa communications and payments

added considerably to the overall confusion.  Id.

In addition, it was clear that MEEB was deceptive, misleading, and extortive in its

communications to McDermott's mortgagees in violation of 15 U.S.C. §§ 1692d, 1692e, and

1692f.  The association's lien for the special assessments, late charges, and accruing assessments

after the enforcement lawsuits were never prior to the mortgagees' mortgages, G.L. c. 183A, §

6(c), ¶ 2, nor was the lien for MEEB's attorneys because of MEEB's failure to comply with the

---

[1]   [W]ithout the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.  15 U.S.C. § 1692c(b).

requirement in G.L. c. 183A § 6(c), ¶ 1 that the mortgagees be sent the thirty day notices of intent at least thirty days prior to filing the enforcement lawsuits.  G.L. c. 183A, § 6(c), ¶ 2. MEEB was well aware of this.  Tr. 3, Brooks direct, p 82, lines 17-25.  The principle concern of the mortgagees was the priority portion of the association's lien.  (Ex 46).  However, MEEB never provided the mortgagees with the requested information concerning the amount of the lien prior to the mortgagees' mortgages and always misleadingly responded by referring only to the amount of the lien.  (F. 16; Tr. 3, Brooks, p 82, lines 17-25 and p. 83, lines 1-5).  As a consequence, McDermott's mortgagees always paid the full amount of the lien rather than the amount which was prior to their mortgages.  (Ex's 17, 41, 54, 48, 60,  and 81).

   **c.  Further evidence of MEEB's bad faith intent to escalate litigation costs was its failure to send the thirty day notice of intent to file suit to McDermott's mortgagees at least thirty days prior to filing suit as required by G.L. c. 183A, § 6(c), ¶ 1.**

   There is no question that G.L. c. 183A, § 6(c) requires that a notice of intent to file an enforcement lawsuit be given to the first mortgagee at least thirty days prior to filing the suit. G.L. c. 183A, § 6(c), ¶ 1.  The reason for the notice under the statute is obvious.  Once a mortgagee is notified that an enforcement lawsuit is seriously contemplated, it has thirty days under the statute to stop the incursion of additional attorneys fees and costs by agreeing to make certain payments.  G.L. c. 183A, § 6(c), ¶ 4.  If the notices are not sent as required prior to filing suit, the lien for attorneys fees and costs is not prior to the first mortgage.  Id.  The reason that MEEB never sent the notices as required was also obvious.  MEEB's invoices evidence that almost all of its income was derived from filing and prosecuting the enforcement lawsuits.  Ex. 23.  It earned only a few hundred dollars from the pre-suit notices themselves.  Id.

Although it was not clear from Brooks' testimony, it appears that MEEB's excuse  for failing to send the notices as required was that despite the fact that MEEB knew the name and mailing address of the mortgagees before it filed each of the nine enforcement lawsuits,[1]  it had no obligation to send them the statutory pre-suit notices because the mortgagees had not given the association a separate writing stating their names and mailing addresses as MEEB contends was required by G.L. c. 183A, § 4(5).[2]   MEEB's contention is wrong and not in good faith and doesn't explain why MEEB almost always sent the thirty day notice of intent but never did so at least thirty days prior to suit.

First, G.L. c. 183A, § 6(c) doesn't require any particular method by which a mortgagee must "inform" an association of its name and mailing address.  G.L. c. 183A, § 6(c), ¶ 1.  This is in contrast to the specific method of notice stated in section 6(c), ¶ 6, requring the mortgagee to send notice by first class and certified mail, in order to be entitled to receive from the association a copy of a notice of intent to collect rent.   There is no required method of "informing" the association of the mortgagees name and mailing address stated in G.L. c. 183A, § 6(c), ¶ 1 nor does it refer to G.L. c. 183A, § 4(5) expressly or by implication.  Second, the Massachusetts legislature drafted this general notice provision within the context of the long standing recognition in Massachusetts that recording an instrument in the registry of deeds provides constructive notice, in other words informs the world, of any information in the instrument.  G.L. c. 183, § 4; see General Builders Supply v. Arlington Co-operative Bank, 359 Mass. 691, 697 (1971) (facts concerning mortgage not recorded is not binding on persons who do not have actual knowledge); see Colonial Bank and Trust Company vs. Sheehan, 357 Mass. 239, 242 (1970); G.L. c. 183, § 4; Kahler v. Marshfield, 347 Mass. 514, 517 (1964) (recording of real estate

---

[1]    MEEB did an examination of title at the registry of deeds prior to filing each enforcement lawsuits.   See FP No. ,

[2]    Something Brooks stated that 99% of mortgagees don't do.  Tr 1, Brooks direct, p. 72, lines 6-9

attachment gave constructive notice of same to town).   Under long standing Massachusetts law,

so long as the name and mailing address of the mortgagee has been recorded in the registry of

deeds, the mortgagee has informed the association of same under G.L. c. 183A, § 6(c), ¶ 1.  That

this was the legislature's intention in drafting this notice provision is further evidenced by the

facts that title examination costs are specifically made recoverable when the association has

complied with the section 6(c) pre-suit notice requirements, G.L. c. 183A, § 6(c), ¶ 4, and that a

title examination is  anticipated and required by the overall enforcement lawsuit procedure.  The

enforcement statute, G.L. c. 254, § 5, requires that mortgagees and "attaching creditors" be made

parties to an enforcement lawsuit.  If the association does not in fact know the name and mailing

address of the mortgagee, they are required by that statute to inform themselves of same in good

faith by examining the title at the registry of deeds.  Brooks admitted as much. (Tr. 3, Brooks

direct, p 7, lines 18 – p 8, line 13).

        And third, there is nothing in G.L. c. 183A, § 4(5) itself which suggests that associations

are excused from sending the pre-suit notices when they in fact know the name and mailing

address of the mortgagee, whether as a result of a title examination or otherwise.  One, there's

nothing in G.L. c. 183A, § 4(5) which indicates that a recorded mortgage containing the name

and mailing address of the mortgagee does not qualify as the "writing" required by that section.

And two, G.L. c. 183A, § 4(5) makes it explicitly clear that any reliance by the association on

any writing containing the name and mailing address of the mortgagee must be in good faith.  In

other words, the association must send the notices to the actual name and mailing address of the

mortgagee irrespective of any writing it may have.

        MEEB's bad faith was evidenced by the fact that there is no possible good faith

construction of G.L. c. 183A, § 6(c) which would justify MEEB's procedure of sending out the

thirty day notices of intent at the same time it filed an enforcement lawsuit.  Brooks' testimony

about why MEEB followed this procedure was particularly dissembling and disingenuous.[1]

MEEB's doing so was consistent with its pattern of obfuscation and confusion to appear to be in

compliance with the law[2] while avoiding its actual intent and purpose.  However, even if MEEB

had been in good faith, it is nonetheless strictly liable for any damages caused by its failure to

comply with a law intended to limit litigation costs because such failure was  "conduct the

natural consequence of which is to harrass, oppress or abuse" McDermott, Pondview, and

McDermott's mortgagees "in connection with the collection of a debt," in violation of 15 U.S.C.

§ 1692d and was an "unfair or unconscionable means to collect or attempt to collect any debt" in

violation of  15 U.S.C. § 1692f.  Moreover, the bona fide error rule is unavailable for mistakes of

law.  Jerman v. Carlisle McNellie Rini, Kramer, supra, 130 S.Ct. at 1608 (2010).

   That McDermott was damaged by MEEB's failure to comply with the law is evidenced

by the fact that immediately after the first three enforcement lawsuits on unit 105 were filed,

McDermott's mortgagee did substantially more than they were required to do in order to have the

suit dismissed.[3]   The unit 104 mortgagee had no chance because it received no pre-suit notices

and wasn't made a party to the first 104 enforcement lawsuit until sometime after MEEB had run

up its fees and costs.

   d.  **Further evidence of MEEB's bad faith was its filing multiple lawsuits to
   collect the same debt and its deliberately abusive and oppressive actions in
   continuing to communicate with McDermott when it knew he was represented by an**

---

[1]   See Tr. 1, Brooks direct, p. 79, lines 3-6 "to avoid arguments by counsel on the other side saying: we didn't send
out the notice when we didn't think we had to, we send it out." and Tr. 1, Brooks direct, p. 90, lines 14 – p 91,
line 1 "We don't need to send the notice out, so we wait until the very end of the process to avoid legal fees."

[2]   MEEB's form complaints always claimed that MEEB gave McDermott's mortgagees notice in compliance with
G.L. c. 183A, § 6(c).  See ex. 16, para. 9..

[3]   Under the statute, all that a mortgagee has to do to stop the filing of a suit is promise to pay within sixty days up
to six months of the delinquent annually budgeted common expenses, the reasonable pre-suit attorneys fees and
costs, and pay the ongoing annually budgeted common expenses.  It doesn't have to pay the delinquent or
ongoing special assessments or the late penalties and fines.  McDermott's

**attorney in violation of 15 U.S.C. 1692c.  Moreover, the breathtaking escalation in litigation costs itself was in bad faith.**

In addition, to Brooks' threat to McDermott in their May 9, 2005 converation that he would run up the legal fees and own McDermott's units by the end of the year, MEEB engagaged in numerous abusive and bullying acts all of which were intended to aggravate and confuse McDermott and escalate the litigation costs.   MEEB filed multiple enforcement lawsuits to collect the same assessments.  F. 19.  Brooks' rationale for doing so, to protect the priority lien, was ludicrous.  (Ex. 65; Tr. 4, Brooks cross, p. 25, lines 2 – p. 26, line 6).  Brooks' construction of G.L. c. 183A, § 6(c) would have the legislature intentionally burdening consumers with multiple lawsuits to collect the same debt.  Even if that were the state legislature's intent, it would be prohibited by 15 U.S.C. §§ 1692d and 1692f because it would be inconsistent and less protective of consumers than same.  15 U.S.C. § 1692n.  However, the more rational construction of the legislature's intent in drafting the priority provisions of G.L. c. 183A, § 6(c) was that six months is all the association gets.  The legislature did not anticipate such an abusive consturction of the statute as MEEB asserts.

MEEB also also continued to communicate directly with McDermott after it knew that he was represented by an attorney when counsel entered an appearance on his behalf in the two pending enforcement lawsuits for each unit.  F. 19.  Whatever justification MEEB might think it has for that procedure under the FTC's construction of the statute is as wrong as the FTC's opinion concerning litigation activity overruled in Heintz, supra, Heintz v. Jenkins, 514 US 291 (1995).  Such an action was clearly intended to annoy and aggravate McDermott and an assertaion that MEEB can pretty much do whatever it pleases.

Finally, the sheer rapid escalation of attorneys fees and costs, as Brooks had threatened, had its own intimidating and vicious circle effect.   It was in MEEB's financial interest to create

as much tension and acrimony between McDermott and Pondview as quickly as possible.

MEEB charged its legal fees to Pondview.  Ex. 23; Tr. 2, Brooks direct, p 96, lines 23-25; Tr. 4,

Brooks cross, p 37, line 11 – p 38, line 6.  The higher those fees, the more aggressive Pondview

was likely to become in pursuing McDermott for same which in turn would likely provoke

McDermott in a vicious circle of escalating tension and litigation costs.  There had been no

acrimony or tension between McDermott and Pondview prior to MEEB's involvement.  Tr. 4,

McDermott direct, p. 91, line 7; Tr. 5, McDermott direct, p 7, lines 11 – 15.  Pondview had never

had any problems with McDermott or anyone else in collecting assessments and had been

solvent for at least 15 years before MEEB.  Tr. 6, Halbich direct, p 56, lines 12 – p 57, line 10

and p 57, 23 – p 58, line 8,  The only one who benefited from the extensive litigation against

McDermott was MEEB.   Pondview now owes MEEB approximately $30,000, McDermott's

mortgagees made payments to Pondview which exceeded $70,000, and McDermott has lost both

his units to foreclosure.  Tr. 5, McDermott direct, p 6, line 6 - p 7, line 10.  The quicker MEEB

could commence charging substantial attorneys fees, the better chance it had of touching off an

escalating avalanche of litigation fees and costs.

## DAMAGES

1.  **McDermott is entitled to economic damages as measured by MEEB's unjust
enrichment  disgorge its profits, its attorneys fees, plus the costs it charged, which were the
motivation behind its relentless violations of the FDCPA, as the measure of his economic
damages and he also seeks damages for his severe emotional distress caused by MEEB's
abusive and oppressive collection actions.**

The disgorgement of all of MEEB's fees and costs including amounts still owed by

Pondview, as the appropriate measure of its unjust enrichment resulting from its intentional

violations of the FDCPA and is clearly an available and appropriate remedy under G.L. c. 93A, §

9.

31

> The reasons that disgorgement [of profits] is particularly appropriate in [instances of 'business torts'] is the same for applying it in the consumer unfair and deceptive action. . . . Need and reason combine to support this avenue of recovery, because it will often be difficult to satisfy strictly a conventional tort formula, and because an intending tortfeasor should not be prompted to speculate that his profits might exceed the injured party's losses, thus encouraging commission of the tort. Nor should such a defendant be heard to say that the unjust enrichment remedy is unfairly "punitive" because the plaintiff may recover more than his exact loss, when use of a tort measure might allow the defendant to retain some part of his ill gotten gains. Here, as in other contexts, a plaintiff in proper cases may be permitted alternative routes of recovery.

National Merchandising Corp. v. Leyden, 370 Mass 425, 433 (1976).   That there may be an adequate remedy at law is no bar to a claim for restitution under G.L. c. 93A.  "It has long been the law that where equity jurisdiction is specifically conferred by statute, it is no objection that the plaintiff also has a plain, adequate, and complete remedy at law."  Slaney v. Westwood Auto, Inc. 366 Mass. 688, 700 (1975).  And unjust enrichment has long been recognized in Massachusetts as available and appropriate under G.L. c. 93A, § 9.  Quinton v. Gavin, 64 Mass. App. 792 (2005) (fiduciary ordered to disgorge profits obtained from funds borrowed at below market rates).  Moreover it is clear that the grant of relief available to consumers under G.L. c. 93A, § 9(1)[1] is at least as broad as that given to the Federal Trade Commission ("FTC") under 15 U.S.C. § 53(b) which the federal courts have consistently construed to provide the right to relief in the form of disgorgement of profits for violations of federal consumer protection statutes, including the FDCPA.   FTC v. Check Investors, Inc., 502 F. 3d 159, 166-167 (3rd.Cir.2007); FTC v. Direct Marketing Concepts, Inc., 648 F.Supp.2d 202, 212 (D.Mass.2009), affirmed FTC v. Direct Marketing Concepts, Inc., 624 F.3d 1, 14-15 (2010).

The evidence shows the following with respect to MEEB's attorneys fees and costs. Brooks claimed that MEEB collected $55,581.20 in attorneys fees and costs for services relating

---

[1]   Techmically, the relief sought here is not equitable relief because McDermott does not seek recovery of an identifiable fund.

32

to McDermott, Tr. 3, Brooks direct, p. 83, lines 5-11, and that Pondview still owed it money, Tr. 4, Brooks redirect, p 79, lines 7-20, its total bills for such services being $83,552, Tr. 3, Brooks direct, p 85, line 10 – p. 86, line 1.   MEEB's invoices[1] show the following relative to MEEB's attorneys fees and costs: $32,413.70 for services relating to unit 104 up to June 30, 2008[2]; $30,260.74 for services relating to unit 105 up to June 30, 2007 when Halbich resided there, and $20,114.75 thereafter.  McDermott's 105 mortgagee made payments of $3,800.27, $3,015.55, $3,454, $2,401.68, and $25,500 = $38,171.50 and   McDermott's 104 mortgagee made payments of $2,226.83 and $34,813.40 = $37,040.23 for total payments of $75,211.73 of which some portion was for common expenses, special assessments, and late fees and fines in addition to MEEB's attorneys fees and costs.

All of MEEB's attorneys fees and costs, including those yet unpaid by Pondview, is the appropriate measure of the disgorgement of its profits because the proper measure of damages for recovery under unjust enrichment[3] is "not less than the market value of the benefits wrongfully obtained,"[4]  Restatement (Second) of Torts, § 51(2).  This includes the fees charged

---

[1]   The invoice for the month of December, 2007 was missing.

[2]   Although the invoices in evidence run through August, 2009 (with several months missing), the June 30, 2008 date was chosen because after that time the invoices lose their continuity making it nearly impossible to understand how attorneys fees were accounted for.  Up to that time, the attorneys fees and costs for both units 105 and 104 appeared on the same invoice.  Ex 23, pp. 1- 93.  The June 30, 2008 invoice, No. 105348 shows a total balance due of $72,982.99.  ex 23, p. 93.  This after showing payments from March, 2005 through June, 2008 totaling $16,432.20.  Starting in July, 2008, however, there were different invoices for each unit and the July 31, 2008 invoice for unit 104 has a starting balance of $0, ex 23, p. 94, invoice 106411, while the entire previous balance for both units was shifted to unit 105, p. 95, invoice 106412.  The last invoice for unit 105 dated August 31, 2009, ex 23, p. 114, shows a balance due of $31,740.26 which was obviously for both units notwithstanding the odd accounting of the charges reflected in the invoices.

[3]   MEEB's actions tortiously interefered with McDermott's relations with both Pondview and with his mortgagees by "causing [McDermott's] performance to be more expensive or burdensome." Restatement (Second) of Torts, § 766A; Shafir v. Steele, 431 Mass. 365, 369-371 (2000) (defendant liable to plaintiff for improper and intentional acts causing plaintiff to terminate her contract with her bank); Gouin v. Gouin, 249 F. Supp. 2d. 62, 74 (D.Mass.2003)

[4]   This is so even if the benefits wrongfully obtained exceed the provable loss because "[o]nly in this way can we ensure that an unfair competitor will not be encouraged to proceed with his unfair methods in the hope 'that his profits might exceed the injured party's losses.'" Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 170 (1979) (action involving business tort of misappropriation of trade secrets) quoting National Merchandising Corp. v. Leyden, supra 370 Mass at 433.  Only a reasonable approximation of the gain is required in order to recover. "Residual risk of uncertainty in calculating net profit is assigned to the wrongdoer." Restatement (Second) of

for collecting the assessments for unit 105 when McDermott rented it to Halbich because McDermott acquired both units in order to be able to continue to live at Pondview, a purpose which is "primarily for personal, family, or household purposes" under the FDCPA. Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, 214 F. 3d 872 (7th.Cir.2000) (it is the purpose for acquiring the condominium unit which determines whether it is a consumer debt under the FDCPA); see Ladick v. Van Gemert, 146 F.3d 1205, 1206 (10th Cir. 1998).[1]

**2. In addition to economic damages, McDermott is entitled to damages for emotional distress under the FDCPA.**

In addition to any economic loss, the plaintiff is also entitled to recover for his emotional and psychological distress caused by MEEB's violations of the FDCPAactions. In re Hart, 246 BR 709, 730 (Bankr.D.Mass.2000). Considerations of state tort elements of intentional infliction of emotional distress are generally not applicable. Id. This is consistent with long standing Massachusetts law, that proof of the elements of the independent tort of intentional infliction of emotional distress is not required when the emotional distress arises from an underlying tort, such as abuse of process. City of Salem v. M.C.A.D., 44 Mass. App. 627, 645-646 (1998) (damages for emotional distress recoverable for employment discrimination in violation of G.L. c. 151B without physical injury or psychiatric evidence - testimony of plaintiff that discriminatory employment decision "left him 'stressed ... out' and 'basically hurting' was sufficient to support award of $100,000 in damages for emotional distress); [2] "[T]he general rule

---

Torts, § 51(4)(d).

[1]  The regulations implementing parallel provisions of 15 U.S.C. § 1601-1651, the Truth in Lending Act, ("TILA") are clear that when the transaction involves property, some of which will be occupied and some of which will be rented, there is a presumption the transaction is not business-purpose if there are less than three units and the transaction involves the acquisition of the property. 12 C.F.R. § 226 Supp. 1, § 226.3(a)(4) (2005). Similarly, Massachusetts courts have held that an owner-occupant of a multi-family residence is not engaged in commerce even though they rent some of the units. Young vs. Patukonis, 24 Mass. App. Ct. 907, 910 (1987) ("Young, as an owner-occupant of a three-family building, whose primary objective is personal, is not engaged in commerce under G. L. c. 93A.").

[2]  American Velodur Metal, Inc. v. Schinabeck, 20 Mass. App. Ct. 460. 470-471 (1985); ("There seems to us to be a clear distinction between (a) mental and emotional distress caused by the commission of an independent and

applicable to [such damages] is that 'a wrongdoer is responsible for the combined effects of the harmful results of his wrongful act and a preexisting disease or condition.'[1]  The measure of the recovery should be the amount which will "reasonably will make the [plaintiff] whole."[2]

The evidence shows that from 1995 when McDermott started living at Pondview, he had an outgoing and sociable personality and enjoyed and living there because it was a friendly place to live.  (F. 21).  When his parents passed in 2002 he became depressed, but by early 2005 he was beginning to come out of his depression and become more like his old self and became employed for the first time since their deaths.  (F. 21-22).  However, MEEB's collection actions caused him substantial stress because they threatened his home and created substantial hostility and tension between himself and his neighbors.  (F. 23).  He became depressed again, stopped socializing, became isolated, became anxious, couldn't sleep, was prescribed valium, and started to suffer from hypertension.  (F. 23).  The stress became so bad he quit his job and has become homeless, living as a tenant at sufferance in a condominium which has become an unfriendly, uncomfortable, hostile place to live.   F. 1 and 23.

McDermott has lived with the stress and acrimony engendered by MEEB's actions since at least May 9, 2011 when he had his first conversation with Brooks.  It will be over six years before a judgment is awarded in this action.  Courts have often used a per diem approach to calculate the daily stress and suffering endured by an individual as a result of another's wrongdoing.  Blake v. Commisioner of Correction, 403 Mass. 764, 769 (1989) (damages for

_____

separate tort recognized at common law, and (b) distress constituting the separate tort [of intentional infliction of emotional distress]." ); accord  Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 648 (2010) (no need to show  medical or psychiatric treatment or physical injury to prove emotional distress as a result of abuse of process);  Restatement (Second) of Torts, § 905 comment c (1979); see Homesavers Council of Greenfield Gardens, Inc. v. Sanchez, 70 Mass. App. 453, 458 (2007); Burke v. Rivo, 406 Mass. 764, 768 (1990) (wrongful birth); Labonte v. Hutchins & Wheeler, 424 Mass. 813, 824 (1997) (employment discrimination); 

[1]   Varelakisv. Etterman, 4 Mass. App. Ct. 841, 841 (1976).

[2]   Kattar v. Demoulas, 433 Mass. 1, 15 (2000).

emotional distress for time spent in segregation as cruel and unusual punishment)("a per diem assessment is 'the most sensible and satisfactory system a Court can use in the calculation of damages' in these cases." quoting <u>Mack v. Johnson</u>, 430 F. Supp. 1139, 1151 (E.D.Penn. 1977). The stress on McDermott has been severe, resulting in physical manifestations, a destroyed social community, the loss of his home, his last connection with his parents, his being treated as a pariah and open hostility, and the anxiety attendant to homelessness.   Therefore, McDermott seeks damages for his emotional distress in the amount of $100  per day for an estimated 2,300 days from the date of his conversation with Brooks to the date of judgment, for a total of $230,000.  .

**3.  McDermott is entitled to his reasonable attorneys fees and up to three times and no less than two times his actual damages and his reasonable attorneys fees under G.L. c. 93A.**

On December 11, 2008, McDermott sent to MEEB by first class and certified mail a demand for relief under G.L. c. 93A.  (F. 24).  The demand more than adequately "define[d] the injury suffered and the relief demanded in a manner that provide[d] [MEEB] with `an opportunity to review the facts and the law involved to see if the requested relief should be granted or denied' and enables him to make `a reasonable tender of settlement.'"  <u>Simas v. House of Cabinets, Inc.</u>, 53 Mass. App. Ct. 131, 139 (2001).  MEEB knew or should have known that it had violated the FDCPA in its collection actions against McDermott but refused to tender any offer of settlement.  (F. 24).  Accordingly, McDermott seeks judgment for his reasonable attorneys fees and costs to be determined by separate motion/hearing after judgment.  In addition, because MEEB's actions were willful and knowing violations of the FDCPA or because its refusal to tender any relief when it knew or should have known that its actions violated the FDCPA, McDermott seeks up to three but not less than two times his actual damages.

McDermott also seeks pre-judgment interest at 12%.  Tobin v. Liberty Mut. Ins. Co., 553 F. 3d 121, 147 (1st.Cir.2009)

Conclusion

Wherefore, the plaintiff William M. McDermott respectfully requests the entry of judgment against the defendant Marcus, Errico, Emmer & Brooks, P.C. for repeated willful violations of the FDCPA and G.L. c. 93A in the amounts of 1) $1,000 statutory damages; 2) $83,552.00 in economic damages; 3) $230,000 in emotional distress damages; 4) three times his actual damages of $314,552; 5) his reasonable attorneys fees as the court may determine after a separate hearing/proceeding; 6) 12% prejudment interest; and such further relief as the court deems just.

<div style="margin-left:40%">

Respectfully submitted,
WILLIAM M. McDERMOTT
By his attorney,

/s/ Philip H. Cahalin
Philip H. Cahalin, Esq., BBO # 545538
85 Exchange Street, Suite 206
Lynn, MA 01901
t. 781.598.3130
f. 781.598.3131
pcahalin@cahalinlaw.com
</div>

CERTIFICATE OF SERVICE

I, Philip Cahalin, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 25th day of April, 2011.

/s/ Philip H. Cahalin
Philip H. Cahalin, Esq., BBO #545538