UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM M. MCDERMOTT,
        Plaintiff,


        v.                                    CIVIL ACTION NO.
                                              09-10159-MBB

MARCUS, ERRICO, EMMER & BROOKS, P.C.,
        Defendant.

## MEMORANDUM AND ORDER

### November 20, 2012

**BOWLER, U.S.M.J.**

Plaintiff William M. McDermott ("plaintiff"), a resident of the Pondview condominiums in Lynn, Massachusetts, filed this action alleging improper debt collection activities against defendant Marcus, Errico, Emmer & Brooks, P.C. ("MEEB" or "defendant"), a professional corporation of attorneys located in Braintree, Massachusetts.  The two count verified complaint sets out violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 ("section 1692"), (Count One) and Massachusetts General Laws chapter 93A (Count Two).

The dispute involves MEEB's efforts, purportedly as early as the fall of 2004, to collect condominium, loan payback and late fees as well as attorney's fees from plaintiff on behalf of MEEB's client, the Pondview Condominium Trust ("Pondview").  Created under a September 1986 Declaration of Trust (Ex. B),

Pondview is the governing body of the Pondview condominiums and consists of a group of trustees.  The Declaration of Trust (Ex. B) along with the Master Deed (Ex. C) are recorded in the Essex South Registry of Deeds.

At the conclusion of plaintiff's case, defendant also rested and at the same time made a motion for judgment on partial findings under Rule 52(c), Fed. R. Civ. P. ("Rule 52(c)").[1] (Docket Entry # 46).  This court took the motion under advisement thereby reserving a ruling as allowed under the terms of the rule.  See International Union of Operating Engineers, Local Union 103 v. Indiana Construction Corp., 13 F.3d 253, 257 (7th Cir. 1994).  The request for a judgment on *partial* findings is denied because judgment on the entire record is appropriate.  See, e.g., W.L. Gore & Associates, Inc. v. Medtronic, Inc., 2012 WL 2308651, *10 (E.D.Va. June 18, 2012) (denying Rule 52(c) motion after initially reserving ruling because court "now concludes that the best course of action is to render a judgment based on all the evidence, testimony, and applicable law"); Warner Chilcott Laboratories Ireland Ltd. v. Impax Laboratories, Inc., 2012 WL 1551709, *7 (D.N.J. April 30) (adhering to same course of action).  This opinion thus constitutes the court's findings of fact and conclusions of law under Rule 52(a), Fed. R.

---

[1]  With one exception, defendant repeats and raises the same issues in a post trial brief.

Civ. P. <u>See</u>, <u>e.g.</u>, <u>W.L. Gore & Associates, Inc. v. Medtronic, Inc.</u>, 2012 WL 2308651, at *1 & *10 (denying Rule 52(c) motion and issuing Rule 52(a) findings and conclusions).

The parties filed post trial briefs.  (Docket Entry ## 60 & 61).  The merits based on the entire record are therefore ripe for review.

FACTUAL BACKGROUND[2]

The September 1986 Declaration of Trust gives the trustees the authority to determine the assessment for each fiscal year and the unit owners' "respective shares of such assessment, according to their percentages of interest in the common areas and facilities."[3]  (Ex. B, Art. V, § 5.3(B)).  The Declaration of Trust allows for monthly payment of the assessment and, "[i]f not paid when due, the amount . . . *shall constitute a lien* on the unit." (Ex. B, Art. V, § 5.3(B)) (emphasis added).[4]  Under both

---

[2]  The factual background sets out the facts found by this court and Pondview's authority under certain documents and statutes.  A number of footnotes include legal rulings in addition to those made in the discussion section.  The discussion section primarily addresses the legal arguments set out in plaintiff's post trial brief.

[3]  Massachusetts General Laws chapter 183A ("chapter 183A"), the state condominium statute, requires Pondview to assess the common expenses "against all units in accordance with their respective percentages of undivided interest in the common areas and facilities."  Mass. Gen. L. ch. 183A, § 6(a)(i).

[4]  Chapter 183A similarly allows Pondview to assess an unpaid expense incurred by Pondview because of a unit owner's failure to abide by the requirements of chapter 183A or a master deed or trust "against the unit owner and such assessment shall

chapter 183A and the Declaration of Trust, Pondview has the
ability and the authority to assess attorney's fees, late charges
and costs of collection against the unit owner.  See Mass. Gen.
L. ch. 183A, § 6(a)(ii) & 6(b); (Ex. B, Art. V, § 5.3(C)).  The
Master Deed likewise provides that:

> The Trustees in their discretion may enforce collection of
> unpaid assessments for common expenses plus interest thereof
> by enforcing the lien by a court action or by other lawful
> means on account of which there shall be added to the amount
> due and payable the reasonable costs of such collection
> including reasonable attorney fees.

(Ex. B, Art. V, § 5.3(C)).

In 1986, plaintiff's parents purchased unit 104, a two
bedroom unit, at the Pondview condominiums.  In 1995, they bought
unit 105, a one bedroom unit across the hall with the
understanding that they would pay the mortgage and that plaintiff
would live in the unit and pay the costs associated with it.  The
assessed values of unit 104 between 2004 and 2011 determined by
the City of Lynn range from a low of $138,700.00 in 2011 to a
high of $214,900.00 in 2006.  (Ex. 86).[5]  The assessed values of
unit 105 between 2004 and 2011 range from a low of $115,500.00 in
2011, to a high of $167,900.00 in 2006.  (Ex. 86).

---

constitute a lien against the unit . . .."  Mass. Gen. L. ch.
183A, § 6(a)(ii).

[5]  After hearing MEEB's position objecting to the admission
of exhibit 86, this court admitted the assessments "solely for
the purpose of setting forth the appraised value."  (Docket Entry
# 57, p. 82).

4

Plaintiff, who was 52 years old at the time of trial and had attended Northeastern University for two years, moved into unit 105 in 1995 and resided there until 2001.  The social environment at the complex was "[v]ery friendly" in 1995.  (Tr. IV, p. 91).[6] During this time period, plaintiff did not fall behind in the condominium charges for the unit.

Sandra Halbich ("Halbich"), a tenant at the complex living in another unit, moved into unit 105 in 2001 when plaintiff left the complex.  In 2002, plaintiff returned to Pondview and moved into unit 104 with his parents.  Plaintiff paid the assessments for both units in 2002.  (Tr. V, pp. 7-8).  In July 2002, his father died of liver cancer and his mother passed away a few months later in December.  In November 2002, plaintiff's mother deeded unit 104 to plaintiff and his brother, Edward Williams ("Williams").

Plaintiff was close to his parents and became extremely depressed as a result of their deaths.  He also experienced the stress of a strained relationship with Williams.  Halbich described plaintiff as "very disturbed."  (Tr. VI, p. 55).  In fact, from 2002 to 2005, plaintiff "became very inward, didn't want to do anything" or talk to anyone.  (Tr. VI, pp. 61-62).

Shortly after his parents' deaths, plaintiff and Halbich

_____

[6]  "Tr." refers to the trial transcript on the applicable day.  At times, the trial transcript is identified by docket entry number.

switched units.  Plaintiff began residing in unit 105 and
Halbich, as a tenant, lived in unit 104.  Halbich eventually
moved back into unit 105 in 2005 and paid rent.  (Tr. VI, pp. 25
& 55-56).

In March 2003, when plaintiff was living in unit 105, he
took out a mortgage for unit 105.  Plaintiff took out the
mortgage "when [he] got title to the units."  (Tr. VI, p. 7).
The property description in the mortgage describes the unit as
conveyed to plaintiff by Richard Sideri ("Sideri").[7]  The
description reads that unit 105 is "the same premises conveyed to
the Mortgagor(s) by deed of Richard Sideri to be recorded
herewith."[8]  (Ex. 27).  This court therefore draws the reasonable
inference that plaintiff obtained title to unit 105 when he took
out the mortgage for the unit in March 2003.  Williams deeded
plaintiff unit 104 as well as a property in Florida around this
time period.

The property description in the unit 105 mortgage states
that the property "is intended for residential purposes only."
(Ex. 27).  Similarly, the occupancy clause of the mortgage
requires plaintiff to occupy the property as his principal
residence for a one year period.  Plaintiff's purpose for

---

[7]  The relationship between plaintiff and Sideri is not
clear.  There was no testimony about Sideri at the trial.

[8]  The mortgage defines plaintiff as the borrower as well as
the mortgagor under a security instrument.

becoming the owner of both units at the time was "[t]o have a place to live." (Tr. V, pp. 9-10).

The mortgage included a condominium rider. The rider allowed the lender to pay condominium dues and assessments in the event the borrower, plaintiff, did not pay them. Any such "amounts disbursed by Lender . . . shall become additional debt of Borrower secured by the Security Instrument." (Ex. 27).

In 2003, plaintiff, who was employed at the time, paid the condominium assessments for units 104 and 105 without falling behind. Although continuing to receive rent from Halbich, plaintiff was not employed in 2004 and in July and August of 2004 he fell behind in the payment of condominium fees, late fees and loan payback charges for both units. (Ex. 1 & 2). The loan payback charge was either part of a special assessment or a line item in the budget.

Several years earlier, Pondview instituted a policy imposing a $25.00 late fee for condominium fees received after the 15th of each month. After three consecutive months of nonpayment, Pondview's stated policy was to undertake legal action against the unit owner in "Small Claims Court." (Ex. 1-3). Because the complex had only 19 units, plaintiff's monthly payments amounted to almost 10% of the incoming fees for the complex.

In September 2004, "the four trustees for the building"[9]
knocked on plaintiff's door at unit 104.  (Tr. V, p. 10).  A
discussion took place between the trustees and plaintiff
regarding "[p]ayment on both units" and the trustees "presented
[plaintiff] with a statement for both units."  (Tr. V, pp. 11-
12).  As a result of this discussion, the group came to an
agreement that plaintiff would pay two months of condominium,
loan payback and condominium late fees for unit 105 by September
22, 2004.  There was no agreement that such payments would make
plaintiff current.  Rather, consistent with a September 16, 2004
letter, the agreement was that Pondview would file suit unless
plaintiff made the above payment by September 22, 2004.  The
letter from Dawn-marie Bailey ("Bailey"),[10] Pondview's bookeeper,
to plaintiff lists the delinquent condominium, loan payback and
condominium late fees for unit 105.  It does not include late
fees for the loan payback charges.  The letter then sets out the
agreement for plaintiff to pay $393.24, a figure that breaks down
to exactly two months of condominium fees, loan payback charges
and condominium late fees for unit 105.  Plaintiff testified that

---

[9]  The trustees at the time were Mary Felice, Betty Jo
Morrison, Joanne Vischetti ("Vischetti"), who has since died, and
Barbara Mann.  Plaintiff felt uncomfortable living at Pondview in
part because of the environment Vischetti caused as opposed to
misconduct, if any, on the part of MEEB.

[10]  Correspondence in the record spells Bailey's name as
Dawn-marie Bailey.  Trial transcripts spell the name as Dawn-
Marie Bailey.

the letter embodied his understanding of the agreement.

Upon receiving the September 16, 2004 letter and on or before September 22, 2004, plaintiff paid the condominium fees, the loan payback charges and the condominium late fees set out in the letter for unit 105.  He also paid these charges for unit 104.  Plaintiff erroneously believed he had brought "both units up to date" (Tr. V, p. 14) even though he had not paid the late fees for the loan payback charges.  The September 16, 2004 letter did not identify overdue late fees for nonpayment of the loan payback charges.  Ledgers show a continued nonpayment of the late fees for loan payback charges.  Pondview, for its part, did not file suit until March 2005 and it did not file suit to recover charges contained in the September 2004 letter.  Finally, there was no agreement between Pondview and plaintiff that would encompass future delinquent fees or would bar Pondview from filing suit for delinquent charges not included in the September 16, 2004 letter.

In the fall, Pondview was considering changing the attorney it had been using since 1995.  On November 24, 2004, a member of MEEB sent Vischetti documentation about the firm.  Plaintiff remembers seeing the documentation near the end of November 2004.  Pondview did not engage, become a client or in any other manner employ MEEB until March 2005.

Meanwhile, plaintiff incurred late fees for October and fell

further behind in December on payments for unit 105.  A December
16, 2004 letter from Bailey shows delinquent charges totaling
$346.62 for unit 105.[11]  Unlike the charges in the July and
September letters, the charges in the December 2004 letter
included late fees on the loan payback charges for July through
October for unit 105.  Pondview had the ability to impose such
late fees.  <u>See</u> Mass. Gen. L. ch. 183A, § 6.[12]  MEEB was not
involved in the decision to impose a $25.00 charge for delinquent
loan payback charges or to change any policy to impose late fees.
Plaintiff did not agree with the fees and refused to pay them.[13]

———————————————

[11]  Although the letter is addressed to plaintiff at a unit
104 address, the amounts in the body of the letter set out the
condominium fee for unit 105 as opposed to unit 104.  The amounts
also correspond to the amounts in a ledger for unit 105.  (Ex.
13.

[12]  The Master Deed submitted Pondview to the "provisions of
Chapter 183A."  (Ex. C, p. 1); <u>see</u> Mass. Gen. L. ch. 183A, § 1
(defining "Master deed" as "the instrument by which the
condominium is submitted to the provisions of this chapter").
The Declaration of Trust grants the trustees the power "to
exercise all of the powers of the 'organization of unit owners'
pursuant to Massachusetts General Laws, Chapter 183A."  (Ex. B,
Art. III, § 3.6).  Under section six of chapter 183A, "The
organization of unit owners may . . . assess any fees,
attorneys' fees [and] late charges . . . against the unit owner."
Mass. Gen. L. ch. 183A, § 6(a)(ii).

[13]  Massachusetts law does not condone plaintiff's decision.
"[A] unit owner in a condominium may not challenge a common
expense assessment by refusing to pay it."  <u>Blood v. Edgar's,
Inc.</u>, 632 N.E.2d 419, 421 (Mass.App.Ct. 1994).  Instead,
an aggrieved unit owner "should timely pay-under protest-the
common expense assessment" and may thereafter seek "a judicial
determination of the legality of the assessment."  <u>Id.</u> at 421-
422.

The remaining charges noted in the December 2004 letter for unit 105 consisted of October late fees on the October condominium fee and the October loan payback charge, the December condominium fee ($155.04), the December loan payback charge ($16.58) and two $25.00 December late fees for these items. Plaintiff did not pay these unit 105 fees ($346.62) which Pondview then carried over to the next year.

Pondview also carried over into 2005 the unpaid charges for unit 104 ($380.33). These charges included four $25.00 late fees for late payments of the loan payback charges for July through October, the December condominium fee ($188.75), the December loan payback charge ($16.58) and two $25.00 December late fees for these items.

The December letter repeats the policy at Pondview to charge a $25.00 late fee charge for any payments received after the 15th of the month and to file suit after three consecutive months of nonpayment. The letter also notes that, "The Association survives and pays its bills only through the collection of its condominium fees." (Ex. 4). Pondview remained solvent from 1992 until 2005. During this time period, Pondview filed two unrelated lawsuits to collect condominium assessments.

Plaintiff's failure to pay condominium charges for both

units continued in 2005.[14]   Drawing reasonable inferences from the
record, until sending an April 21, 2005 letter, plaintiff made it
clear to Pondview that he would not pay the late fees for the
loan payback charges for both units for the July to September
2004 period, an amount that totaled $150.00.   Plaintiff, who
remained emotionally distraught as a result of his parents'
deaths, decided not to pay the late fees because he disagreed
with them.   By the end of March 2005, plaintiff had not paid
condominium fees, loan payback charges and late fees for these
two items for January, February and March for both units.[15]
Plaintiff's unilateral decision not to pay these late fees led to
Pondview's decision to file suit.

      It was not until around March 23, 2005, that Pondview hired
MEEB as its attorney.   On March 23, 2005, MEEB sent plaintiff,
who was still living in unit 104, a letter by certified and first
class mail notifying him that he owed Pondview the accurate
amount of $1,495.61 on unit 104 "through the date of this

---

      [14]   The condominium fees for each unit increased from
$188.75 to $215.18 for unit 104 and from $155.04 to $176.75 for
unit 105.

      [15]   Plaintiff testified that he sent a letter to Bailey in
January 2005 with checks in an amount that he did not identify
except that they did not include amounts for the July through
October 2004 late fees.   Plaintiff further testified that he did
not pay the February and March 2005 assessments because he
believed Pondview would not cash his checks upon advice of
counsel.   This self serving testimony is not credible.   Moreover,
MEEB was not involved with Pondview until on or about March 23,
2005.

12

letter."[16]  (Ex. 8).  Richard E. Brooks, Esq. ("Brooks"), a
principal of MEEB, wrote and signed the letter.  The letter is
addressed to Michael McDermott.  Plaintiff's full name is William
Michael McDermott.

The letter informed plaintiff he was responsible for
Pondview's "collection costs, including its attorney's fees," and
that "the amount stated" included "those costs which" Pondview
has incurred.  The letter enclosed a ledger that MEEB received
from Pondview for unit 104 listing outstanding charges that
totaled $1,225.61.[17]  The remaining amount was attorney's fees
Pondview owed MEEB consisting of $195.00 to draft the letter,
order a title search and review the examiner's report and $75.00
for the examiner's fee.  The letter explained that certain
"amounts are at least sixty days overdue."[18]  (Ex. 8).

---

[16]  Plaintiff's testimony that he did not receive the letter
is not credible.

[17]  The letter refers to "copy enclosed" of the
condominiums's records in the first paragraph as well as an
"enclosure" below and to the left of the signature line.  In
light of such evidence, this court finds that it included the
ledger.

[18]  Section six of chapter 183A imposes a requirement on a
condominium association such as Pondview to send a so called 60
day letter to the owner of a unit when any portion of a unit
owner's share of common expenses is delinquent for at least 60
days ("60 day letter" or "60 day delinquency letter").  Section
six also requires Pondview to send the first mortgagee a 60 day
letter and a notice 30 days in advance of filing suit of its
intention to file suit ("30 day notice letter") "provided that
the first mortgagee has informed the condominium association of
its name and mailing address."  Mass. Gen. L. ch. 183A, § 6(c).

MEEB sent plaintiff a second letter dated March 23, 2005, again addressed to Michael McDermott, by certified and first class mail notifying him of the delinquency on the unit 105 account.  Plaintiff also received this letter within a few days of its date.  The letter advised him of Pondview's intent to collect rent directly from the tenant occupying unit 105 and that the Massachusetts Condominium Act allowed the direct collection from his tenant.[19]  The letter, which included an attached ledger MEEB received from Pondview, set out the amount plaintiff owed on unit 105 ($1,431.61) as of the March 23, 2005 date and, in accordance with chapter 183A, that certain amounts "are at least twenty-five days overdue."  (Ex. 9).

By the end of March 2005, MEEB received the result of a title search on unit 105.  The search uncovered Williams as another owner and, drawing reasonable inferences from the record, plaintiff's name as William M. McDermott.  Accordingly, in order to comply with chapter 183A, MEEB sent plaintiff two more letters by certified and first class mail on March 31, 2005, similar to the March 23, 2005 letters, although addressed to William M. McDermott as opposed to Michael McDermott and Edward F. Williams. The March 31, 2005 letter notifying plaintiff of Pondview's

---

[19]  The relevant provision of section six of chapter 183A gives Pondview the ability to collect rent directly from the tenant where, as here, the unit owner fails to pay common expenses for at least 25 days.  See Mass. Gen. L. ch. 183A, § 6.

intent to collect rent directly from the unit 105 tenant set out
an amount due and owing on unit 105 ($1,689.61) as of March 31,
2005.[20]  In accordance with MEEB's office policy, the March 31,
2005 letter notifying plaintiff that he owed Pondview $1,545.61
on unit 104 as of March 31, 2005, attached a statement or ledger
identifying the fees and charges.[21]  The letter accurately stated
that certain of the "amounts are at least sixty days overdue."
(Ex. 5).

Both the March 23 and 31, 2005 letters informed plaintiff
that he could telephone MEEB if he had any questions.  (Ex. 5, 8
& 9).  Likewise, the majority of the other notices of intent to
collect rent and the 60 day letters advised plaintiff to
telephone MEEB if he had any questions.  (Ex. 25, 40, 44, 49 &
50).

---

[20]  The fact that plaintiff received this letter on or after
April 1, 2005, when the April assessment was due would not
mislead or confuse the least sophisticated consumer that the
amount included the April assessment.  The short and simple
letter set out the amount due "as of March 31, 2005," the date of
the letter, and advised the recipient that "the amount due on the
day you pay may be greater than this stated amount."  (Ex. 5).
The same ruling and reasoning applies to the other notices of
intent to collect rent letters.

[21]  The March 31, 2005 letter for unit 104 submitted at
trial did not include the ledger.  MEEB's files included "a draft
of the statement with the letter."  (Tr. I, pp. 46-47).  The
ledger or statement was more than likely misplaced during related
litigation in state court.  Plaintiff's self serving testimony
that he did not receive the March 31, 2005 letters is further
discredited by the fact that MEEB sent the letters by certified
and first class mail and that plaintiff resided at the unit 104
address noted in the letters at this point in time.

The March 23 and 31, 2005 letters also advised plaintiff that he was responsible for "the Condominium's collection costs." (Ex. 5, 8, 9 & 29).  In addition, each letter accurately and unambiguously stated that, "Because of common expense assessments . . . and other charges that may become due, including additional attorney's fees and costs, the amount due on the day you pay may be greater than this stated amount."  (Ex. 5, 8, 9 & 29).  The letters also stated in a straight forward manner that, "the amount stated in this letter includes those costs," which the previous sentence defined as including attorney's fees.[22]  (Ex. 5, 8, 9 & 29).

The March 23 and 31, 2005 letters relative to unit 104 also informed plaintiff that certain amounts were overdue by at least 60 days.  The March 23 and 31, 2005 letters relative to both units all contained a notice of important rights required by the FDCPA.  The notice reads as follows:

> ***You have thirty days after you receive this letter to dispute the validity of the debt, or any part of it.[23]  If you don't dispute it within that period, we will assume that it's valid.  If you do dispute it–by notifying us in writing to this effect–we will obtain and mail you verification of***

---

[22]  The least sophisticated consumer would understand that the stated amounts included attorney's fees.

[23]  On cross examination, plaintiff testified that there was nothing about this sentence that he did not understand and characterized it as self explanatory.

*the debt.[24]  And if, within the same period, you request the name and address of the original creditor, if the original creditor is other than the Condominium named above, we will furnish that information too.*

*Please note, we are not required to wait until the end of this thirty day period before taking further steps to collect this debt.[25]  If, however, you request proof of the debt or the name and address of the original creditor, if other than the Condominium named above, within that thirty day period, we will suspend our efforts to collect the debt until we mail the requested information to you.*

*We additionally note that this firm is acting as a debt collector for the Condominium named on the first page of this letter, to collect the debt discussed in this letter. Any information obtained by us will be used for that purpose.*

(Ex. 5, 8, 9 & 29) ("validation notice") (emphasis in original).

By the end of March 2005, plaintiff recognized he owed $1,545.61 on unit 104 and $1,689.61 on unit 105.  He also recognized his responsibility for the attorney's fees that Pondview incurred to collect the fees on his units and that Pondview had incurred attorney's fees in the drafting of the letters.[26]

---

[24]  On cross examination, plaintiff testified that he also understood the meaning of this sentence.

[25]  The notice of intent to collect rent letters included the same notice of important rights language except that the letters added before the end of the above sentence the language, "including sending a Direction to your tenant to pay their rent to the Condominium as discussed above."  (Ex. 9 & 29).

[26]  Plaintiff testified that he was not aware that he owed any legal fees until he received a May 2, 2005 letter.  The testimony is not credible because plaintiff received the March 23 and 31, 2005 letters which explicitly informed him that he was

Unbeknownst to MEEB at the time, on April 16, 2005, Bailey sent plaintiff a letter detailing the delinquent charges for unit 104 as of April 15, 2005.  The April 16, 2005 letter stated the total as $1,507.37 for unit 104 as of April 15, 2005, and listed the items that comprised this total.[27]  Accrued attorney's fees were not on the list.  Plaintiff recognized the discrepancy between the higher amount in the March 31, 2005 letter for unit 104 ($1,545.61) that included attorney's fees and the lower amount in the April 16, 2005 letter ($1,507.37), which did not include attorney's fees but did include additional amounts from April ($281.76).[28]  Plaintiff therefore decided to pay the lower amount for unit 104 in the April letter with a $1,507.37 check marked "Full payment on Unit 104."  He also decided to pay the outstanding charges for unit 105 with a second check ($1,310.24) marked "Full payment on Unit 105."  By letter dated April 21, 2005, plaintiff sent the checks marked payment in full to Bailey. The April 21, 2005 letter reiterated that, "These checks

---

responsible for collection costs including attorney's fees.

[27]  The letter included the $380.33 carry over from 2004. It also included identical amounts for the condominium fee ($215.18), the condominium late fee ($25.00), the loan payback charge ($16.58) and the loan payback late fee ($25.00) for the four months of January through April 2005.

[28]  The $281.76 figure reflects the April condominium fee ($215.18), the April condominium late fee ($25.00), the April loan payback charge ($16.58) and the April loan payback late fee ($25.00).

18

represent payment in full" even though "I still disagree with the amounts" and "would like to reserve my right to dispute this in the future."  (Ex. 20).

The April 16, 2005 letter also totaled the outstanding amount through March 2005, which did not include attorney's fees, as $1,225.61.  Attorney's fees and costs for unit 104 in MEEB's invoice to Pondview totaled $348.00 as of March 31, 2005.  The resulting $1,573.61 total differs from the slightly lower $1,545.61 amount in MEEB's March 31, 2005 notice of delinquency letter to plaintiff for unit 104.  MEEB would credit a client the $28.00 difference for the time spent to draft a delinquency letter if the client paid the charged amount.

On April 28, 2005, a date more than 30 days after MEEB sent the initial March 23, 2005 letters to plaintiff, MEEB filed the first and second of a number of lawsuits in the Massachusetts District Court Department (Lynn Division) ("Lynn District Court")[29] to collect delinquent fees on units 104 and 105 on behalf of its client, Pondview.  As a party to these suits, plaintiff received notice of filings including dismissals.

Once Brooks became aware of Bailey's April 16, 2005 letter, he advised her not to communicate by letter with plaintiff.  MEEB

---

[29]  MEEB filed one of the lawsuits in Massachusetts Superior Court (Essex County) ("Essex Superior Court").  (Ex. 78).  The complaint in this action asserts that the filing of the suit "in Essex Superior Court violated 15 U.S.C. §§ 1692i."  (Docket Entry # 1, ¶ 35).

did not instruct Bailey or anyone else at Pondview to refuse to speak with plaintiff.  Brought by the Pondview Board of Trustees, the collection suit on unit 104 ("April 2005 unit 104 suit") against plaintiff stated that plaintiff was "assessed common expenses and charges in the amount of $2,567.37 (hereinafter 'common expenses'), which have not been paid when due."[30]  (Ex. 15, ¶ 5).  Brooks knew about plaintiff's submission of checks or a check to Pondview before filing the April 2005 unit 104 suit. The next paragraph states, "Interest and late fees have been charged for these overdue payments of common expenses."  (Ex. 15, ¶ 6).

The collection suit on unit 105 ("April 2005 unit 105 suit") identified unpaid "assessed common expenses and charges in the amount of $2,694.94" in paragraph six.  (Ex. 16, ¶ 6).  The referenced "assessed common expenses and charges" included attorney's fees as noted and explained in the next paragraph. (Ex. 16, ¶ 7).  The cover form accompanying the complaint in the April 2005 unit 105 suit reads, "There are common expenses due as of this date in the amount of $2,694.94 which expenses continue to accrue on a monthly basis together with attorneys' fees and costs incurred in connection with this matter."  (Ex. 16).

Similar to the other lawsuits MEEB filed, paragraph six in

---

[30]  The least sophisticated consumer would understand that the $2,567.37 amount included interest and late fees in light of the next paragraph.

the complaint in the April 2005 unit 104 suit states that, "Defendants are liable for attorneys' fees and costs incurred by the Plaintiffs in pursuing this matter in accordance with" provisions of the condominium documents and section six of chapter 183A.[31]  (Ex. 15, ¶ 6).  Also similar to the other lawsuits MEEB filed, paragraph eight in the complaint in the April 2005 unit 104 suit states that, "Defendants are, pursuant to [chapter 183A, section 6(b),] and the applicable provisions of the Condominium's documents, indebted to the Plaintiffs for the amount of unpaid common expenses" and "attorneys' fees and collections costs."  (Ex. 15, ¶ 8).  Paragraph seven in the April 2005 unit 104 complaint, like corresponding paragraphs in the other lawsuits MEEB filed, states that, "Pursuant to M.G.L. c. 183a, s. 6(c) of chapter 183A, the Plaintiffs did give the Defendants notice by certified mail and first class mail of the aforesaid delinquency, such delinquency having existed for at least sixty days."  (Ex. 15, ¶ 7).

The complaint in the April 2005 unit 105 suit states, "Pursuant to M.G.L. c. 6(c), the Plaintiffs did give notice to the First Mortgagee, by certified and first class mail of their intent to file this action."  (Ex. 16, ¶ 9).  The complaint in

---

[31]  Section six of chapter 183A allows the organization of unit owners to assess attorney's fees against the unit owner and such fees constitute part of the automatic lien against the unit "enforceable as common expense assessments under this chapter."  Mass. Gen. L. ch. 183A, § 6.

21

the April 2005 unit 104 suit contains similar language.  (Ex. 15,
¶ 7).  MEEB did not send out a notice of intent to file suit
letter to the first mortgagee with respect to either the April
2005 unit 105 or the April 2005 unit 104 suits.

On May 2, 2005, before cashing the aforementioned checks
from plaintiff, Bailey contacted MEEB by telephone and spoke to
Brooks.  Consistent with MEEB's practice, Brooks advised Bailey
not to send any more letters to plaintiff.[32]  Brooks also advised
Bailey not to cash the checks.  After speaking with Bailey,
Brooks sent plaintiff a letter on Pondview's behalf informing him
that Pondview would be returning the checks because they "do not
represent payment in full" because "you did not include any legal
fees."[33]  (Ex. 21).  Notwithstanding plaintiff's testimony to the
contrary, Pondview returned the checks.

The May 2, 2005 letter listed $1,507.37 as the amount owing
on unit 104, $1,319.94 as the amount owing on unit 105, $1,389.00
as the amount of legal fees on unit 104, $1,772.00 as the amount
of legal fees on unit 105 and $150.00 as the amount of dismissal
fees.  The legal fees were greater than those disclosed in the

---

[32]  Contrary to plaintiff's position, there was nothing
inappropriate about this practice.  Moreover, the vast majority
of MEEB's letters to plaintiff instructed or invited plaintiff to
contact the MEEB attorney sending the letter if plaintiff had any
questions.

[33]  Such statements would not have confused the least
sophisticated consumer.

ledger attached to the March 31, 2005 letters because they included fees associated with filing the April 2005 unit 105 and 104 suits.  The letter explained that these amounts "are due" and set out these specific amounts.[34]  The letter also informed plaintiff, who had been served with the April 2005 unit 104 and unit 105 suits, that Pondview had "filed suit on each unit." (Ex. 21).  The amount of legal fees included the amount MEEB charged Pondview for filing the April 2005 unit 104 and unit 105 suits.

On May 9, 2005, after receiving the May 2, 2005 letter, plaintiff telephoned MEEB and spoke to Brooks.[35]  Contrary to plaintiff's testimony, Brooks did not tell plaintiff "he would run up $30,000 on each unit and within a year he would own them." (Docket Entry # 52, p. 32).  Brooks also never told plaintiff that he would own the units if plaintiff did not pay his attorney's fees and he never told plaintiff that "MEEB would run up legal fees."  (Docket Entry # 52, p. 36).  Although the

_____

[34]  The least sophisticated consumer would recognize that the fees were due as of May 2, 2005, and therefore differed from those in the ledgers attached to the March 31, 2005 letters.

[35]  Although Brooks did not recall the conversation at the time of trial and testified that plaintiff left a message, this court finds there was a conversation albeit not containing the content detailed by plaintiff.  MEEB's time slips describe a telephone conference with the owner, i.e., plaintiff, on May 9, 2005.  (Ex. 85).

conversation took place, Brooks did not threaten plaintiff.[36]

By letter dated May 16, 2005, MEEB, acting on behalf of Pondview, notified the tenant of unit 105 to forward the rent checks to Pondview, in care of Brooks, to MEEB's Braintree address.  MEEB addressed the letter to plaintiff or the current occupant.

On May 17, 2005, MEEB sent plaintiff a one sentence letter enclosing two "current ledgers," one for unit 104 and the other for unit 105, of the amounts owed "[a]s of May 10, 2005."  (Ex. 22).  Pondview sent the ledgers to MEEB with the amounts except for certain amounts typed on the bottom of each ledger.  MEEB added these typed amounts.  The typed portion for unit 105

_____

[36] On cross examination, MEEB's counsel convincingly impeached plaintiff.  At trial, plaintiff testified to remembering the events "very clearly" and that he was a passenger in a car driven by a friend when he made the telephone call. (Docket Entry # 57, p. 94).  At a prior deposition, however, plaintiff used the same words, "very clearly," to describe that *he* "was driving [a friend] to the hospital."  (Docket Entry # 57, p. 95).  In addition, whereas at trial plaintiff testified that Brooks said he would run up $30,000 on each unit, at the April 2010 deposition plaintiff testified that Brooks said, "'he would run up approximately $25,000 in legal fees on each unit and would own them within a year.'"  (Docket Entry # 53, p. 18). Plaintiff's demeanor when he described the conversation was not convincing.
    Plaintiff also testified that, after he "mentioned the water damage on Unit 104, which Pondview had agreed to pay for," Brooks responded "that since I didn't have anything in writing, it didn't matter whether they agreed to it or not, that I would not see a penny for water damage."  (Docket Entry # 57, p. 33). Although this court finds that plaintiff mentioned the water damage to Brooks, this court does not find that Brooks responded in the controversial and threatening manner plaintiff describes.

24

identifies the fees and costs added by MEEB as legal fees for
March ($536.00), April ($1,013.00) and through May 17, 2005
($488.00), as well as estimated "outstanding sheriff bills"
($100.00)[37] and a "dismissal fee" ($150.00).[38]  The typed portion
for unit 104 identifies the fees and costs added by MEEB as legal
fees for March ($348.00), April ($798.00) and through May 17,
2005 ($317.00), as well as estimated "outstanding sheriff bills"
($100.00) and a "dismissal fee" ($150.00).

     The dismissal fees were not entirely accurate.  The $150.00
charge was a standard rate.  If a dismissal was "very simple,"
Brooks would charge $75.00 and credit the client in the event of
a prior payment of the $150.00 charge.  Likewise, if plaintiff
paid the $150.00 set out in the ledger attached to the May 17,
2005 letter, he "would have ended up with a credit of $75."  (Tr.
II, p. 40).  Before receiving any payment, on May 27, 2005,
Brooks decided not to charge the $150.00 normal fee and instead

---

[37]  The invoice MEEB prepared for Pondview sets out a
different and lower amount of out of pocket expenses for
sheriff's service on May 12, 2005, a date prior to the May 17,
2005 letter.  The MEEB administrator had not entered the
sheriff's fees into the computer at the time Brooks' assistant
looked at the computer to add the fees.  Plaintiff did not see
this invoice at the time and had no knowledge of any discrepancy.

[38]  The fact that the cover letter is dated May 17, 2005,
and the top of each ledger states "[a]s of May 10, 2005," would
not confuse the least sophisticated consumer that the amounts
reflect amounts as of May 17 as opposed to the stated May 10th
date on each ledger.  The marked legal fees "THROUGH 5/17/05" is
also not confusing with respect to the dates.

to charge the $75.00 fee for a dismissal of the April 2005 unit 105 suit.  The May 27, 2005 dismissal charge for unit 105 on MEEB's invoice to Pondview was $75.00 as opposed to the $150.00 in the ledger attached to the May 17, 2005 letter.

The Pondview portion of each ledger consisted of legible amounts owed on the particular unit for the July through October 2004 late fees on the loan payback charges, the October and December 2004 condominium late fees, the December 2004 condominium fee and the December 2004 late fee on the loan payback charge.  The other remaining Pondview portion of each ledger set out the outstanding amounts for the condominium fees, the condominium late fees, the loan payback charges and the loan payback late fees for the four months of January through April 2005.  The letter did not include May 2005 late fees because the foregoing charges "[a]s of May 10, 2005" were not overdue until May 15, 2005.

Notably, the Pondview portion of each ledger included the May condominium fee, the May loan payback charge and additional legal fees.  The additional legal fees for unit 105 ($536.00) and unit 104 ($348.00) are included in the ledger's total for unit 105 ($2,049.27) and the ledger's total for unit 104 ($2,087.13).  These totals appear before the aforementioned legal fees and costs typed and added by MEEB at the bottom of each ledger.  The legal fees in the ledger prepared by Pondview thus duplicated the

26

same legal fees for March 2005 for unit 105 ($536.00) and unit 104 ($348.00) added by MEEB.

On or about May 17, 2005, MEEB corrected the duplication error by sending out another letter dated May 17, 2005, which was the same except for an underlined and capitalized heading "CORRECTED NOTICE." (Ex. 24). The second letter was more than likely a photocopy of the first letter with the foregoing heading typed onto the photocopy. The attached ledgers for unit 105 and unit 104 credited the duplicate legal fees ($536.00 for unit 105 and $348.00 for unit 104) at the bottom of each ledger. Plaintiff received the second May 17, 2005 letter with the corrected and credited legal fees no more than a few days after receiving the first May 17, 2005 letter.

MEEB has a practice in place to ensure the accuracy of ledgers received from its clients. MEEB initially asks the client for an accurate ledger with up to date payments of amounts owed. It also asks for any communications from the unit owner. Once MEEB receives the ledger, if the dates and amount of a condominium fee appear accurate, MEEB relies on the ledger. If the amount appears odd or unusual, MEEB makes an inquiry to the client. MEEB typically requests a ledger "at each step of the process." (Docket Entry # 51, p. 45).

Brooks' practice is to have his assistant, who has an accounting background, first examine a ledger from the client to

27

determine if it looks accurate.  She may then examine prior bills on the computer to determine if the current ledger looks correct. Thereafter, Brooks examines the ledger to see if it makes sense and all of the numbers look correct.

In mid May, MEEB provided a $3,800.27 payoff amount to Bayview Loan Servicing, LLC ("Bayview"), the servicer for the mortgage on unit 105.  On May 20, 2005, Bayview paid Pondview $3,800.27.  Pondview credited the amount to the unit 105 account. Plaintiff always received information about the amounts paid to Pondview with letters from the bank "with figures stated in them."  (Docket Entry # 57, p. 40).  Bayview informed plaintiff of the payment "near the end of May."  (Docket Entry # 57, p. 35).[39]  Bayview more than likely added the $3,800.27 to the amount plaintiff owed on the mortgage for unit 105.  Bayview's payment did not include two $25.00 charges for late fees on the May condominium fee and loan payback charge on unit 105.[40]  It also

---

[39]  Plaintiff complains that MEEB did not inform him of the payment until "over one year letter[sic] in a ledger included with a letter dated June 23, 2006 sent to him just prior to filing the third 105 lawsuit."  (Docket Entry # 60, p. 14, n.1). Even assuming the truth of the argument and that MEEB's delay in sending this information was misleading to plaintiff, plaintiff was not damaged because Bayview informed him of the payment near the end of May 2005.

[40]  Plaintiff fails to establish that the check included the $150.00 dismissal fee.  MEEB's invoices show the $75.00 charge as of May 27, 2005.  Based on the date of the payment and the date Brooks changed the $150.00 amount as well as the failure of MEEB's invoices to reflect to the $150.00 charge, this court finds that Bayview did not add the $150.00 dismissal fee to

did not include legal fees incurred in late May, the June
condominium fee, the June loan payback charge and a June special
assessment ($42.75).  Brooks posited that approximately half of
the $3,800.27 overdue amount constituted legal fees.

On behalf of Pondview, Brooks filed a dismissal of the April
2005 unit 105 suit shortly after receiving the check.  Plaintiff
received notice of the dismissal.

On or about June 1, 2005, plaintiff submitted a $400.00
check to Pondview with the designation, "Payment May + June 2005
Unit 105."  (Ex. 30).  Bailey applied the $400.00 check to the
oldest outstanding balance in the unit 105 account, which
consisted entirely of the requested May and June charges.
Bailey thereby complied with plaintiff's notation on the check to
apply the amounts to unit 105's May and June charges.  A $98.18
credit remained in the unit 105 account at the end of June 2005.

Plaintiff also submitted a $500.00 check dated June 1, 2005,
to Pondview with the designation, "Payment May + June 2005 Unit
104."  (Ex. 30).  Bailey applied this check to the oldest
outstanding balance in the unit 104 account thereby leaving a
credit of $119.67 as of the end of 2004, which she applied
against the $215.18 January condominium fee.  Plaintiff received
full credit in the unit 104 account for the $500.00 amount.

---

plaintiff's mortgage but instead added the actual $75.00 charge
to the mortgage.

In June 2005, Pondview began imposing a monthly special assessment on unit owners such as plaintiff.  Pondview had the authority to impose such assessments.  See Mass. Gen. L. ch. 183A, § 6.[41]  Plaintiff's proportionate share of the special assessment was $42.75 for unit 105 and $52.25 for unit 104.  In a June 23, 2005 letter from Alison Forbes, Esq. ("Forbes"), a MEEB attorney who took over the Pondview file from Brooks, plaintiff received a copy of his unit 105 account as of June 16, 2005, which included the charge.[42]  The letter invited plaintiff to contact her if he had any questions.  Plaintiff did not contact Forbes.

In mid to late August 2005, plaintiff submitted another two checks to Bailey.  He marked one check "Unit 104 July August 2005" in the amount of $500.00 and the other "Unit 105 July

---

[41]  See fn. 12.  Elaborating on the authority outlined in footnote 12, section six of chapter 183A requires the organization of unit owners to assess common expenses against each unit owner in accordance with the owner's percentage of undivided interest in the common areas and facilities.  Mass. Gen. L. ch. 183A, § 6(a).  The Master Deed likewise authorizes the trustees to assess against a unit owner the expenses of maintaining, repairing, replacing and improving the common areas and facilities as common expenses.  (Ex. C, Art. V, §§ 5.2 & 5.4(B)).  Finally, section six of chapter 183A allows the organization of unit owners to assess a "unit owner his proportionate share of the costs for water and other utilities." Mass. Gen. L. ch. 183A, § 6(a)(ii).

[42]  Plaintiff's testimony that he never became aware of the special assessment until a 2006 trial is not credible.  He received a number of ledgers for both units reflecting the special assessment charges in 2005.

30

August 2005" in the amount of $400.00.  (Ex. 35).  Plaintiff accompanied the checks with typed instructions that Pondview should only cash the checks for condominium fees and not late fees or legal fees.  As instructed, Pondview applied the $400.00 check to the July and August condominium fees for unit 105 and the $500.00 check to the July and August condominium fees for unit 104.

Throughout the summer, Pondview continued to incur legal fees in relation to units 104 and 105 because plaintiff refused to pay late fees, loan payback charges and special assessments and because of ongoing charges for the April 2005 unit 104 suit.[43] As with the March, April and May 2005 legal fees, Pondview charged these fees to plaintiff by adding them to the unit's account.  The June legal fee of $253.00 for unit 105 however is designated as July legal fees on Pondview's ledger.  MEEB did not

---

[43] Plaintiff complains that MEEB continued to charge attorney's fees after the dismissal of the April 2005 unit 105 suit in late May.  The unnecessary charges consist of a $180.00 charge on June 23, 2005, to prepare a motion for a default and a $75.00 charge on August 9, 2005, for a title examiner at a time when a unit 105 suit was not contemplated.  MEEB did not include these charges in a November 30, 2005 letter to Bayview in response to Bayview's request for a payoff figure for unit 105. Taken in the context of all the other charges in the billing records, these charges do not show that MEEB acted in a manner to escalate its attorney's fees.

Plaintiff similarly argues that MEEB's "aggressive actions in the first 104 enforcement suit" ran "up legal fees of $5,840.70 by the end of August, 2005."  (Docket Entry # 60, ¶ 17).  This court finds that MEEB did not intentionally escalate these fees.

bill Pondview for legal fees for unit 105 for July 2005.
Similarly, MEEB billed Pondview $931.00 for June legal fees and
$1,547.00 for July legal fees for unit 104.  Pondview's ledger
correctly reflects the amounts but designates the $931.00 as July
legal fees.[44]

In addition to legal fees, plaintiff failed to pay the June
loan payback charge, the special assessment and the late fees for
both charges on unit 104.  Also in addition to legal fees,
plaintiff failed to pay the July through September condominium
late fees, loan payback charges, late fees on the loan payback
charges, the special assessments ($42.75 for unit 105 and $52.25
for unit 104) and late fees on the special assessments for both
units.  Plaintiff's nonpayment of the foregoing, legitimately
imposed and reasonable charges led to a second suit on unit 105.

By letters dated August 15, 2005, MEEB, on Pondview's
behalf, sent Mortgage Electronic Registration Systems, Inc.
("MERS") a 60 day letter.  MEEB also sent MERS a letter notifying
MERS of MEEB's "intent to file/continue an action to enforce our
lien for delinquent common expenses."  (Ex. 36 & 37).

In mid October 2005, plaintiff submitted another two checks

_____

[44]   MEEB properly relied on the ledger.  The FDCPA does not
"require a debt collector to independently investigate the merit
of the debt" and "a debt collector can rely on its clients'
representations regarding the validity of the debt."  Poulin v.
The Thomas Agency, 760 F.Supp.2d 151, 160 (D.Me. 2011)
(collecting cases).  In addition, plaintiff was not damaged by
this erroneous designation.

to Bailey.  He again instructed Bailey to apply the $500.00 check only to unit 104's condominium fees and not to any late fees or legal fees.  He gave Bailey similar instructions to apply the $400.00 check for unit 105's condominium fees and not to any late fees or legal fees.  Bailey complied with each request.  She applied the $500.00 check to the September and October condominium fees for unit 104 and the $400.00 check to the September and October condominium fees for unit 105.  She applied the remaining balance from the $400.00 check ($46.50) as a credit toward condominium fees for unit 105.  She applied the remaining balance from the $500.00 check ($69.64) as a credit toward condominium fees for unit 104.

On October 4, 2005, MEEB drafted and sent plaintiff by certified and first class mail another 60 day delinquency letter and a notice of intent to collect rent letter relative to unit 105.  Both letters directed plaintiff to submit a written payment plan in the event he wished to submit such a plan and informed him he needed to notify MEEB in writing if he decided to dispute the debt.  They also stated that MEEB "is acting as a debt collector for [Pondview]."  (Ex. 25 & 26).

In light of the passage of time since ordering the March 2005 title search on unit 105, MEEB made a reasonable decision to order another title search on unit 105.  MEEB included the $101.00 charge in the October 2005 invoice to Pondview.  The

33

invoice totaled $1,440.00.  Pondview added these charges to plaintiff's unit 105 account.

The letters set out the amount of the unit 105 debt ($1,098.14) "incurred through the" October 4, 2005 date of the letter.  The unit 105 ledger attached to each letter listed the fees including a $95.00 charge set out the with the exception of an inaccuracy of $1.00 in a $95.00 charge to draft each delinquency letter.[45]  The ledger attached to each letter also did not include certain legal fees incurred on October 4, 2005.  The omitted fees consisted of $101.00 to order title and $180.00 for drafting the notice to collect rent letter.

Due to the aforementioned delinquencies in the unit 105 account, on October 27, 2005, Forbes prepared a complaint for a second collection action in Lynn District Court on unit 105. Forbes also prepared an October 27, 2005 letter to send to MERS,

---

[45]  The corresponding legal bill for the $95.00 charge for drafting the delinquency letter sets out a $96.00 charge.  The $1.00 difference in amount is immaterial.  See Miller v. Javitch, Block & Rathbone, 561 F.3d 588, 596 (6th Cir. 2009).  In addition, the letter was not false or misleading to the least sophisticated consumer because the ledger includes "as of October 1" in the heading and therefore did not include an amount for October legal fees.

Plaintiff disingenuously testified that he did not understand what a parentheses around a number on the ledger meant.  Plaintiff made this statement even though he had received the August 16, 2005 unit 104 ledger which has the figure "$(119.57)" across from the item, "Unit 104 Credit Total."  (Ex. 84).  Such testimony adds weight to the view of this court that plaintiff at certain times tailored and designed his testimony to suit his position at trial.

the first mortgagee of unit 105, regarding Pondview's intent to file or continue "an action to enforce Pondview's lien for delinquent common expenses." (Ex. 11). MEEB also sent MERS a 30 day notice letter on October 27, 2005. Throughout MEEB's debt collection efforts, it never sent a 30 day notice letter 30 days before filing suit.[46] Plaintiff's first mortgagees had not informed Pondview of their names and addresses. Brooks estimated that 99% of banks do not comply with the provision in section four of chapter 183A that a mortgagee with a mortgage on a unit "give written notice" of its name and "address to the organization of unit owners." Mass. Gen. L. ch. 183A, § 4.

On October 31, 2005, MEEB filed the collection suit in Lynn District Court to collect delinquent charges on unit 105 in the amount of $1,866.14 on behalf of its client, Pondview ("October 2005 unit 105 suit"). The suit named plaintiff as a defendant and the first mortgagee on unit 105, MERS, as a party in interest. See Mass. Gen. L. ch. 254, § 5. The complaint included the amount of unpaid common expenses which in turn included attorney's fees. The October 2005 unit 105 suit resulted from plaintiff's nonpayment of unit 105 charges as opposed to any intent on the part of MEEB to unnecessarily escalate its legal fees. Attorney's fees for the month totaled $1,526.00.

---

[46] See fn. 18.

In late November 2005, plaintiff again submitted two checks to Bailey.  He instructed Bailey to apply the $500.00 check only to unit 104's condominium fees and the $400.00 check only to unit 105's condominium fees.  Plaintiff did not specify the particular "condo fees" by month.  Bailey complied with each request.  She applied the $500.00 check to unit 104's condominium fees for January, February and a portion of March 2005.  She applied the $400.00 check to the November and December 2005 condominium fees for unit 105.

On November 30, 2005, plaintiff and Forbes appeared at a summary judgment and assessment of damages hearing in Lynn District Court for the April 2005 unit 104 suit.  During a conversation, plaintiff asked Forbes for a breakdown of the amount owed for unit 104.  She did not supply the information at that time and plaintiff did not submit a request in writing.

In addition to legitimately imposed legal fees, the following charges remained outstanding in the unit 104 account after Bailey applied the November 21, 2005, $500.00 check: January through November condominium late fees; January through November loan payback charges; January through November loan payback late fees; a portion of the March condominium fee; April, May, June and November condominium fees; June through November special assessments; and June through November special assessment late fees.  Similarly, in addition to legitimately imposed legal

36

fees, the following charges remained outstanding in the unit 105 account after Bailey applied the November 21, 2005 $400.00 check: July though November condominium late fees; July through November loan payback charges; July through November loan payback late fees; July through November special assessments; and July through November special assessment late fees.

On November 30, 2005, MEEB responded by letter to a request by Bayview for a current payoff amount.[47]  MEEB's letter attached accumulated legal fees for unit 105 ($2,074.00) and a unit 105 ledger.[48]  It noted additional legal fees to prepare, file and record a dismissal of the suit as well as the December condominium fee ($176.75) and loan payback charge ($16.58).  A handwritten notation on the letter reflects a total of $3,015.55 through December 5, 2005.  Bayview paid the $3,015.55 amount by check dated December 15, 2005, and Pondview credited the amount

---

[47]  MEEB's invoices reflect a telephone conference with Bayview on November 23, 2005, during which Bayview more than likely made the request.  MEEB did not send this letter to plaintiff.

[48]  At various times, plaintiff submits that ledgers were illegible or partially illegible.  The facts do not support this contention.  Having reviewed all of the ledgers, they are not illegible.  Although not cited by plaintiff, a Justice of the Lynn District Court noted in dicta in a decision that a ledger before her was "barely legible."  (Ex. 80).  Another decision by a Circuit Justice of the same court however sets out the amounts culled from exhibits in detail.  Similarly, although certain amounts are not a model of clarity, the amounts are legible.  The facts therefore fail to support plaintiff's attempt to impose liability on MEEB based on illegible and incomprehensible ledgers.

to plaintiff's unit 105 account.  Bayview more than likely added this amount to plaintiff's unit 105 mortgage and provided him notice in the following month's mortgage bill.[49]  Plaintiff testified that he received a copy of Bayview's check when he requested and received documents from MEEB believing he would need the documents for a February 2006 trial.  In light of the payment, MEEB filed a stipulated voluntary dismissal of the October 2005 unit 105 suit in late December 2005.

In addition to condominium charges, Pondview applied Bayview's May and December 2005 payments to unit 105 legal charges.  Plaintiff only instructed Bailey not to apply his payments to legal fees.  He did not provide written instructions regarding payments made by any mortgagee for units 105 or 104.

As a result of Bayview's two payments and plaintiff's four payments limited to condominium fees, the unit 105 account carried forward a $250.00 credit into January 2006.  Plaintiff's continued nonpayment of unit 104 fees, other than the aforementioned payments, and the legal fees associated with the April 2005 unit 104 suit resulted in a carry over debit in excess of $12,000.00 in the unit 104 account.  MEEB's invoices set out legal fees for the year of $11,537.70 for unit 104 and $4,763.74 for unit 105.  (Ex. 23).

---

[49]  Plaintiff complains that MEEB did not inform him about Bayview's payment until a June 23, 2006 60 day letter relative to unit 105.

On January 31, 2006, plaintiff sent Bailey two postal money orders, one for $185.59 and the other for $225.94. As before, he instructed Bailey to apply the $185.59 money order to unit 105 condominium fees and the $225.94 money order to unit 104 condominium fees.[50] Bailey complied with each request. She applied $185.59 to the January 2006 condominium fee for unit 105 ($185.59) and the $225.94 to the outstanding November 2005 condominium fee for unit 104 ($215.18) with the remainder ($10.76) applied as a credit only toward condominium fees. These January 2006 money orders were the last payments plaintiff made toward the balance in either the unit 104 or the unit 105 account.

On February 13, 2006, Forbes had a telephone conference with MERS and Aegis Lending Corporation ("Aegis").[51] At Aegis' request, she sent a payoff letter dated February 14, 2006 to Aegis reflecting the outstanding unit 104 condominium charges ($2,450.89) and legal fees ($13,223.70). Lenders often request the entire amount of an associations' lien. This court finds by a preponderance of the evidence that Aegis requested the amount

---

[50] In January 2006, condominium fees increased to $225.94 for unit 104 and $185.59 for unit 105.

[51] A February 14, 2006 letter from Forbes to Aegis identifies Aegis as the servicer for MERS. An April 2005 mortgage on unit 104 identifies Aegis as the lender, plaintiff as the borrower and MERS as nominee for Aegis as well as a mortgagee under a related security instrument.

of the entire lien.  The letter attached a copy of Pondview's current ledger and enclosed the legal bills to date.  It also advised Aegis that trial was set to begin on February 24, 2006. Similar to some but not all of MEEB's letters to MERS, Forbes did not send plaintiff a copy of the February 14, 2006 payoff letter.[52]

On February 24, 2006, a bench trial in the April 2005 unit 104 suit commenced.  To prepare for trial, MEEB drafted requests for rulings of law and findings of fact, communicated with Pondview, drafted an exhibit list, performed another title search at a cost of $160.00, prepared for trial, drafted a motion to exclude expert witnesses at a cost of $190.00, drafted a number of other motions, communicated with MERS and its loan servicer and drafted a letter to plaintiff about Halbich's misconduct in picking a lock.  MEEB's unit 104 legal fees for January and February 2006 respectively totaled $1,173.00 and $6,346.00.[53]

The second and final day of the trial took place on March 13, 2006, and the court took the matter under advisement.  The

---

[52]  Plaintiff maintains that MEEB communicated directly with the mortgagees for units 104 and 105 without giving him notice of these communications.  The 60 day delinquency letters to plaintiff all included the information that the Massachusetts Condominium Act "provides that your Mortgage Lender . . . be given notice of your delinquency."  (Ex. 5, 8, 26, 44, 49, 50 & 72).

[53]  As discussed below, the Circuit Justice in the April 2005 unit 104 suit left the January bill intact and reduced the February bill.

opinion, which issued a year later, found that Pondview established its lien under section six of chapter 183A for all outstanding condominium charges as of February 2006.  Judgment entered in the amount of $3,106.17 against plaintiff, Williams and MERS for the condominium charges.[54]

The opinion also addressed the legal fees and determined a fair and reasonable fee in the amount of $18,803.00.[55]  The calculation involved applying a number of the customary factors.[56] (Ex. 80).  Applying the relevant factors, the Circuit Justice left the March and April 2005 monthly charges the same and reduced the May 2005 charges by $71.70 for reviewing the complaint in the April unit 104 suit.  He also left the June and September 2005 requested charges the same as well as the January 2006 monthly charge.  His reductions to the July, August and October through December 2005 monthly charges are modest and

---

[54]  The amount appears in a corrected judgment that issued on March 28, 2007.

[55]  This amount likewise appears in the corrected judgment.

[56]  The Circuit Justice noted the following factors as pertinent to the determination:

the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other Attorney's[sic] in the same neighborhood, the amount of money or the value of the property affected by controversy, and the results secured.

(Ex. 80).

primarily based upon excess time spent on tasks that could be accomplished in a shorter time period.  He also reduced the February 2006 monthly charge to eliminate charges for filing a motion in limine to exclude certain witnesses at trial.  In total, the opinion reduced the initial request for legal fees ($18,106.70) by less than $3,000.00 to $15,601.00.  The corrected judgment increased the amount of the legal fees awarded to $18,803.00 in light of Pondview's March 9, 2007 motion to amend the judgment.

This court's independent review of the unit 104 legal fees through February 2006 finds they were not excessive.[57]  Brooks' demeanor[58] and testimony confirm that from March 2005 through February 2006 MEEB was not acting in a manner intending to escalate its attorney's fees.[59]

In the first half of 2006, plaintiff also fell behind in making payments in the unit 105 account.  Except for the money order payment of the January 2006 condominium fee, plaintiff

_____

[57]  This finding therefore moots any assertion on the part of defendant that the amount of the fee was fair and reasonable. (Docket Entry # 37, p. 4).

[58]  Unlike plaintiff's demeanor, which markedly changed on cross examination, Brooks' demeanor did not change when he testified on direct, cross examination, redirect and recross.

[59]  Plaintiff argues that MEEB deliberately and in bad faith engaged in a collection process intended to escalate its attorney's fees in violation of the FDCPA.  (Docket Entry # 60, pp. 18-31).

failed to pay the condominium fees for February through June and the condominium late fees for January through June 2006.  In June and July 2006, Pondview imposed another special assessment which totaled $100.43.  Plaintiff failed to pay the special assessment thus incurring a $25.00 late fee for both months.  He also failed to pay the modest amount of legal fees incurred during this time period.  The lack of any significant legal fee during this time lends further credence to the fact that MEEB did not intentionally or even carelessly act in a manner to escalate its legal fees.

On June 23, 2006, Forbes sent MERS a 60 day letter that plaintiff was delinquent in the payment of common expenses for unit 105 in excess of $3,096.04.  The letter attached a ledger accurately setting out the unit 105 charges.  Forbes also sent plaintiff a copy of the letter with the attached ledger.

Forbes sent plaintiff a separate 60 day letter by certified and first class mail setting out the same $3,096.04 arrearage. The letter attached a complete ledger for unit 105 reflecting the May and December 2005 payments by Bayview.  The ledger additionally informed plaintiff that Pondview applied his three earlier $400.00 checks toward the requisite condominium fees. Like the other 60 day letters, Forbes informed plaintiff that the Massachusetts Condominium Act provides that his mortgage lender "be given notice of your delinquency."  (Ex. 40).

43

Because of the continued delinquency, on June 23, 2006, Forbes sent a 30 day letter notifying MERS of Pondview's intent to file suit on unit 105.  Chapter 183A gives the first mortgagee a means to stop further collection action if it complies with certain statutory conditions.  The conditions include agreeing in writing that a priority lien exists and paying certain categories of charges within 60 days.  See Mass. Gen. L. ch. 183A, §§ 6(a)(ii) & 6(c), ¶ 4.  Similar to what took place in the filing of the previous suits, MEEB filed suit on unit 105 on June 30, 2006 ("June 2006 unit 105 suit"), seeking to collect unpaid common expenses of $3,771.04 without waiting the 30 days proscribed in section 6(c) of chapter 183A.  Brooks explained that MEEB waited before sending 60 day delinquency and notice of intent to collect rent letters to avoid additional attorney's fees in the event the matter was resolved.

Meanwhile, plaintiff fell further behind in making payments against the balance in the unit 104 account.  He also failed to make payments of monthly condominium fees, condominium late fees and legal fees from January to June 2006 as well as the June and July special assessments and related late fees.  The March legal fees totaled $1,993.00, the bulk of which ($1,615.00) entailed attending the second and final day of trial in the April 2005 unit 104 suit.  The April and May 2006 legal bills totaled a

44

modest $38.00 and $19.00 respectively.[60]

Because of MEEB's actual, albeit mistaken, belief of a continuing need to protect Pondview's chapter 183A, section 6(c) priority lien,[61]  MEEB filed a second suit on unit 104 in late June 2006 ("June 2006 unit 104 suit").  MEEB did not wait the 30 days proscribed in section 6(c) of chapter 183A to notify the first mortgagee.

On June 22, 2006, MEEB sent plaintiff a 60 day delinquency letter.  By letter dated June 22, 2006, Forbes also sent MERS a 60 day delinquency letter with copies sent to plaintiff, Williams, Pondview and Aegis.  Forbes additionally sent MERS a 30 day notice letter dated June 22, 2006.  The 60 day letter to plaintiff asked him to contact the firm if he had any questions

---

[60]  This court finds that these necessary and reasonable fees do not evidence intentional or even negligent conduct designed to escalate MEEB's attorney's fees.

[61]  Section 6(c) of chapter 183A creates a lien with priority over a first mortgagee for "common expenses assessments based on the budget . . . which would have become due . . . during the six months immediately preceding institution of an action to enforce the lien . . .."  Mass. Gen. L. ch. 183A, § 6(c); see In re Ames, 447 B.R. 680, 682 (Bkrtcy.D.Mass. 2011).  Brooks, who lobbied the Massachusetts legislature to enact the super lien provision in section 6(c) and whose partner received credit for drafting the legislation, explained that the reason MEEB filed multiple lawsuits against plaintiff was "to protect the super lien status" every six months.  (Docket Entry # 52, pp. 25-26).  As explained in the discussion section, however, a July 2011 decision by the Massachusetts Appellate Division in Drummer Boy Homes Assoc., Inc. v. Britton, 2011 WL 2981374 (Mass.App.Div. July 20, 2011), rejects this view.  Id. at *2-3 (condominium association's filing successive suits does not extend the lien priority beyond the initial and single six month period of time).

and, if he wished to propose a payment plan, to submit the plan to MEEB in writing.  Even though MEEB repeatedly instructed him to contact the firm if he had any questions, plaintiff never telephoned or contacted the firm after May 2005 with questions about the debt.  Similar to the other 60 day letters, the June 22, 2006 letter advised plaintiff about the need to inform MEEB in writing if he disputed the debt or desired to propose a payment plan.  At no time did plaintiff send a written communication to MEEB disputing the debt or proposing a payment plan.  The June 2006 legal fees for unit 104 included a $75.00 charge for a title examination and a $675.00 charge for reviewing the condominium documents and charges, preparing the complaint and drafting correspondence.  By letter dated June 27, 2006, Forbes informed Aegis that Pondview was willing to cease legal activity against plaintiff if Aegis agreed in writing to pay the arrears on unit 104.  (Ex. 53).

On or about August 10, 2006, Forbes had a telephone conference with the unit 104 lender during which the lender requested a payoff amount.  (Ex. 23, Aug. 31, 2006 invoice).  By letter dated August 18, 2006, Forbes sent M & T Mortgage Corporation ("M & T"), which the letter identifies as the servicing company for MERS,[62] a payoff amount totaling $3,454.00

_____

[62]  MERS is the first mortgagee on the March 2003 mortgage for unit 105 as well as on a April 2005 mortgage for unit 104. East West Mortgage is the lender for the March 2003 mortgage for

for the June 2006 unit 104 suit.  The amount included legal fees from June through August 14, 2006 ($1,703.00), outstanding condominium charges at the $225.94 monthly amount applicable to unit 104 from January to August 2006 ($1,286.00)[63] and anticipated legal fees to resolve the matter ($190.00) and the dismissal fee ($275.00) for the June 2006 unit 104 lawsuit.  Forbes attached a ledger for unit 104 dating back to July 2004 and time slips with the amount of legal fees incurred dating back to June 8, 2006.

By check dated August 29, 2006, payable to Pondview, M & T

---

unit 105 whereas Aegis is the lender for the April 2005 mortgage for unit 104.  Plaintiff is the borrower under both mortgages and the mortgagor under the accompanying security instruments. MEEB's invoice (Ex. 23, Aug. 31, 2006 invoice) does not identify the name of the lender.  The August 18, 2006 letter identifying M & T as the servicing company for MERS includes a mortgage loan number different than either the March 2003 mortgage for unit 105 or the April 2005 mortgage for unit 104.  While the record may support a contrary finding, this court finds that the payoff letter to M & T was for unit 104.  Plaintiff does not seek collateral estoppel of an issue regarding this payment made in a decision by the Lynn District Court in the June 2006 unit 105 suit.  Similarly, plaintiff does not raise an argument about a misapplication, if any, of a $3,545 check from M & T payable to Pondview.  See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed").

[63]  These fees duplicated the January and February 2006 condominium fees sought in the April 2005 unit 104 suit then under advisement with the Circuit Justice.  Pondview applied $1,737.80 of the amount to the January through August 2006 condominium fees and other non-legal unit 104 charges.  Plaintiff was not damaged or injured as a result of the oversight because the entire payment reduced his outstanding condominium charges for which he remained responsible by virtue of chapter 183A and the Declaration of Trust.  Plaintiff did not receive a copy of the August 18, 2006 letter.

paid the $3,545.00 amount.  On September 1, 2006, MEEB sent Pondview a letter regarding the payment.  No further litigation in the June 2006 unit 104 suit took place.  The $3,545.00 amount tallied by Forbes included a dismissal fee.  This court therefore draws the reasonable assumption that MEEB dismissed the June 2006 unit 104 suit shortly after receiving the payment and forwarding it to Pondview.

Pondview credited the entire amount to the unit 104 account. Pondview applied $1,737.80 of the amount to the January through August condominium fees and the remaining $1,716.20 amount to legal fees.[64]

By letter dated September 22, 2006, an attorney with Harmon Law Offices, P.C. ("Harmon") who represented MERS, wrote to Brooks requesting a payoff amount for unit 104.  In the letter, MERS requested "the entire amount [Pondview] claims is owed by [plaintiff]" and "the claimed six month priority amount."  (Ex. 46).

In an October 16, 2006 reply letter, Forbes set out the entire amount due on the unit 104 account ($26,035.10).  Forbes attached a ledger for unit 104 dating back to July 2004 and time

---

[64] The latter payment that Pondview applied to legal fees does not contravene plaintiff's instructions to Pondview. Plaintiff instructed Bailey to apply certain payments that plaintiff made to condominium fees and not to late fees or legal fees.  Plaintiff did not instruct Pondview to apply the payments of a first mortgagee in any particular manner.

slips with the amount of legal fees incurred dating back to March 23, 2005. The ledger and time slips enabled Harmon to calculate the six month priority lien.[65]

Lenders often request the entire balance as opposed to the six month priority amount under section 6(c) of chapter 183A. (Tr. III, p. 83). Accordingly, this court finds that the request that prompted a June 6, 2008 letter from MEEB to Harmon (Ex. 70) and the conversation that prompted a May 13, 2008 letter from MEEB to Harmon (Ex. 69) were requests for the entire amount of Pondview's lien at the time.

The bulk of the amount owed ($26,035.10) consisted of legal fees ($22,118.70). The latter amount, while significantly larger than the amount of the debt, included fees for preparing summary judgment papers and fees associated with the trial in the April 2005 unit 104 suit. MERS did not make a payment at this time. By the end of 2006, the unit 104 account was running a deficit of $27,140.88.

MEEB charged Pondview less in certain months such as July ($95.00), August ($138.00) and September ($114.00) 2006 because relatively little activity took place with respect to unit 104. Whereas Pondview incurred $901.00 in legal fees in October 2006 due to the need to attend a court proceeding and to respond to

---

[65] Plaintiff argues that MEEB never provided plaintiff's mortgagees with the amount of the priority lien the mortgagees requested. (Docket Entry # 60, § 1(b), pp. 25-26).

Harmon's request for a payoff, Pondview did not incur any more legal fees for the remainder of the year relative to unit 104. Such minimal activity belies the existence of any intention on the part of MEEB to escalate legal fees.

After MEEB filed the June 2006 unit 105 suit, plaintiff filed a counterclaim in August 2006 to recover for "[w]ater damage and overpayment of condo fees" with respect to unit 105. (Docket Entry # 57, p. 71).  Pondview incurred additional legal fees ($665.00 in August and $972.00 in September) in seeking to dismiss the counterclaim.  Although the Justice denied the motion to dismiss the counterclaim, it was eventually severed from the claim for unpaid assessments.  Drafting interrogatories and a request for production of documents in November 2006 engendered additional and necessary legal fees ($760.00).  Reviewing these and other legal fees MEEB billed to Pondview from June through December 2006 reaffirms that MEEB did not intentionally or unnecessarily escalate Pondview's legal fees for unit 105. Pondview charged these fees to the unit 105 account.

Plaintiff's continued nonpayment of condominium fees, the locksmith charge and the June and July special assessments and late fees resulted in an approximate delinquency of $3,100.00 by the end of 2006 for these unit 105 charges.  Legal fees, which primarily involved activity related to the June 2006 unit 105 suit, totaled slightly more than $8,000.00 by the end of the year

50

for unit 105.  As of December 31, 2006, the unit 105 account carried forward a total and accurate arrearage of $11,448.37. (Ex. 61).

On January 24, 2007, Forbes sent plaintiff another 60 day letter for unit 104 with an attached ledger.[66]  She also made a reasonable decision to update the title resulting in a modest $75.00 charge to Pondview which Pondview then charged to the unit 104 account.

In January and February 2007, Forbes communicated with MERS, the first mortgagee under the April 2005 mortgage for unit 104, and Harmon, MERS' counsel, without advising plaintiff.[67]  A communication on January 23, 2007, with the lender led to a letter from Forbes to Harmon stating the amount of MEEB's priority lien as $2,226.83.  In early February 2007, MERS paid this amount with a check to Pondview.  Forbes confirmed the payment in a February 15, 2007 letter to Harmon.  As a result of the payment, MEEB did not file a third unit 104 suit in the first

---

[66]  There was no testimony about this letter.  It was entered into evidence without objection.  Plaintiff does not discuss the letter in the post trial brief.  He refers to the exhibit number twice in the post trial brief as evidence that MEEB communicated with plaintiff and sent the delinquency notices at or around the time it drafted the complaints.

[67]  As previously indicted, plaintiff argues that MEEB's "secret communications" with plaintiff's mortgagees shows its bad faith and violates the FDCPA.  Plaintiff characterizes the communications as "deceptive, misleading, and extortive." (Docket Entry # 60).

six months of 2007.

On March 28, 2007, the aforementioned judgment in the April 2005 unit 104 suit issued.  The judgment totaled $22,622.99, consisting of condominium charges ($3,106.17), legal fees ($18,803.00) and prejudgment interest ($713.82).  Pondview continued to incur legal fees for unit 104 in April and May 2007 to draft an opposition to plaintiff's motion for a new trial as well as respond to two other motions filed by plaintiff and to attend court hearings on the new trial motion.  The lack of any unit 104 legal fees in June and only a $72.00 fee in July 2007 to respond to Harmon's communication regarding a payoff amount evidences the absence of any intentional escalation of legal fees on the part of MEEB.

Court hearings, motion practice, preparation for and continuation of an April 2007 trial, preparation for and rescheduling of a number of pretrial conferences, mediation proceedings and various telephone conferences in the June 2006 unit 105 suit during the first six months of 2007 led to an increase in Pondview's legal fees of $17,907.00.  The largest monthly charge consisted of $9,664.00 in April 2007 to prepare for the then scheduled April 11, 2007 trial.  The work appears necessary and, although certain tasks took longer than necessary, there was no duplication of effort.

On April 9, 2007, plaintiff's attorney filed an appearance

in the April 2005 unit 104 suit.  Three weeks later, he filed an
appearance in the June 2006 unit 105 suit.

On May 3, 2007, a MEEB attorney reviewed a notice of
foreclosure.  On May 30, 2007, MEEB prepared 60 day delinquency
letters for plaintiff and the first mortgagee.  At the same time,
MEEB sent the first mortgagee a 30 day notice letter of
Pondview's intent to file or continue an action on unit 104.
MEEB did not wait 30 days to file another lawsuit.  Thus,
on June 1, 2007, MEEB filed another unit 105 suit ("June 2007
unit 105 suit").  Thereafter, Pondview incurred additional legal
fees related in part to the start of foreclosure proceedings on
unit 105.[68]  Specifically, Pondview incurred legal fees which it
debited to the unit 105 account in July ($426.70), August
($856.00) and September ($411.00) of 2007.

In July 2007, Halbich left Pondview and no longer resided in
unit 105.  In or around October 2007, plaintiff moved into unit
105 where he resided until January 2008.  Foreclosure proceedings
began in May 2007 on unit 105, which plaintiff owned at the time.
A foreclosure took place in September 2007 which led to an
eviction proceeding.  The foreclosure resulted from plaintiff's
failure to pay his mortgage debt.  MEEB's filing of the June 2006
and June 2007 unit 105 suits did not result in or cause the

---

[68]  Plaintiff's calculations of unit 105 legal fees after
June 30, 2007 (Docket Entry # 60, p. 16, fn. 4) do not contain
accurate numbers for a number of the monthly charges.

foreclosure.[69]  In January 2008, plaintiff was evicted from unit 105 and moved into unit 104.  Plaintiff continues to live in unit 104 without paying condominium fees, rent or mortgage payments.  In September 2008, a separate foreclosure took place on unit 104.  Plaintiff felt devastated by the foreclosures especially unit 104 because it was his "mother and father's place."  (Docket Entry # 57, p. 87).  He testified to going to a hospital in Lynn, Massachusetts in September 2008 experiencing chest pains.[70]

Plaintiff testified that as a result of the September 2007 and September 2008 foreclosures, he lost sleep, was prescribed Valium at a five milligram dosage and experienced anxiety.  Previously in 2003 and 2004, however, plaintiff took Valium at the same dosage.  In 2003, a physician also prescribed plaintiff Paxil, an antidepressant.  He received these prescriptions and took these medications before MEEB's involvement.  As an issue of fact, this court finds that plaintiff's sleeplessness, Valium prescription and need to take antidepressant medication did not result from misconduct, if any, on the part of MEEB.  He additionally experiences high blood pressure.

On October 10, 2007, MEEB sent plaintiff another 60 day

---

[69]  As discussed later in this opinion, filing these lawsuits violated section 1692d.

[70]  In a deposition in a prior lawsuit plaintiff brought against MERS and another banking entity, plaintiff attributed the hospital admission not to MEEB but rather to the stress and anxiety of the mortgage at issue in that lawsuit.

delinquency letter for unit 105.  MEEB sent the letter to
plaintiff as opposed to his attorney.  On October 11, 2007, MEEB
filed another unit 105 suit on Pondview's behalf again due to a
perceived need to obtain a priority lien for the proceeding six
months given the increased risk of foreclosure ("October 2007
unit 105 suit").  The suit alleges common expenses, including
attorney's fees, in the amount of $34,012.07.[71]

On November 26, 2007, a MEEB attorney, Andrew Brooslin, Esq.
("Brooslin"), had a telephone conference with an attorney at
Harmon, Neil Heiger, Esq. ("Heiger"), about the current lien
payoff amount for unit 104.  Brooslin provided the figures to
Heiger in a letter the following day.  The total ($29,764.19)
included the outstanding $22,622.99 amount from the March 28,
2007 judgment, additional condominium fees from April to November
2007 ($2,328.00), legal fees for the same time period ($4,538.00)
and a dismissal fee ($275.00).  Brooslin did not provide
plaintiff with a copy of the November 27, 2007 letter.

Plaintiff continued not to pay condominium fees and
corresponding late fees for the remainder of 2007 for both unit
104 and unit 105.  At the end of the year, he had a balance due

---

[71] Plaintiff does not specifically identify or allege that
this amount is inaccurate.  See Higgins v. New Balance Athletic
Shoe, Inc., 194 F.3d at 260 ("district court is free to disregard
arguments that are not adequately developed"); see also fn. 81
infra.

in the unit 104 account of $34,482.22.[72]

In March 2008, the June 2006 unit 105 suit went to trial thereby necessitating a legal fee in March of $8,536.05.  A review of the entries shows 34 hours of work on matters such as attending court proceedings, preparing affidavits and proposed stipulations of fact, telephone conferences with court personnel and Vischetti, drafting motions and appearing at trial.  Drawing the reasonable inference that Pondview debited the unit 105 account for these March legal fees, they relate to the trial and, while large, do not show an excessive duplication of effort on tasks let alone an intentional escalation of legal fees by a preponderance of the evidence.

In June 2008, the Justice in the June 2006 unit 105 suit issued a decision.  Finding that plaintiff had "failed to pay the condominium fees and assessments since February 2006 and incurred late fees and collection fees as a result," she awarded Pondview $7,234.54 for unpaid condominium fees, late fees and assessments up to the date of the March 28, 2008 trial.  Without itemizing the reductions by billing entry but noting that MEEB represents it redacted "all legal services rendered in connection with the defense of the counterclaim," she reduced Pondview's request for

---

[72]  Plaintiff's calculations for the unit 105 legal fees after June 30, 2007 (Docket Entry # 60, p. 16, fn. 4) do not contain accurate numbers for a number of the monthly charges.

$29,792.72 in legal fees to $14,000.00.[73]  (Ex. 80).  Plaintiff did not pay the judgment.

Meanwhile, during the first six months of 2008, MEEB charged Pondview a total of $2,002.00 for unit 104 collection activities. Plaintiff's nonpayment of condominium fees and accompanying late fees after the March 2007 corrected judgment ($22,622.99) led to another perceived need on the part of MEEB to file a unit 104 suit to protect the priority lien.

Consequently, on June 30, 2008, MEEB ordered another title examiner's report.  It also sent plaintiff, as opposed to his attorney, another 60 day delinquency letter stating that Pondview's records "as of April 2, 2007 through June 30, 2008 indicate" that plaintiff was "delinquent in meeting [his] financial obligations."  (Ex. 50).  The 60 day letter, which state law requires Pondview to send to "the unit owner," see Mass. Gen. L. ch. 183A, § 6(c), informed plaintiff of the amount of the debt set forth in Pondview's records "as of April 2, 2007 through June 30, 2008" at the time of the letter ($10,351.33). (Ex. 50).

Like the other 60 day letters, it explained that the amount

---

[73]  Defendant's request for a finding that the $14,000.00 amount was fair and reasonable (Docket Entry # 37, p. 37), such a finding is not required in this action at this point in time.  It is also moot in light of this court's finding that MEEB did not act with a bad faith intention to escalate its legal fees.

due ($10,351.33)[74] may be greater than the amount due "on the day you pay" and, accordingly, "an additional payment may be necessary to bring your account current."[75]  (Ex. 50).  Also like the other 60 day letters, it identified MEEB as a debt collector.[76]

After also sending the first mortgagee a 60 day delinquency letter (Ex. 23, 7/16/08 invoice, p. 2) and a 30 day notice letter on July 1, 2008 (Ex. 71), MEEB filed suit on July 3, 2008 ("the July 2008 unit 104 suit") without waiting 30 days.[77]  The complaint states that plaintiff was "assessed common expenses and charges in the amount of $10,351.33 since April 1, 2007 (hereinafter 'common expenses'), which have not been paid when due."  (Ex. 72, ¶ 5).  The next paragraph provides that,

_____

[74]  Plaintiff does not argue that this specific amount is inaccurate.  See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260.

[75]  The least sophisticated consumer would recognize that the amount stated ($10,351.33) was the amount due on June 30, 2008, and that a greater amount might be "due on the day you pay."  (Ex. 50).

[76]  Because plaintiff filed the present suit on February 3, 2009, the above letter falls within the one year limitations period applicable to the FDCPA.

[77]  Summarily referring to 17 exhibits, including exhibit 71, plaintiff states that MEEB communicated with plaintiff's "mortgagees after filing enforcement lawsuits" and that plaintiff "was given no notice of these communications."  Again referring to these exhibits, plaintiff complains that Pondview failed to "notify the mortgagees that [plaintiff] disputed MEEB's attorneys['] fees."  (Docket Entry # 60, ¶ 16).

"Interest and late fees have been charged for these overdue payments of common expenses" and that plaintiff and MERS, a defendant/party in interest, "are liable for attorneys' fees and costs . . .."[78]  (Ex. 72, ¶ 6).

Before filing the July 2008 unit 104 suit, MEEB, on behalf of Pondview, sent Harmon, MERS' counsel, a letter setting out the amounts plaintiff owed on unit 104.  The June 9, 2008 letter set out a total amount as of June 9, 2008 ($33,249.32) for unit 104. The amount included the April 2005 unit 104 suit judgment ($22,622.99), the condominium charges after the March 2007 judgment through June 6, 2008 ($4,947.33), the legal fees from April 24, 2007 through June 6, 2008 ($5,404.00) and a dismissal fee ($275.00).[79]  The legal fees and condominium charges total the exact amount in the July 2008 unit 104 suit, i.e., $10,351.33.

On July 31, 2008, MERS, added as a defendant and party in interest in 2005 in the April 2005 unit 104 suit, paid Pondview a slightly greater amount ($34,813.40) representing the amount of legal fees and costs "through July 2008."  (Ex. 48 & 77).  The $34,813.40 payment included the amounts in the June 9, 2008

---

[78]  The least sophisticated consumer would understand that the $10,351.33 amount included interest, late fees and common expenses including attorney's fees.

[79]  A prior letter dated May 13, 2008, from MEEB to Harmon set out a slightly lower total of $31,309.09.  (Ex. 69). Plaintiff alleges he had no notice of this communication to the attorney for MERS in violation of 15 U.S.C. § 1692c(b).

letter which in turn includes the $275.00 dismissal fee.[80]
Plaintiff did not receive copies of these communications.  As the
borrower on the April 2005 mortgage, this court draws the
reasonable inference that he received notice of MERS' payment
shortly thereafter in a mortgage statement.  On August 1, 2008,
MEEB filed a notice of voluntary dismissal of the April 2005 unit
104 suit.  As a party, plaintiff received a copy of the dismissal
notice.  On August 4, 2008, MEEB notified the Lynn District Court
that the judgment in the April 2005 unit 104 suit was satisfied
in full.  MEEB's invoices reflect that no further litigation took
place relative to the July 2008 unit 104 suit.

Pondview received judgments totaling $45,334.30 and MEEB
received $55,581.20 in attorney's fees.  MEEB billed Pondview a
total of $83,552.00 in legal fees and costs, an amount that the
courts in the April 2005 unit 104 and the June 2006 unit 105
suits reduced.  (Docket Entry # 51, pp. 84-85).

On September 16, 2008, MEEB sent plaintiff another 60 day
delinquency letter for unit 104.[81]  The letter stated a

---

[80]  Thus, MERS paid a greater dismissal fee than the $150.00
dismissal fee in the unit 104 ledger attached to the May 17, 2005
letter.

[81]  Plaintiff has not challenged the statement in *this*
letter that "certain of those amounts are at least 60 days
overdue" as false in violation of section 1692e of the FDCPA.  He
had ample opportunity to make the argument when this court
extended the page limit for his post trial brief.  The argument
is therefore waived.  See Vallejo v. Santini-Padilla, 607 F.3d at
7; Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260

delinquency in the amount of $2,401.68.[82]  On September 16, 2008, MEEB also sent MERS a 60 day delinquency letter and a 30 day notice of intent to file or continue an action.  (Ex. 74; Ex. 23, Aug. 31, 2008 invoice).  MEEB sent a copy of MERS' 60 day letter to plaintiff.  Without waiting 30 days, MEEB filed suit on Pondview's behalf to collect the unpaid "common expenses and charges in the amount of $2,401.68" on unit 104 ("September 2008 unit 104 suit") in Essex Superior Court.[83]  (Ex. 78, ¶ 5).

MEEB adheres to a procedure in drafting and sending out the form 60 day delinquency letters.  Brooks or Janet Aronson ("Aronson"), the other partner in the collection department, supervise the attorneys in the collection department, including Brooslin and other MEEB attorneys involved in the collection activities for units 104 and 105.  Brooks and Aronson show the

---

("district court is free to disregard arguments that are not adequately developed"); see also United States v. Zannino, 895 F.2d at 17 (court cannot expected to do counsel's work); see generally U.S. v. Dyer, 589 F.3d 520, 527 (1st Cir. 2009) (before "district court, Dyer never used the term 'specific intent' to set forth the legal requirements for applying § 2G2.4(c)(2), and has waived the argument"); Jennings v. Jones, 587 F.3d 430, 444 (1st Cir. 2009) ("Jennings did not present the argument to the district court until his motion to reconsider the court's decision to grant a new trial, and it is waived").

[82]  Again, plaintiff does not specifically address, let alone argue, that this amount is false or misleading under section 1692e or otherwise in violation of the FDCPA.  Based on the reason and the legal authority set out in the previous footnote, the argument is waived.

[83]  See fn. 29.

attorneys the relevant forms and are available for questions. Brooks, who has lectured at approximately 40 condominium law seminars during the past 15 years, receives questions on a daily basis from various attorneys in the collection department. Brooks served as president of the New England chapter of Community Associates Institute ("CAI"), a national organization for condominium associations, on two occasions.

MEEB also has a practice in place in the collection department to ensure compliance with the FDCPA. The collection department develops and readjusts, if necessary depending on case law and information obtained at legal seminars, the 60 day delinquency letters. Attorneys in the collection department attend seminars concerning the FDCPA. When significant cases are decided, MEEB circulates the cases around the office. The 60 day delinquency letters all have a telephone number that is exclusive for calls from condominium owners and debtors. When dialed, the caller hears a pre-recorded message which repeats the FDCPA validation notice in the letter. Preprinted facsimile sheets also include the language. MEEB based the FDCPA validation notice on language approved by the court in <u>Bartlett v. Heibl</u>, 128 F.3d 497, 501-502 (7th Cir. 1997), as not confusing to the least sophisticated consumer.[84]

---

[84] As discussed infra, the bona fide error defense, <u>see</u> 15 U.S.C. § 1692k(c), is not available for mistakes of law.

MEEB does not send the 60 day letters to the unit owners in order to harass, embarrass or cause the owner concern. Rather, MEEB sends the 60 days letters because chapter 183A requires them and MEEB's clients were unable to collect the funds themselves from the unit owners.

On June 29, 2009, MEEB sent Pondview a letter enclosing a $25,500.00 check relative to unit 105 from an attorney. The letter requested that Pondview pay MEEB $24,500.00 to pay the outstanding attorney's fees. It also noted that "the Board of Trustees agreed to compromise the amount of the lien in order to resolve this matter." (Ex. 81). On July 10, 2009, MEEB received and applied the $24,500.00 payment toward the outstanding legal fees for unit 105.

Plaintiff testified that he "spent several thousand dollars" to make copies of various documents "for the courts" to defend himself against MEEB during the time he was proceeding pro se. (Docket Entry # 57, p. 79). With respect to legal fees, he incurred attorney's fees of $400.00 at an undetermined time.[85] There was no evidence that plaintiff incurred any medical costs.[86]

---

[85] Prior to trial, MEEB filed a motion in limine to preclude evidence of legal fees, except for a $400.00 payment allegedly paid to Charles Sachetta, Esq., due to plaintiff's non-production during discovery. This court allowed the motion in limine on January 24, 2011, and on February 3, 2011, excluded any testimony above a $400.00 amount.

[86] This court excluded the evidence at trial. Plaintiff did not object to the exclusion at trial.

Plaintiff also experienced stress and anxiety due to one of the mortgages and brought suit against MERS and another banking entity under the Truth in Lending Act, 15 U.S.C. § 1643 ("TILA"). In a December 2009 deposition in that suit, plaintiff testified that the mortgage at issue financially harmed him "'[b]ecause it's tied up the last five years of my life.'" (Docket Entry # 53, p. 30). Plaintiff elaborated that, "'It's caused a lot of stress, anxiety'" (Docket Entry # 53, p. 32) and attributed the September 2008 hospital visit to that stress and anxiety, similar to the alleged anxiety and stress purportedly caused by MEEB in this action. Plaintiff also testified that another TILA lawsuit he brought relating to the interest rate on the March 2003 unit 105 mortgage caused him stress.

Plaintiff was unemployed from 2004 to the time of trial except for a period in 2005. In April 2005, he took a position as a general laborer at Testa Corporation ("Testa"), a demolition company. He worked at the company until August or September 2005. The time constraints of the litigation with Pondview did not force plaintiff to leave work. Rather, he became depressed and a recluse initially as a result of his father's death and even more so as a result of his mother's death. In another lawsuit, he also testified under oath that he stopped working at Testa because of a car accident. See Rule 32(a), Fed. R. Civ. P. The accident resulted in injuries to his lower back and upper

neck.  This court finds that the misconduct identified below on the part of MEEB was not causally connected to plaintiff leaving Testa.

## DISCUSSION

The complaint sets out violations of the FDCPA and chapter 93A.  It also refers to sections 1692d, 1692e, 1692f and 1692h as the basis of MEEB's liability.  Turning to the arguments in plaintiff's trial brief,[87] plaintiff submits that MEEB engaged in collection efforts that violated the FDCPA with the intention to escalate its legal fees.  (Docket Entry # 60, § 1).  With respect to this argument, plaintiff identifies sections 1692d, 1692e, 1692f, 1692c(b), 1692h and 1692g(a)(1) as the basis for the violations.[88]

Plaintiff subdivides the argument that MEEB intentionally escalated its attorney's fees into four categories.  First, plaintiff maintains that MEEB communicated false amounts of its attorney's fees to plaintiff and his mortgagees and communicated to plaintiff in a consistently vague, ambiguous and confusing

---

[87]  A prior Memorandum and Order denied plaintiff's request in footnote one of the brief to incorporate by reference all previous statements of law and arguments.  (Docket Entry # 62).

[88]  Plaintiff also relies on the definitions of the terms "communication" and "debt collector" in sections 1692a(2) and 1692a(6) to hold MEEB responsible for the conduct of Pondview and plaintiff's mortgagees.  In the course of rendering decisions on MEEB's liability under the FDCPA, this court has fully considered plaintiff's argument that MEEB is responsible for the conduct of Pondview and plaintiff's mortgagees.

manner in violation of sections 1692e(2)(A) and 1692g(a)(1).
(Docket Entry # 60, § 1(a)).

Second, plaintiff contends that MEEB secretly communicated
with plaintiff's mortgagees without his consent in violation of
sections 1692c(b) and 1692(e)(8).  Plaintiff adds that the
communications with plaintiff's mortgagees were deceptive,
misleading and extortive in violation of sections 1692d, 1692e
and 1692f.  (Docket Entry # 60, § 1(b)).

Third, plaintiff argues that MEEB never sent the 30 day
notice letters informing him of the intent to file suit 30 days
before filing suit as required under state law.  See Mass. Gen.
L. ch. 3A, § 6(c).  Plaintiff attributes the delay to MEEB's
desire to escalate its legal fees by recovering the additional
costs associated with filing the lawsuit and performing title
searches.  According to plaintiff, sending the summons and the
complaint at the same time as the 30 day notice letter violated
sections 1692d and 1692f.  (Docket Entry # 60, § 1(c)).

Fourth, plaintiff argues that MEEB's "bad faith" filing of
multiple lawsuits to collect the same debt violated sections
1692d and 1692f.  Plaintiff also complains that MEEB violated
section 1692c(b) by contacting plaintiff when it knew he was
represented by an attorney.  (Docket Entry # 60, § 1(d)).

Overall, the post trial brief focuses on MEEB's liability
under the foregoing sections of the FDCPA as opposed to chapter

93A.  Except for chapter 93A damages, plaintiff devotes only a
single sentence in the 37 page brief to MEEB's substantive
liability under chapter 93A.  (Docket Entry # 60).  Therein, he
argues that MEEB's violations of sections 1692d and 1692f
constitute "unfair and deceptive acts in violation of" section
two of chapter 93A.  (Docket Entry # 60).  The complaint,
however, asserts that MEEB's violations of the FDCPA are
independent as well as per se violations of chapter 93A.  (Docket
Entry # 1, ¶¶ 74 & 75).  Accordingly, this court addresses both
theories of chapter 93A liability.

I.  FDCPA

        Before turning to the particular sections of the FDCPA that
MEEB purportedly violated with respect to each of the four
arguments, MEEB raises three overarching arguments.  First, it
submits that the FDCPA's one year statute of limitations bars any
claims under the FDCPA prior to February 3, 2008.  As a matter of
state sovereignty, MEEB further argues that plaintiff cannot
recover under chapter 93A for FDCPA violations occurring before
February 3, 2008.  (Docket Entry # 61, ¶¶ 8-9; Docket Entry #
34).  Plaintiff submits that the four year limitations period
applies to the chapter 93 claims when based on FDCPA violations
and also relies on the continuing violation doctrine.  (Docket
Entry # 39).  Second, MEEB maintains that the fees and conduct
associated with the collection efforts for unit 105 during the

rental period lie outside the reach of the FDCPA.  Third, MEEB contends that it is not a "debt collector" within the meaning of the FDCPA.

A.  <u>Statute of Limitations</u>

Section 1692k(d), captioned jurisdiction, allows a party to bring "[a]n action to enforce any liability" under the FDCPA "within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d).  Absent an FDCPA violation after February 3, 2008, the FDCPA claims are time barred.  15 U.S.C. § 1692k(d); <u>see</u> <u>Harrington v. CACV of Colorado, LLC</u>, 508 F.Supp.2d 128, 131-132 (D.Mass. 2007) (quoting section 1692k(d) and summarily stating that FDCPA bars FDCPA claims for violations occurring prior to the one year period).

The statute does not define the accrual date and the First Circuit has not addressed the issue.  <u>Simard v. LVNV Funding, LLC</u>, 2011 WL 4543956, at *3 (D.Mass. Sept. 28, 2011) (section 1692k "'does not specifically define the date on which the violation occurs' thereby triggering the one year statute of limitations period").  Where, as here, an FDCPA claim "arises from a debt collection suit filed in state or municipal court, the statute of limitations runs from the day the complaint is filed or the day the plaintiff is served with a copy of the complaint."  <u>Id.</u> (citing <u>Johnson v. Riddle</u>, 305 F.3d 1107, 1113 (10th Cir. 2002), and <u>Naas v. Stolman</u>, 130 F.3d 892, 893 (9th Cir.

1997)); see Egbarin v. Lewis, Lewis & Ferraro LLC, 2006 WL 236846, at *9 (D.Conn. Jan. 31, 2006) ("FDCPA claims based on the filing of a lawsuit generally accrue when a claim is filed").

Moreover, plaintiff's reliance on the continuing violation doctrine (Docket Entry # 39) does not salvage the FDCPA claims arising prior to February 3, 2008. The doctrine typically applies "to the employment discrimination context." Schaffhauser v. Citibank (S.D.) N.A., 2009 WL 2400254, at *2 (3rd Cir. Aug. 6, 2009) (declining to extend doctrine to FDCPA claim) (not selected for publication).[89] Numerous courts therefore reject the doctrine's application to claims under the FDCPA. Fisk v. ARS National Services, Inc., 2012 WL 3236569, at *1 (N.D.N.Y. Aug. 7, 2012); Wilhelm v. Credico, Inc., 455 F.Supp.2d 1006, 1009 (D.N.D. 2006) (collecting cases); Egbarin v. Lewis, Lewis & Ferraro LLC, 2006 WL 236846, at *9 (collecting cases). Furthermore, each new discrete communication on the part of a debt collector "may constitute a separate violation of the FDCPA and commence a new statute of limitations period." Simard v. LVNV Funding, LLC,

_____

[89]   Rule 32.1, Fed. R. App. Pro., allows citations of unpublished opinions issued on or after January 1, 2007.  In addition to Schaffhauser, this opinion cites a number of unpublished opinions.  The local rule applicable to each unpublished opinion allows the citation but designates the opinion as non-precedential.  The applicable Third Circuit local rule provides that unpublished opinions are not binding precedent.  See Third Circuit LAR, App. I, IOP 5.7.  Accordingly, although this court cites a number of unpublished decisions for their persuasive authority, they do not provide precedent and are not binding.

2011 WL 4543956, at *3; see Solomon v. HSBC Mortgage Corp., 2010 WL 3069699, at *3 (10th Cir. Aug. 6, 2010) (collecting authority for principle that, "discrete violations of the FDCPA should be analyzed on an individual basis" for statute of limitations purposes) (not selected for publication).[90]

Accordingly, each suit MEEB filed constitutes a discrete and independent alleged violation of the FDCPA.  Incurring additional legal fees during the course of the litigation is simply a continuation of the escalation of fees incurred by filing the suit.  See Ball v. Ocwen Loan Servicing, LLC, 2012 WL 1745479, at *5 (N.D.Ohio May 16, 2012) ("course of litigation is not, in itself, a 'continuing violation' of the FDCPA").  Thus, the March 2008 trial in the June 2006 unit 105 suit is not a discrete act unrelated to the filing of the suit or the debt alleged therein. See, e.g., Calka v. Kucker, Kraus & Bruh, LLP, 1998 WL 437151, at *3 (S.D.N.Y. Aug. 3, 1998) (continued prosecution of collection suit, including filing amended complaint and summary judgment motion, did not constitute continuing violation and all such "claims" accrued on date suit was filed).  Similarly, attorney's fees and costs to collect the March 2007 judgment in the April 2005 unit 104 suit after February 3, 2008, do not constitute an independent, discrete FDCPA violation.

---

[90]   The applicable Tenth Circuit local rule provides that unpublished opinions are not binding precedent.  See Tenth Cir. R. App. P. 32.1(A).

The only two, timely filed suits are the July and September 2008 unit 104 suits.  In large part, plaintiff's arguments do not address these two lawsuits.  These timely acts, to the extent raised by plaintiff as an FDCPA violation, are discussed below under the relevant section of the FDCPA in the event they provide a basis for liability.  The vast majority of the testimony and exhibits at trial involve conduct that took place before February 3, 2008.

In a related limitations argument, MEEB asserts that chapter 93A does not provide liability for the untimely FDCPA misconduct. (Docket Entry # 61, ¶ 9, p. 13).  It is well established that an FDCPA violation "constitutes a per se violation of ch. 93A." French v. Corporate Receivables, Inc., 489 F.3d 402, 403 n.1 (1st Cir. 2007).  Chapter 93A has a four year statute of limitations. See Mass. Gen. L. ch. 260, § 5A.  MEEB submits that the longer, four year statute of limitations under state law "cannot 'trump'" the "'more restrictive period'" set out in the FDCPA.  (Docket Entry # 61, ¶ 9, p. 13) (quoting Crooker v. Wachovia Bank, N.A., 2008 WL 2066943, at *1 n.4 (D.Mass. May 14, 2008)).  The foregoing dicta in Crooker v. Wachovia Bank, N.A., 2008 WL 2066943, at *1 n.4, supports MEEB's position.  As stated in Crooker:

> Nor as a matter of sovereignty can a state statute of limitations trump a more restrictive limitations period set out in a federal statute creating a federal cause of action. Cf. Cambridge Literary Props., Ltd. v. W. Goebel

<u>Porzellanfabrik G.m.b.H. & Co. KG.</u>, 510 F.3d 77, 86-87 (1st Cir. 2007) (state-law cause of action which involves a threshold determination of plaintiff's copyright ownership "arises under" the federal Copyright Act and thus is subject to the federal three-year statute of limitations).

<u>Id.</u>

The issue MEEB raises presents a question of federal preemption based on chapter 93A's limitations period as opposed to jurisdiction.  Moreover, the timely and colorable FDCPA violations, detailed below, provide the necessary jurisdiction under section 1692k(d).  <u>See</u> 15 U.S.C. § 1692k(d) ("action to enforce any liability created by this subchapter may be brought in any appropriate United States district court").  Thus, even assuming that the one year statute of limitations in section 1692k(d) is jurisdictional, the timely FDCPA claims provide the basis for supplemental jurisdiction of the chapter 93A claims. <u>See</u> 28 U.S.C. § 1367(a); <u>Rhode Island Fishermen's Alliance, Inc. v. Rhode Island Dept. of Environmental Management</u>, 585 F.3d 42, 48 (1st Cir. 2009).

The issue MEEB raises is one of first impression in the First Circuit.  "The doctrine of federal preemption is rooted in the Supremacy Clause, which provides that 'the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding.'"  <u>SPGGC, LLC v. Ayotte</u>, 488 F.3d 525, 530 (1st

Cir. 2007) (quoting U.S. Const. art. VI, cl. 2).  Here, Congress

expressly addressed preemption of state laws in section 1692n of

the FDCPA which reads:

> § 1692n.  Relation to State laws
>
> This subchapter does not annul, alter, or affect, or exempt
> any person subject to the provisions of this subchapter from
> complying with the laws of any State with respect to debt
> collection practices, except to the extent that those laws
> are inconsistent with any provision of this subchapter, and
> then only to the extent of the inconsistency.  For purposes
> of this section, a State law is not inconsistent with this
> subchapter if the protection such law affords any consumer
> is greater than the protection provided by this subchapter.

15 U.S.C. § 1692n.

The four year, state statute of limitations applicable to

chapter 93A goes farther to protect consumers against unfair and

deceptive conduct in collection practices than the FDCPA's one

year limitations period.  As such, the four year limitations

period is not preempted by the FDCPA.  Indeed, "No revealed case

law suggests that Chapter 93A and the related Massachusetts

statutes and regulations dealing with debt collection practices

are inconsistent with, and thus preempted by, the FDCPA." Dean

v. Compass Receivables Management Corp., 148 F.Supp.2d 116, 119

(D.Mass. 2001) (citing 15 U.S.C. § 1692n); see also

Gonzales v. Arrow Financial Services, LLC, 660 F.3d 1055, 1067

(9th Cir. 2011) (section 1692n "coupled with the FDCPA's express

purpose to 'promote consistent State action,' 15 U.S.C. §

1692(e), establishes that Congress did not intend the FDCPA to

preempt consistent state consumer protection laws"); see, e.g., Harrington v. CACV of Colorado, LLC, 508 F.Supp.2d at 132 (summarily noting FDCPA claims barred by one year statute of limitations period and related chapter 93A claims barred by four year statute of limitations).

B.  Unit 105 as Outside Reach of FDCPA

MEEB next maintains that because unit 105 was a commercial, rental unit, all of the fees and conduct associated with MEEB's collection efforts lie outside the reach of the FDCPA.  More specifically, MEEB argues that expenses plaintiff owed for the rental unit constituted commercial as opposed to personal "debts" within the meaning of section 1692a(5).  (Docket Entry # 61, ¶ 14, p. 15).[91]

"The basic premise of the statutory scheme" of the FDCPA is that its protection "applies in connection with the collection of debts."  Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 23 (1st Cir. 2002) (citing section 1692e).  Consequently, "At a minimum," a complaint alleging FDCPA liability "must allege a scenario involving the collection (or attempted collection) of a debt." Id.

Section 1692a(5) defines the term "debt" as:

---

[91]  MEEB limits the one sentence argument to unit 105. (Docket Entry # 61, ¶ 14, p. 15).

any obligation or alleged obligation of a consumer[92] to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a(5).  Examining the statutory language as a whole, see Lawson v. FMR LLC, 670 F.3d 61, 68 (1st Cir.), petition for cert. filed, 80 U.S.L.W. 3007 (U.S. June 28, 2012) (No. 12-3), (First Circuit "and Supreme Court precedent require" examination of "broader statutory framework, including particularly the nearby language and the title and caption") (citations omitted), the breadth of the phrase "any obligation or alleged obligation" is not limited to a particular set of obligations.  Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C., 111 F.3d 1322, 1325 (7th Cir. 1997) (the "absolute language" of "any obligation to pay" does not "reference only a limited set of obligations").  The obligation must, however, be one "to pay money."  15 U.S.C. § 1692a(5); see Arruda v. Sears, Roebuck & Co., 310 F.3d at 23 (interpreting section 1692a(5) and finding bankruptcy discharge did not extinguish Sears' lien on consumer goods purchased by plaintiffs but obligation to Sears after bankruptcy discharge was only in rem right of repossession as opposed to obligation to pay money).  Here, plaintiff had an

_____

[92]  Section 1692a(2) broadly defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a(2).  The "debt" of a consumer therefore encompasses the debt of any person, including plaintiff.

75

obligation to pay money in the form of common expenses for unit 105, including attorney's fees.   The definition of a "debt" in section 1692a(5) additionally states that the debt consists of any obligation to pay money "arising out of a transaction."  15 U.S.C. § 1692a(5); see also Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d 477, 481 (7th Cir. 1997) (definition of "debt" centers "on the transaction creating the obligation to pay"). The language of section 1692a(5) then focuses on the "*subject* of the transaction," i.e., the "money, property, insurance or services" which must be "primarily for personal, family, or household purposes."  15 U.S.C. § 1692a(5) (emphasis added); see Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d at 481 (under section 1692a(5), "'the money, property, insurance, or services which are the subject of the transaction' must primarily be 'for personal, family, or household purposes'"); see also Bloom v. I.C. System, Inc., 972 F.2d 1067, 1068 (9th Cir. 1992) (FDCPA "applies to consumer debts and not business loans" and then quoting section 1692a(5)); Fleet National Bank v. Baker, 263 F.Supp.2d 150, 153 (D.Mass. 2003) (whether debt constitutes consumer debt "covered by the FDCPA, depends on the character of the lending transaction with particular attention to the purpose for which the credit was extended"); Business Lenders, LLC v. Gazak, 2005 WL 1353378, at *4 (D.Me. June 6, 2005) ("standards and duties set forth in the FDCPA do not extend to efforts to

collect on debts unrelated to transactions entered into 'primarily for personal, family, or household purposes'") (quoting section 1692a(5)); see, e.g., Dikun v. Streich, 369 F.Supp.2d 781, 785 (E.D.Va. 2005) ("[p]roperty owners association assessments for a plaintiff's residence are debts subject to the FDCPA").

In addition, the antecedent of the clause beginning "in which the money, property insurance or services" is the "transaction" out of which the obligation to pay arose as opposed to the "obligation" itself. Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, L.L.C., 214 F.3d 872, 875 (7th Cir. 2000) (antecedent of this clause "as a matter of grammar" is "the transaction out of which the obligation to repay arose, not the obligation itself"); see Pollice v. National Tax Funding, L.P., 225 F.3d 379, 401 (3rd Cir. 2000) ("plain meaning of section 1692a(5) indicates that a 'debt' is created whenever a consumer is obligated to pay money as a result of a transaction whose subject is primarily for personal, family, or household purposes"). Here, the obligation of plaintiff "to pay money" consists of the common expenses, including attorney's fees, for unit 105. In light of the statutory language and grammar, however, it is the subject of the transaction, as opposed to the debt or obligation, that must be "primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5). The issue

therefore reduces to identifying the transaction out of which the obligation to pay the common expenses for unit 105 arose.

The FDCPA does not define the term "transaction." Determining if the term is plain and unambiguous "begin[s] with the ordinary meaning of the term[] as of the time when the statutory provision was enacted."[93]  Hernandez-Miranda v. Empresas Diaz Masso, Inc., 651 F.3d 167, 171 (1st Cir. 2011).  To determine the ordinary meaning, it is permissible to "consult dictionary definitions, interpretations given to the same terms by judicial construction, and the statutory context in which the words are used."  Id.  Resorting to a dictionary definition, the Seventh Circuit in Bass defined the term "transaction" in section 1692a(5) as a "reference to many different types of business dealings between parties, and does not connote any specific form of payment."  Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C., 111 F.3d at 1325 (quoting definition of "transaction" in Webster's New World Dictionary 1509 (2nd ed. 1986), as "'a business deal or agreement'"); see also The Random House Dictionary of the English Language 2008 (2nd ed. 1987) (defining "transaction" as "the act of transacting or the fact of being transacted" and the verb "transact" as "to carry on or conduct (business, negotiations, activities, etc.) to a conclusion or settlement").

---

[93]  Section 1692a(5) was enacted in 1977.

In addition, the statute's use of the singular form of the term "a transaction" and "the transaction" reveals Congress' intent to limit "transaction" to a single business deal or transaction.  The nearby language of "transaction," as noted above, also connects the "debt" at issue, i.e., the common expenses for unit 105, as one "arising out of the transaction." 15 U.S.C. § 1692a(5).

Applying these meanings to the case at bar, the debt or obligation to pay the common expenses of unit 105 arose out of the transaction in which plaintiff took title to the property.[94] The debt to the condominium association also arose out of this transaction under which plaintiff became the unit owner.  Upon becoming the owner of unit 105, he became obligated to pay unit 105's respective share of the assessment as stated in the Declaration of Trust and by virtue of the Master Deed and chapter 183A, section six.[95]  Likewise, as a "unit owner," plaintiff became liable for his respective share of the assessment. (Docket Entry # B, Art. V, § 5.3); see, e.g., Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d at 481 (by purchasing condominium, Newmans became obligated at the time of *that* transaction "to pay any assessments" under "by-laws of their

---

[94]  See footnote eight and related text.

[95]  See fn. three, four and 12.

association" and Illinois condominium statute).[96]

Plaintiff became the owner of unit 105 when he obtained title to the unit and took out the mortgage in March 2003. He was living in the unit at that time and the terms of the mortgage documents describe the unit as plaintiff's residence. The purpose of becoming the owner was to have a place to live.[97] The transaction was therefore primarily for personal, family or household purposes within the meaning of section 1692a(5).

Case law confirms and supports this interpretation. See Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, L.L.C., 214 F.3d at 874-876; Ladick v. Van Gemert, 146 F.3d 1205, 1206 (10th Cir. 1998); see also Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d at 481. As explained by the Tenth Circuit in Ladick, "Ladick became obligated upon purchasing his condominium unit to pay any assessments pursuant to the governing documents of his association" and the assessment "therefore qualifies as an 'obligation of a consumer to pay money arising out of a transaction.'" Ladick v. Van Gemert, 146 F.3d at 1206 (quoting section 1692a(5)). Indeed, when an individual purchases a home with a mortgage but later moves to another city and then rents the home, the loan debt remains subject to the FDCPA

---

[96] See fn. three, four and 12.

[97] Footnotes seven and eight and the related text detail the relevant facts.

because the character of the debt is determined "when it arose rather than when it is to be collected" and at the time of the loan the individual purchased the property for a personal reason. <u>Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, L.L.C.</u>, 214 F.3d at 874-876.  The language of section 1692a(5) readily supports this conclusion because the "debt," defined as the obligation of a consumer to pay money, is one "*arising out of a transaction*."  15 U.S.C. §§ 1692a(5) (emphasis added).

Accordingly, MEEB's one sentence argument that the common expenses plaintiff owed relative to unit 105 were commercial, as opposed to personal or consumer, debts is unavailing.  Unit 105's expenses therefore fall within the reach of the FDCPA.

C.  <u>MEEB as Debt Collector</u>

MEEB submits that enforcing a security interest, such as the lien created under chapter 183A,[98] "does not qualify as debt collection activity under the FDCPA, except for the purposes of 15 U.S.C. § 1692f(6)."  (Docket Entry # 61, ¶ 12).  MEEB further reasons that because of the statutory lien under chapter 183A, the condominium assessments are not debts within the meaning of the FDCPA.  Accordingly, MEEB was not acting as a "debt collector."  (Docket Entry # 61, ¶ 13).  MEEB also points out, correctly, that plaintiff does not rely on section 1692f(6).

---

[98]  As explained in footnote four and the related text, MEEB is correct insofar as chapter 183A establishes a lien.

81

(Docket Entry # 61, ¶ 12).

The FDCPA defines a "debt collector" as one who "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6); see Heintz v. Jenkins, 514 U.S. 291, 292 (1995) (FDCPA "applies to a lawyer who 'regularly,' through litigation, tries to collect consumer debts") (emphasis omitted).  In pertinent part, the definition, which contains a reference to the statute relied upon by MEEB, section 1692f(6), reads as follows:

> (6) The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another . . . For the purpose of section 1692f(6) of this title, such term *also* includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.

15 U.S.C.A. § 1692a(6) (emphasis added).

"[T]here is a split of authority as to whether enforcers of security interests are 'debt collectors' for purposes of section 1692f(6) only, or whether they are subject to the entire FDCPA if they meet the general definition of a 'debt collector.'"  Payne v. Reiter & Schiller, P.A., 2012 WL 1054873, at *2 (D.Minn. March 8, 2012) (citing Montgomery v. Huntington Bank, 346 F.3d 693, 700-01 (6th Cir. 2003), and Kaltenbach v. Richards, 464 F.3d 524, 529 (5th Cir. 2006)).  Principles of statutory construction clarify the meaning of section 1692a(6) and its reference to

82

section 1692f(6).

The plain language of the last sentence in section 1692a(6) "distinguishes debt collection from security interest enforcement in its definition of a 'debt collector.'"  Speleos v. BAC Home Loans Servicing, L.P., 824 F.Supp.2d 226, 232 (D.Mass. 2011). Section 1692a(6) gives "a general definition of 'debt collector' but then adds that, under § 1692f(6), the term also includes an entity enforcing security interests."  Id. (emphasis added)  To avoid rendering the latter language surplusage, "[t]he plain implication is that a 'debt collector' under any other provision" of the FDCPA "does not include" a person in "any business the principal purpose of which is the enforcement of security interests."  Id.; accord Derisme v. Hunt Leibert Jacobson P.C., 2012 WL 3000386, at *12 (D.Conn. July 23, 2012) (because "Section 1692a(6) expressly includes enforcers of security interests only in reference to Section 1692f(6), courts have held that an enforcer of security interest is therefore not a debt collector for purposes of the other sections of the FDCPA").  Thus, the purposeful inclusion of an enforcer of a security interest for "'one section of the FDCPA [section 1692f(6)] implies that the term "debt collector" does not include [that] enforcer of a security interest for any other section of the FDCPA.'" Montgomery v. Huntington Bank, 346 F.3d 693, 700 (6th Cir. 2003) (quoting Jordan v. Kent Recovery Serv., Inc., 731 F.Supp. 652,

657 (D.Del. 1990)); see Derisme v. Hunt Leibert Jacobson P.C.,
2012 WL 3000386, at *13 (collecting authority supporting same
conclusion).[99]

The issue therefore reduces to whether MEEB is a "business
the principal purpose of which is the enforcement of security
interests" within the meaning of section 1692a(6).  The plain
meaning of "a security interest is not a promise to pay a debt;
it is an interest in some collateral that a lender can take if a
debtor does not fulfill a payment obligation."  Reese v. Ellis,
Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1216 (11th Cir.
2012) (interpreting section 1692a(6)) (citing Black's Law
Dictionary 1384 (8th ed. 2004) and its definition of "a 'security'

---

[99]   The Derisme court collected the following cases which
illustrate that courts interpret the security enforcer as an
entity primarily involved in foreclosure activities such as the
repossession agency at issue in Montgomery, 346 F.3d at 699-700.
The citations and parentheticals in Derisme are as follows:

> See e.g., Chomilo, 2007 WL 2695795, at *3 (concluding that
> an enforcer of security interest, such as a law firm
> foreclosing on mortgages of real property, fall "outside the
> ambit of the FDCPA except for the provisions of section
> 1692f(6)."); . . . ; Hulse v. Owen Fed. Bank, FSB, 195
> F.Supp.2d 1188, 1204 (D.Or. 2002) (finding that foreclosing
> on property pursuant to a deed of trust was not the
> collection of a debt within the meaning of the FDCPA); . . .
> ; Beadle v. Haughey, No.Civ. 04-272-SM, 2005 WL 300060, at
> *3 (D.N.H. Feb. 9, 2005) ("Nearly every court that has
> addressed the question has held that foreclosing on a
> mortgage is not debt collection activity for purposes of the
> FDCPA since [s]ecurity enforcement activities fall outside
> the scope of the FDCPA") (internal quotation marks and
> citation omitted); . . . .

Derisme v. Hunt Leibert Jacobson P.C., 2012 WL 3000386, at *13.

84

as '[c]ollateral given or pledged to guarantee the fulfillment of an obligation'").  In contrast, condominium assessments are obligations to pay money, i.e., a debt.  See Ladick v. Van Gemert, 146 F.3d at 1207 ("condominium assessment owed by Mr. Ladick to his condominium association qualifies as a debt under the FDCPA"); Dikun v. Streich, 369 F.Supp.2d at 785 ("[p]roperty owners association assessments for a plaintiff's residence are debts subject to the FDCPA"); Garner v. Kansas, 1999 WL 262100, at *2 (E.D.La. April 30, 1999) (condominium assessment "qualifies as an 'obligation of a consumer to pay money arising out of a transaction,' thereby meeting the definition of a 'debt' under Section 1692a(5)").

At the time of trial, MEEB had approximately 3,500 condominium associations as clients located in Massachusetts, New Hampshire and Rhode Island.  In representing those clients, MEEB engaged in "the collection of overdue condominium assessments." (Tr. I, p. 23).  Moreover, "MEEB admits that it regularly collects or attempts to collect, directly or indirectly, condominium assessments owed or due or asserted to be owed or due condominium associations."  (Docket Entry # 21, p. 2).  It also admits that, to the extent the FDCPA applies, "MEEB was attempting to collect a debt."  (Docket Entry # 21, p. 2).  The majority of MEEB's correspondence with plaintiff states "that this firm is acting as a debt collector for [Pondview] to collect

the debt discussed in this letter."  (Ex. 5, 8, 9, 25, 26, 29, 40, 44, 49, 50 56, 61 & 76).[100]  The principal purpose of MEEB's business is not seeking to obtain a pledged interest in collateral, such as a condominium unit in a foreclosure sale.  It is to collect the money owed condominium associations in overdue assessments.  The fact that assessments of common expenses "shall constitute a lien against the unit,"[101] Mass. Gen. L. ch. 183A, § 6(a)(ii), does not convince this court otherwise.  In sum, MEEB is not engaged in a "business the principal purpose of which is the enforcement of security interests," 15 U.S.C. § 1692a(6).  Rather, it is a "debt collector" within the meaning of section 1692a(6).

D.  <u>False Amounts and Vague Communications</u>

In the first of the aforementioned four arguments in the post trial brief, plaintiff asserts that MEEB consistently stated false amounts to plaintiff of the amount owed for attorney's fees and costs.  He submits that such conduct violates sections 1692e(2)(A) and 1692g(a)(1).  (Docket Entry # 60, § 1(a)).

Briefly turning to the history and purpose of the statute, Congress enacted the FDCPA in 1977 "'"to protect consumers from a host of unfair, harassing, and deceptive collection practices

---

[100]  The letters also include the language that Pondview "may" file suit and that a sale of your unit "may" result from that suit.

[101]  <u>See</u> fn. four.

without imposing unnecessary restrictions on ethical debt
collectors."'" F.T.C. v. Check Investors, Inc., 502 F.3d 159,
165 (3rd Cir. 2007) (quoting Staub v. Harris, 626 F.2d 275, 276-77
(3rd Cir. 1980) (quoting Consumer Credit Protection Act, S.Rep.
No. 95-382, at 1-2 (1977)); accord Jerman v. Carlisle, McNellie,
Rini, Kramer & Ulrich LPA, 130 S.Ct. 1605, 1608 (2010) (Congress
enacted FDCPA inter alia "to eliminate abusive debt collection
practices" and "ensure that debt collectors who abstain from such
practices are not competitively disadvantaged"); 15 U.S.C. §
1692e.  The statute accomplishes this goal by imposing strict
liability on a "debt collector" for certain enumerated collection
activities while allowing a bona fide error defense in section
1692k(c).  See Allen ex rel. Martin v. LaSalle Bank, N.A., 629
F.3d 364, 368 (3rd Cir. 2011) ("FDCPA is a strict liability
statute to the extent it imposes liability without proof of an
intentional violation") (collecting cases from Eleventh, Ninth,
Seventh and Second circuits); Som v. Daniels Law Offices, P.C.,
573 F.Supp.2d 349, 356 (D.Mass. 2008).  Courts evaluate the
proscribed collection activities and communications to the debtor
under a "least sophisticated consumer" standard.  See McMurray v.
ProCollect, Inc., 687 F.3d 665, 669 (5th Cir. 2012).

The least sophisticated consumer is an objective standard.
See Easterling v. Collecto, Inc., 692 F.3d 229, 234 (2nd Cir.
2012) ("least sophisticated consumer test is an objective

inquiry"); <u>Kistner v. Law Offices of Michael P. Margelefsky, LLC</u>, 518 F.3d 433, 438 (6th Cir. 2008) (least sophisticated consumer "test is objective"); <u>Pettway v. Harmon Law Offices, P.C.</u>, 2005 WL 2365331, at *3 (D.Mass. Sept. 27, 2005).  It protects "'the gullible as well as the shrewd'" but preserves "'a quotient of reasonableness'" by preventing liability for "'bizarre or idiosyncratic interpretations of collection notices.'"  <u>Hartman v. Great Seneca Financial Corp.</u>, 569 F.3d 606, 612 (6th Cir. 2009) (quoting <u>Barany-Snyder v. Weiner</u>, 539 F.3d 327, 332-33 (6th Cir. 2008)); <u>accord</u> <u>Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.</u>, 653 F.3d 241, 251 (3rd Cir. 2011) ("'least sophisticated consumer standard' . . . includes the 'gullible as well as the shrewd,' because the Act is a consumer protection law, but we 'preserv[e] a quotient of reasonableness and presum[e] a basic level of understanding and willingness to read with care'") (quoting <u>Wilson v. Quadramed Corp.</u>, 225 F.3d 350, 354-55 (3rd Cir. 2000), in parenthetical).  The least sophisticated consumer "'possesses rudimentary knowledge about the financial world and is capable of making basic logical deductions and inferences.'"  <u>Pettway v. Harmon Law Offices, P.C.</u>, 2005 WL 2365331, at *3 (quoting <u>Pettit v. Retrieval Masters Creditors Bureau, Inc.</u>, 211 F.3d 1057, 1060 (7th Cir. 2000), in parenthetical) (internal ellipses omitted); <u>accord</u> <u>Marino v. Hoganwillig, PLLC</u>, 2012 WL 1424733, at *4 (W.D.N.Y. April 24, 2012).

The proscribed collection methods in the statute prohibit inter alia debt collectors from:

> engaging in any conduct "the natural consequence of which is to harass, oppress, or abuse any person," 15 U.S.C. § 1692d; from using "any false, deceptive, or misleading representations or means in connection with the collection of any debt," 15 U.S.C. § 1692e; or from using "unfair or unconscionable means to collect or attempt to collect any debt," 15 U.S.C. § 1692f.

F.T.C. v. Check Investors, Inc., 502 F.3d at 166.  These broad categories of proscribed collection activity each "include examples of prohibited activity."  Id.  For example, the false or misleading representations proscribed in section 1692e include false representations about a debt's "character, amount or legal status."  15 U.S.C. § 1692e(2)(A).

   (1) Section 1692g(a)(1)

In the post trial brief, plaintiff maintains that MEEB failed to state "the amount of the debt" in a number of communications in violation of section 1692g(a)(1).  (Docket Entry # 60, p. 22).  As discussed below, section 1692g(a) only applies to an "initial communication."  15 U.S.C. § 1692g(a).  In the complaint, plaintiff additionally asserts that the March 31, 2005 letters do not comply with section 1692g.  (Docket Entry # 1, ¶ 25).

Section 1692g proscribes the notice and contents of a debt collector's "initial communication" to a debtor.  15 U.S.C. §

1692g (captioned "Notice of debt; contents").[102]  15 U.S.C. §

1692g(a)(1); <u>McKinney v. Cadleway Properties, Inc.</u>, 548 F.3d 496,

502 (7th Cir. 2008) ("FDCPA requires debt collectors to provide

certain information 'in the initial communication' with the

consumer or '[w]ithin five days after the initial

communication'") (quoting section 1692g(a)); <u>Silva v. National</u>

---

[102]  The complete language reads as follows:

(a) Notice of debt; contents

Within five days after the initial communication with a
consumer in connection with the collection of any debt, a
debt collector shall, unless the following information is
contained in the initial communication or the consumer has
paid the debt, send the consumer a written notice
containing--

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days
after receipt of the notice, disputes the validity of the
debt, or any portion thereof, the debt will be assumed to be
valid by the debt collector;

(4) a statement that if the consumer notifies the debt
collector in writing within the thirty-day period that the
debt, or any portion thereof, is disputed, the debt
collector will obtain verification of the debt or a copy of
a judgment against the consumer and a copy of such
verification or judgment will be mailed to the consumer by
the debt collector; and

(5) a statement that, upon the consumer's written request
within the thirty-day period, the debt collector will
provide the consumer with the name and address of the
original creditor, if different from the current creditor.

15 U.S.C. § 1692g.

Telewire Corp., 2000 WL 1466149, at *1 (D.N.H. Jan. 3, 2000)
(section 1692g(a) requires "debt collector to send the consumer
written notice containing specific information either with the
initial communication or within five days of it").

By its terms, section 1692g(a)(1) requires inclusion of "the
amount of the debt" in the "initial communication" or five days
thereafter.  15 U.S.C. § 1692g(a)(1).  A more specific statutory
section, to wit, section 1692e(2)(A), proscribes the debt
collector's continuing obligation to avoid making a false
representation of the amount of the debt after the initial
communication.  Where, as here, "'"Congress includes particular
language in one section of a statute but omits it in another
section of the same Act, it is generally presumed that Congress
acts intentionally and purposely in the disparate inclusion or
exclusion."'"  Duncan v. Walker, 533 U.S. 167, 173 (2001)
(quoting Bates v. United States, 522 U.S. 23, 29–30 (1997))
(internal brackets omitted); In re 229 Main Street Limited
Partnership, 262 F.3d 1, 5-6 (1st Cir. 2001) (recognizing
presumption that Congress acts intentionally "'in the disparate
inclusion or exclusion'" of terms in statutory sections) (quoting
Duncan v. Walker, 531 U.S. at 173).

The common meaning of "initial" denotes "the beginning" or
"first."  Random House Dictionary of the English Language 982 (2nd
ed. 1987) (defining "initial").  Principles of statutory

construction thus limit the reach of section 1692g(a) to the
"initial communication" or the written notice sent within five
days thereafter.  See Newman v. Ormond, 2010 WL 3623174, at *2
(11th Cir. Sept. 20, 2010) (unpublished).[103]

As aptly expressed in a recent Third Circuit opinion:

> We agree with the common-sense conclusion reached by other
> courts that "there can be only one 'initial communication'
> between a debt collector and a consumer, and any
> communication that follows the 'initial communication' is
> necessarily not an 'initial communication." Derisme v.
> Hunt Leibert Jacobson, PC, 2010 WL 4683916, at *5 (D.Conn.
> Nov. 10, 2010).  Faced with cases in which a validation
> notice did accompany an initial communication, but the
> plaintiff argued that the FDCPA was violated by subsequent
> communications lacking such a notice, courts have concluded
> that a debt collector has no obligation to send a validation
> notice with any communication other than the initial
> communication.  Weber v. Computer Credit, Inc., 259 F.R.D.
> 33, 39 (E.D.N.Y. 2009); Spira v. Ashwood Fin., Inc., 358
> F.Supp.2d 150, 158–59 (E.D.N.Y. 2005); see also Ehrich v.
> RJM Acquisitions LLC, 2009 WL 4545179, at *2 (E.D.N.Y. Dec.
> 4, 2009) ("Any letters after [the first communication
> between a debt collector and a consumer] are irrelevant for
> purposes of the notice requirement in Section 1692g(a).").

Peterson v. Portfolio Recovery Associates, LLC, 2011 WL 2181508,
at *2 (3rd Cir. June 6, 2011) (unpublished).[104]  As to section
1692g(a)(1), the issue therefore devolves into identifying the
"initial communication" (or the written communication five days
thereafter) and whether it contains "the amount of the debt."

---

[103]   See fn. 89.  The applicable Eleventh Circuit rule allows
citations of unpublished opinions.  "Unpublished opinions are not
considered binding precedent, but they may be cited as persuasive
authority."  11th Cir. R. 36-2.

[104]   See fn. 89.

The FDCPA does not define the term "initial communication" but it does define the term "communication."  See 15 U.S.C. § 1692a(2).  A "communication" within the meaning of the FDCPA "means the conveying of information regarding a debt directly or indirectly to any person through any medium."  15 U.S.C. § 1692a(2).  The statute also uses the singular as opposed to the plural form of the term "initial communication" thus evidencing an intent to limit the requirement to a single, initial communication as opposed to communications that follow.

Here, MEEB's first or initial communication with plaintiff in connection with the unit 104 debt was the March 23, 2005 letter relative to unit 104.  Likewise, MEEB's initial communication with plaintiff in connection with the unit 105 debt was the March 23, 2005 letter relative to unit 105.  Each letter included an amount of the debt for the respective unit.  MEEB did not send a previous communication and each letter is a communication "in connection with the collection of any debt" within the meaning of section 1692g(a).  Accordingly, it is the March 23, 2005 letters as to the unit 104 and the unit 105 debts that constitute the "initial communication" within the meaning of section 1692g(a).

The stated $1,495.61 amount of the debt in the March 23, 2005 letter for unit 104 was the actual amount owed as explained in the factual background.  Accordingly, MEEB did not violate section 1692g(a)(1) with respect to the amount of the unit 104 debt.

93

The stated amount of the debt "incurred through the date of" the March 23, 2005 letter for unit 105 was $1,431.61.  (Ex. 9). The amount was not correct.  Pondview carried over a balance of $346.62 in the unit 105 account into 2005.  Adding three months of condominium fees ($530.25), three months of loan payback charges ($49.74) and three months of late fees for both items ($150.00) yields a total of $1,076.61.  Legal fees as of March 23, 2005, totaled $280.00.  Accordingly, the March 23, 2005 letter overstated the amount of the debt, which included legal fees, owed by $75.00.  MEEB therefore violated section 1692g(a)(1).  The effect of this untimely FDCPA violation with respect to MEEB's chapter 93A liability is addressed later in this opinion.

The complaint challenges the validation language in the March 31, 2005 letters for unit 104 and 105 as not compliant with section 1692g(a).  As previously discussed, the March 31, 2005 letters are not the initial communications within the meaning of section 1692g.  Because they contain the same validation language as the initial communications in the March 23, 2005 letters, however, this court construes the allegations as based on the March 23, 2005 letters.

Plaintiff submits that the validation language "misleadingly inferred" that plaintiff:

> had only thirty days to dispute the validity of the debt (including the disputed retroactively charged late fees) instead of making it clear that the thirty days applied only to [MEEB's] right to assume that the debt was valid.  This

94

> confusion was compounded by the letter's subsequent emphatic
> statement that [MEEB] was not required to wait thirty days
> before undertaking further collection efforts which
> overshadowed and otherwise obfuscated [MEEB's] subsequent
> unemphasized statement concerning its suspension of such
> efforts upon receipt of notice of a dispute.

(Docket Entry # 1, ¶ 25).  Fairly construed, plaintiff raises a claim based on violations of sections 1692g(a)(3) and (4).

Section 1692g(a)(3) requires the debt collector to send the consumer a written "statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector."  15 U.S.C. § 1692g(a)(3).  Section 1692g(a)(4), in turn, requires the debt collector to include a statement "that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt . . .."  15 U.S.C. § 1692g(a)(4).

Section 1692g(b) instructs that a debt collector may engage in collection activities during the 30 day period "unless the consumer has notified the debt collector in writing that the debt . . . is disputed or . . . requests the name and address of the original creditor."  15 U.S.C. § 1692g(b).  Plaintiff did not provide MEEB with a written request disputing the debt let alone one within 30 days of receiving the March 23, 2005 letters. Accordingly, MEEB's collection activities consisting of the March 31, 2005 letters and Bailey's April 2005 letter did not contravene

this aspect to section 1692g(b).

Section 1692g(b) also prohibits "[a]ny collection activities and communication during the 30-day period" that "overshadow or" are "inconsistent with . . . the consumer's right to dispute the debt or request the name and address of the original creditor." 15 U.S.C. § 1692g(b).  The March 31, 2005 collection letters and Bailey's April 2005 letter did not overshadow plaintiff's right to dispute the debt or otherwise violate section 1692g(b).  The April 2005 suits did not overshadow or otherwise violate section 1692g(b) because MEEB filed them more than 30 days after plaintiff received the March 23, 2005 letters.

Turning to the actual content of the validation notice and contrary to plaintiff's assertion (Docket Entry # 1, ¶ 25), the language did not misleadingly infer or imply that plaintiff had only 30 days to dispute the debt.  The first sentence states that plaintiff has 30 days to dispute the validity of the debt but then immediately follows this language with two sentences.  The first of the two sentences outlines what happens if plaintiff disputes the debt.  The second of the two sentences outlines what happens if plaintiff does not dispute the debt.  See Wilson v. Quadramed Corp., 225 F.3d at 356 (letter, giving option of immediate payment or notification in 30 days did "not emphasize one option over the other, or suggest that Wilson forego the second option in favor of immediate payment").  This language does not confuse or mislead

96

the least sophisticated consumer that he has only 30 days to dispute the debt's validity.  See, e.g., Bartlett v. Heibl, 128 F.3d at 501-502 (setting out almost identical language as not confusing or in violation of section 1692g).

Taking the foregoing language in the context of the next paragraph, it is true that the notice underlines and therefore emphasizes the first sentence that MEEB is "not required to wait until the end of" the 30 day period "before taking further steps to collect" the debt.  (Ex. 8 & 9) (omitting bolding, italics and underlining).  The entire notice, however, is in bold and in italics.  Only the first sentence of the second paragraph is underlined.  The sentence immediately following this language also explains that if plaintiff "request[s] proof of the debt or the name and address of the original creditor" within the 30 day period, MEEB "will suspend our efforts to collect the debt until we mail you the information."  (Ex. 8 & 9) (italics and bolding omitted).  Although this sentence is not underlined, it is still emphasized with italics and bolding.  It also has the same type face as the underlined sentence.  See Wilson v. Quadramed Corp., 225 F.3d at 356 ("first two paragraphs of the letter do not overshadow the validation notice" because notice had "same font, size and color type-face as the first two paragraphs"); see also Peter v. GC Services L.P., 310 F.3d 344, 349 n.2 (5th Cir. 2002) ("validation letter engages in overshadowing when the

97

contradictory language is in 'screaming headlines' or the notice language is in fine print, faint print, or confusing typeface") (citation omitted).

In sum, from the viewpoint of the least sophisticated consumer, see Russell v. Equifax A.R.S., 74 F.3d 30, 34 (2nd Cir. 1996) ("[w]hen determining whether § 1692g has been violated, an objective standard, measured by how the 'least sophisticated consumer' would interpret the notice . . . is applied"), the March 23, 2005 letters comply with sections 1692g(a) and (b) except for the false amount of the unit 105 debt in the March 23, 2005, unit 105 letter (Ex. 9).

(2) Section 1692e(2)(A)

Turning to section 1692e(2)(A), plaintiff identifies the following documents in the post trial brief as the basis for MEEB's liability:  the May 2, 2005 letter (Ex. 21); the first May 17, 2005 letter (Ex. 22); the October 4, 2005, 60 day letter relative to unit 105 (Ex. 25); the October 4, 2005 notice of intent to collect rent letter relative to unit 105 (Ex. 25); the complaint in the April 2005 unit 104 suit (Ex. 15); and the complaint in the April 2005 unit 105 suit (Ex. 16).  (Docket Entry # 60, § 1(a)).  Plaintiff argues that the foregoing communications contained false representations of the character, amount and legal

status of the debt in violation of section 1692e(2)(A).[105]
Alternatively, he asserts that the communications were
"consistently vague, ambiguous, misleading and confusing" in
violation of section 1692e.  (Docket Entry # 60, § 1(a)).

Section 1692e prevents a debt collector from using "any
false, deceptive, or misleading representation or means in
connection with the collection of any debt."[106]  15 U.S.C. § 1692e.
The section provides a non-exclusive list of examples that
contravene this general prohibition.  15 U.S.C. § 1692e(1)-(16);
see F.T.C. v. Check Investors, Inc., 502 F.3d at 166.  Plaintiff
relies on section 1692e(2)(A) which prohibits a false
representation of "the character, amount, or legal status of any
debt."  15 U.S.C. § 1692e(2)(A).

Stating an incorrect amount of the debt undeniably violates
section 1692e(2)(A).  See Hepsen v. Resurgent Capital Services,

---

[105]  As explained in greater detail in footnote 113,
plaintiff limits the challenge to the April 2005 suits to the
character and legal status of the debt.

[106]  In pertinent part, section 1692e(2)(A), states that:

A debt collector may not use any false, deceptive, or
misleading representation or means in connection with the
collection of any debt.  Without limiting the general
application of the foregoing, the following conduct is a
violation of this section: . . .

(2) The false representation of--

(A) the character, amount, or legal status of any debt.

15 U.S.C.A. § 1692e.

LP, 2010 WL 2490734, at *3 (11th Cir. June 17, 2010)
(unpublished).[107]  Although a debt collector is not necessarily
required to take affirmative steps to verify the creditor's debt,
the debt collector remains liable for including an incorrect
amount unless he can establish the bona fide error defense.  Id.
at *3-4.  On the other hand, a debt collector's letter stating a
correct amount ($3,864.09) as the "current amount due" for a
credit card debt and a letter more than two months later
accurately stating the "total due" as a different amount
($3,904.97) does not violate section 1692(2)(A) simply because the
initial letter did not inform the consumer that the debt would
increase over time.  Schaefer v. ARM Receivable Management, Inc.,
2011 WL 2847768, at *5 (D.Mass. July 19, 2011).

It is also not a false representation of the character of the
debt under section 1692e(2)(A) to identify the "interest due" as a
certain amount without subdividing the amount into principal and
interest.  See Hahn v. Triumph Partnerships LLC, 557 F.3d 755, 757
(7th Cir. 2009).  To provide another example, stating that the
amount of the "debt may vary daily based on additional interest,
late charges, and collection costs" is not a misrepresentation
under section 1692e "simply because the amount listed . . .
differed from the amount ultimately sought in settlement and
judgment."  Newman v. Ormond, 2010 WL 3623174, at *2.

---

[107]  See fn. 89 & 103.

Gauging the standard from the objective viewpoint of the least sophisticated consumer, this court turns to the May 2, 2005 letter.  Plaintiff argues that the statements that plaintiff owed $1,389.00 for attorney's fees for unit 104 and $1,772.00 for attorney's fees for unit 105 were false representations of the amount of the debt under section 1692e(2)(A).  MEEB's invoices to Pondview evidence legal fees for unit 104 of $1,194.00 as of May 2, 2005, and $1,605.00 for unit 105 as of May 2, 2005.  Because the amounts in the letter differ from the amounts due in the invoices as of May 2, 2005, plaintiff establishes that MEEB violated section 1692e(2)(A).

With respect to the existence of a bona fide error, a debt collector may avoid liability if he "shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."  15 U.S.C. § 1692k(c).  The defense requires that:  "'(1) The alleged violation was unintentional, (2) the alleged violation resulted from a bona fide error, and (3) the bona fide error occurred despite procedures designed to avoid such errors.'"  LaRocque ex rel. Spang v. TRS Recovery Services, Inc., 2012 WL 2921191, at *12 (D.Me. July 17, 2012) (quoting Beck v. Maximus, 457 F.3d 291, 297-98 (3rd Cir. 2006), and noting that First Circuit has not addressed the defense); see Owen v. I.C. System, Inc., 629 F.3d

101

1263, 1271 (11th Cir. 2011) ("§ 1692k(c) is an affirmative defense" under which debt collector bears "burden of showing that its FDCPA violation (1) was 'not intentional'; (2) was 'a bona fide error'; and (3) occurred despite the maintenance of procedures 'reasonably adapted to avoid any such error'"); <u>Johnson v. Riddle</u>, 443 F.3d 723, 729 (10th Cir. 2006) (in addition to intent, "debt collector's error must be bona fide and he must have maintained procedures reasonably adapted to avoid error").

It is true that MEEB has a practice in place before legal bills go out to clients such as Pondview to ensure the accuracy of such bills.  Associates review their time slips for accuracy and a partner then "looks at the bills before they go out."[108]  (Tr. IV, p. 48).  Brooks testified that the legal fees in the letter are those due at that time (May 2, 2005) and are correct.  (Tr. IV, p. 12 & 18).  Such testimony, in addition to other evidence, establishes that the error was intentional.  MEEB therefore fails in its burden to establish the bona fide error defense.

Accordingly, although now untimely, MEEB violated section 1692e(2)(A) by including two false amounts of its attorney's fees in the May 2, 2005 letter in violation of the FDCPA.  The false representation of the amount of the unit 104 debt totals $195.00 and for the unit 105 debt totals $231.00.

---

[108]  MEEB also has a practice tailored to avoiding an error in a ledger supplied by a client which MEEB then sends to a consumer debtor.

Plaintiff also contends that the May 2, 2005 letter violates section 1692e(2)(A) because it falsely represents that "[t]he following amounts are due" (Ex. 21) but the amounts did not include the May 1, 2005 condominium fees for unit 105 ($176.75) and unit 104 ($155.04).  It is true that the monetary amounts in the letter that follow do not include the May condominium fees.  The letter however does not state that the following amounts "are the total due" or "are all of the amount due."  See Schaefer v. ARM Receivable Management, Inc., 2011 WL 2847768, at *5.  The letter accurately states that "the following amounts are due." (Ex. 21).  Notably, immediately after the listed monetary amounts, the letter states that, "In addition, the May condominium fee was due on May 1st for each unit."  (Ex. 21).  Accordingly, the letter is not a false representation of the character of the debt vis-à-vis the condominium fees.  To the contrary, it is an accurate representation of the character and amount of the debt.  It accurately and forthrightly gives the monetary amounts along with a statement that the May condominium fees are also due.

Plaintiff's reliance on Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, L.L.C., 214 F.3d at 875, is misplaced. That case involved the requirement in section 1692g(a)(1) to state "the amount of the debt" in the "initial communication" or five days thereafter.  15 U.S.C. § 1692g(a)(1).  Furthermore, the statement of the debt in Miller as the "'unpaid principal

balance'" without giving a statement of the full amount of the debt, id., differs factually from the May 2, 2005 letter.  Here, MEEB made a representation of amounts that "are due" and that the May condominium fee is also "due."  (Ex. 21).  The latter is a known monetary amount that did not change from April to May 2005.  Viewed by the least sophisticated consumer, the May 2, 2005 letter does not falsely represent the character or the amount of the debt.

Plaintiff also submits that the May 2, 2005 letter violates section 1692e(2)(A) because it "falsely inferred" that Pondview did not accept the checks because plaintiff failed to pay legal fees when the amounts of such fees consisted "largely" of fees for "preparing, filing, and recording" the April 2005 unit 104 and unit 105 suits.  (Docket Entry # 60, § 1(a)).  Plaintiff also complains that the letter falsely accuses plaintiff of not paying condominium fees even though he sent the two April 22, 2005 checks to Bailey.

The letter, however, correctly and in a straight forward manner states, "These checks do not represent payment in full.  When you made payment, you did not include *any* legal fees."  (Ex. 21)(emphasis added).  The statement is true and not false or misleading to the least sophisticated consumer.  The checks ($1,597.37 for unit 104 and $1,310.24 for unit 105) did not include any legal fees.  As of the date of the April 16, 2005

104

letter, Pondview owed MEEB the legal fees in the March 2005 invoices.  Plaintiff, in turn, owed these fees to Pondview.  Thus, although marked "full payment" for the particular unit, the amount of the checks was not a full payment of the debt for the designated unit.  In addition, the fact that legal fees increased after plaintiff tendered the checks does not render the letter misleading or a mischaracterization of the debt.

The letter further states that, "The following amounts are due" and lists the amounts, including the unit 104 and unit 105 fees.  (Ex. 21).  It does not falsely represent or misleadingly accuse plaintiff of not paying condominium or attorney's fees.  As of May 2, 2005, plaintiff had not paid the listed fees including the unit 104 fee of $1,507.37 and the unit 105 fee of $1,319.94.  Plaintiff had not paid these condominium fees because a check marked "full payment" for the "unit" is not full payment of the condominium fees for the unit where, as here, the debt for the unit included additional legal fees and Pondview never cashed the checks.  Indeed, cashing such a check under certain circumstances extinguishes the debt for the unpaid legal fees.  See McDonald v. U.S., 13 Cl.Ct. 255, 261 (Cl.Ct. 1987).[109]

_____

[109]  In greater detail, the Macdonald court explains that:

Retention or cashing of the debtor's check can, in some circumstances, operate as an acceptance by the creditor of the debtor's offer to give substituted performance.  "Where the amount is in dispute, and the debtor sends cash or check for less than the amount claimed, clearly expressing his

In addition and notwithstanding plaintiff's argument to the contrary, the fact that MEEB did not include copies of the complaints in the April 2005 unit 104 and unit 105 suits does not render the letter a violation of section 1692e(2)(A).  In short, except for the aforementioned false amounts of attorney's fees in the May 2, 2005 letter, viewing the letter as a whole, it is not a false representation of the character or amount of the debt under section 1692e(2)(A).

Next, plaintiff points to section 1692e(2)(A) violations in the first May 17, 2005 letter.  Like the May 2, 2005 letter, the May 17, 2005 letter incorrectly states the amount of the debt.  In particular, it includes two, duplicate legal fees for March 2005.  The two ledgers from Pondview attached to the letter already included the legal fees for March for each unit.  MEEB, however, then typed the same fee at the bottom of each ledger and added each fee to the balance as of May 17, 2005.  The letter thus adds the attorney's fees for unit 104 ($348.00) and for unit 105 ($536.00) twice to the balance as of May 17, 2005.  (Ex. 22).

_____

    intention that it is sent as a settlement in full, and not
    on account or in part payment, the retention and use of the
    money or the cashing of the check is almost always held to
    be an acceptance of the offer operating as a full
    satisfaction, even though the creditor may assert or send
    word to the debtor that the sum is received only in part
    payment."  6 Corbin on Contracts § 1279 (1962) (emphasis
    added).

McDonald v. U.S., 13 Cl.Ct. at 261 (emphasis omitted).

Although plaintiff did not suffer any economic or emotional injury due to MEEB's prompt correction of the amounts in the second May 17, 2005 letter (Ex. 24), the false amounts of the debt violate section 1692e(2)(A).  See Eads v. Wolpoff & Abramson, LLP, 538 F.Supp.2d 981, 986 (W.D.Tex. 2008) (FDCPA liability imposed even though debt collector amended state court petition to reflect accurate value of arbitration award).

MEEB fails to establish a bona fide error defense.  Its practice of reviewing the statements in ledgers received from its clients to ferret out inaccurate amounts does not insulate it from liability for the false statements because the practice was not reasonably adapted to avoid the error at issue.  See 15 U.S.C. § 1692k(c) (violation must result "from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any *such* error") (emphasis added); Owen v. I.C. System, Inc., 629 F.3d at 1274 (describing the relevant inquiry as "'whether the procedures were "reasonably adapted" to avoid the specific error at issue'").  The error resulted from MEEB's conduct typing in the additional amounts as opposed to Pondview's initial and accurate inclusion of the legal fees in each ledger.

Plaintiff additionally argues that the May 17, 2005 letters are misleading because the figures at the bottom of each ledger setting out the "BALANCE AS OF 5/17/05" do not include the late fees for May 2005.  The least sophisticated consumer, however,

would not be misled.  The ledgers itemize the late fees and
identify each late fee with a particular month.  The ledgers
therefore include late fees for January, February, March and
April.  They do not include late fees for May.  Accordingly, they
adequately and forthrightly depict the late fees included in the
balance.

Plaintiff next asserts that the May legal fees "THROUGH
5/17/05" in the letter incorrectly state the amount as $317.00 for
unit 104 and $488.00 for unit 105.  MEEB's May 2005 invoice
evidences actual fees as of May 17, 2005, as $443.70 for unit 104
and $566.74 for unit 105.  MEEB therefore understated the amount
of legal fees owed for both units in the first May 17, 2005
letter.  MEEB's false representation of the amount of the debt
through May 17, 2005, thus violated section 1692e(2)(A).  MEEB
fails to meet its burden of showing that the inclusions were bona
fide errors and that such errors resulted from a procedure
reasonably adopted to avoid the error.  Although the FDCPA
violation is untimely, the misconduct provides support for a per
se chapter 93A violation.

Finally, the first May 17, 2005 letter included a dismissal
fee of $150.00 in each ledger and an estimate of a sheriff's bill
of $100.00 in each ledger.  Plaintiff submits that both
representations are false under section 1692e(2)(A).  As of May
17, 2005, there was no dismissal of either the April 2005 unit 105

suit or the April 2005 unit 104 suit.  "'A debt collector that
inflates the amount of the debt, whether through unauthorized
service fees or otherwise, violates [section 1692e(2)(A)].'"
Gathuru v. Credit Control Services, Inc., 623 F.Supp.2d 113, 122
(D.Mass. 2009) (collecting cases).  Because MEEB fails to
establish a bona fide error defense relative to these errors,
MEEB's inclusion of the dismissal fees violates section
1692e(2)(A).  Although untimely, the failure supports a per se
chapter 93A claim.  In contrast, the $100.00 *estimated* amounts of
the sheriff's fees accurately represent the actual sheriff's fees
of $93.74 for unit 105 and $70.70 for unit 104.

The next section 1692e(2)(A) violations plaintiff identifies
in the post trial brief arise from the two October 4, 2005 letters
that MEEB sent plaintiff.  The notice of intent to collect rent
letter identifies the amount of the debt as $1,098.14 and the 60
day letter for unit 105 identifies the same figure.  MEEB attached
the ledger it received from Pondview to both letters reflecting
the accurate amount owed of $1,003.14.  The ledger did not include
Bayview's May 20, 2005 payment of $3,800.27 except insofar as it
reflected reduced amounts.[110]  At the bottom of both ledgers, MEEB
typed in the October 4, 2005 charge of $95.00 for drafting the
"notice of delinquency letter."  (Ex. 25 & 26).

---

[110]  The failure to include the credit would not mislead the
least sophisticated consumer.

Each letter contains the characterization of the unit 105 debt as being "through the date of the letter," i.e., October 4, 2005. MEEB's invoice for unit 105 as of October 4, 2005, however, reflects charges of $96.00 for drafting the delinquency letter, $101.00 for ordering the title search and $180.00 for drafting the notice of intent to collect rent letter. Plaintiff therefore argues that each letter falsely represents the character of the debt. Plaintiff is correct. MEEB violated section 1692e(2)(A) by incorrectly stating the amount of the debt ($1,098.14) as of the October 4, 2005 letter when, in fact, the debt was $282.00 greater for a total amount of $1,380.14.

As the last violation of section 1692e(2)(A) in section 1(a) of the post trial brief, plaintiff relies on the complaints in the April 2005 unit 104 suit and the April 2005 unit 105 suit. Defendant argues that a complaint is not a "communication" within the meaning of the FDCPA. (Docket Entry # 61, ¶ 38).

The FDCPA defines "communication" as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). The language does not expressly exclude a legal pleading.

In a different section, however, the statute makes an exception for "a formal pleading made in connection with a legal action" as outside the reach of section 1692e(11) liability. 15 U.S.C. § 1692e(11). As explained in Goldman v. Cohen, 2004 WL

110

2937793 (S.D.N.Y. Dec. 17, 2004), "'If a legal pleading was not
included within the meaning of communication under the FDCPA, then
it would have been unnecessary for Congress to except formal
pleadings from the requirements of § 1692e(11).'" Id. at *2
(rejecting argument "communication" does not include legal
pleadings); see also In re 229 Main Street Limited Partnership,
262 F.3d at 5-6 (noting presumption that Congress acts
intentionally "in the disparate inclusion or exclusion" of terms
in statutory sections).  The "exclusion of a legal pleading from
the scope of the term 'communication'" in section 1692e(11)
therefore "implies the drafters' understanding that the term
'communication' would otherwise include legal pleadings." Goldman
v. Cohen, 2004 WL 2937793, at *2.  Accordingly, in the sections
"of the statute that mention 'communication' without expressly
excluding legal pleadings, legal pleadings are included." Id.
Section 1692e(2)(A) does not expressly exclude legal pleadings
from its reach.

In addition, defendant's reliance on *Federal Trade
Commission-Statements of General Policy or Interpretation Staff
Commentary on the Fair Debt Collection Practices Act*, 53 Fed.Reg.
50097, 50100 (1988) ("staff commentary"), is misplaced.  The
relevant portion of the staff commentary reads as follows:

> Attorneys or law firms that engage in traditional debt
> collection activities (sending dunning letters, making
> collection calls to consumers) are covered by the FDCPA, but
> those whose practice is limited to legal activities are not

111

> covered.  Similarly, filing or service of a complaint or
> other legal paper (or transmission of a notice that is a
> legal prerequisite to enforcement of a debt) is not a
> "communication" covered by the FDCPA, but traditional
> collection efforts are covered.

Id.  In citing this staff commentary, the Supreme Court in Heintz

v. Jenkins, 514 U.S. at 298, considered it nonbinding because it

states "it 'is not binding on the Commission or the public.'"   Id.

at 298 (quoting staff commentary).  Here too, the nonbinding

staff commentary does not supplant the statutory language that

excludes a "formal pleading" in a legal action in section

1692e(11) but makes no exception for a formal pleading in section

1692e(2) or the act's definition of a "communication."  15 U.S.C.

§ 1692a(2).  Accordingly, section 1692e(2)(A), which proscribes

false representations of "the character, amount or legal status of

any debt," encompasses false representations in the state court

complaints filed by MEEB.[111]   See, e.g., Delawder v. Platinum

Financial Services, 443 F.Supp.2d 942, 948 (S.D.Ohio 2005)

(attaching false affidavit to complaint may violate section

1692e(2)).  Having rejected defendant's argument with respect to

its FDCPA liability,[112] this court turns to the statements in the

_____

[111]  It is also worth noting that the state court lawsuits
were not foreclosure actions on a piece of property.  See Trent
v. Mortgage Electronic Registration Systems, Inc., 618 F.Supp.2d
1356, 1361 (M.D.Fla. 2007) (foreclosing on mortgage is not debt
collection activity within scope of FDCPA) (collecting cases).

[112]  The litigation privilege, which does not apply to the
FDCPA, is addressed later in this opinion.

April 2005 unit 104 suit and the April 2005 unit 105 suit that plaintiff challenges.

Plaintiff initially submits that paragraph five in the April 2005 unit 104 suit and paragraph six in the April 2005 unit 105 suit falsely represent the character and legal status of the debt under section 1692e(2)(A).[113]   (Docket Entry # 60, § 1(a), pp. 24-

---

[113]   The post trial brief quotes *only* the portion of section 1692e(2)(A) that proscribes the false representation "of the 'character . . . [and] legal status' of the debt" (Docket Entry # 60, p. 24) (quoting section 1692e(2)(A)) as opposed to the prohibition in section 1692e(2)(A) that the "amount" is false. Paragraphs 34 and 35 of the complaint do not refer to the amounts as false but they do state that, "The amounts stated *as due* were greater than the amounts shown *as due* in Marcus, Errico's own records at the time."  (Docket Entry # 1, ¶ 34) (emphasis added). This unadorned allegation does not, without more, raise the issue that the entire figure designated as the common expenses in each of the nine enforcement suits was a false representation of the "amount . . . of any debt" under section 1692e(2)(A).  Rather, it raises the same issue raised and developed in the post trial brief with respect to the April 2005 suits, to wit, that the amounts stated were not due at the time and were not duly assessed.  As such, they purportedly misrepresent the character and legal status of the debts.  The issue of the common expenses in each of the nine enforcement suits as a "false representation" of "the . . . amount . . . of any debt" is therefore waived.  See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed"); see also U.S. v. Dyer, 589 F.3d 520, 527 (1st Cir. 2009) (before "district court, Dyer never used the term 'specific intent' to set forth the legal requirements for applying § 2G2.4(c)(2), and has waived the argument"); Jennings v. Jones, 587 F.3d 430, 444 (1st Cir. 2009) ("Jennings did not present the argument to the district court until his motion to reconsider the court's decision to grant a new trial, and it is waived"); see generally Vallejo v. Santini-Padilla, 607 F.3d 1, 7 (1st Cir. 2010) ("[p]laintiffs have not cited a single authority in support of their assertion that their failure to timely oppose the motion to dismiss did not constitute waiver").

25).  The paragraphs state that plaintiff has "been duly assessed common expenses and charges" in the designated amount "which have not been paid when due."  (Ex. 15, ¶ 6; Ex. 16, ¶ 6).  Plaintiff points out that the amounts included attorney's fees and costs to prepare and file the complaints on April 26, 2005.  Plaintiff thus asserts that, "Brooks knew [that plaintiff] received no notice of [these legal fees and costs], and that consequently [plaintiff] had not been assessed and failed to pay [sic] when due."  (Docket Entry # 60) (§ 1(a)).[114]

The least sophisticated consumer would recognize that each monetary figure in the two paragraphs at issue included legal fees.  The paragraphs state that plaintiff has "been duly assessed common expenses and charges in the amount of [$2,567.37 in the unit 104 suit and $2,694.94 in the unit 105 suit]."  The next paragraph in each complaint states that plaintiff is "liable for attorney's fees and costs incurred by [Pondview] in pursuing this matter."[115]  "'[C]apable of making basic logical deductions and inferences,'" Pettway v. Harmon Law Offices, P.C., 2005 WL

---

[114]  Except for quoting section 1692e(2)(A) and setting out the above sentence, plaintiff does not offer any legal authority to support the argument or elaborate the basis of argument.

[115]  Although not necessary to this aspect of the decision, the March 23 and 31, 2005 letters all informed plaintiff that, "[Y]ou are responsible for [Pondview's] collection costs, including its attorney's fees."  (Ex. 5, 8, 9 & 29).  The same letters also advised plaintiff that Pondview "may file a lawsuit against you to establish your debt and enforce its lien."  (Ex. 5, 8, 9 & 29).

2365331, at *3, the least sophisticated consumer would therefore realize his responsibility for the attorney's fees Pondview incurred for filing the lawsuit.

The amounts, however, included attorney's fees and costs for preparing and filing the complaints. The complaints represent that the amounts "have not been paid *when due*." (Ex. 15 & 16) (emphasis added). MEEB generates its invoices to Pondview on a monthly basis. Pondview's ledgers reflect legal fees categorized by month, for example, "February Legal Fees" or "July Legal Fees." (Ex. 61). The Declaration of Trust states that the Trustees shall render statements to the unit owners of their percentages of interest and, "Unless otherwise provided, such statements *shall be due and payable within thirty days* after being rendered to the unit owners." (Ex. B, § 5.3) (emphasis added). Attorney's fees were therefore due and payable within 30 days of the unit owner's statement. The April 2005 unit 104 and unit 105 suits describe the $2,567.37 and $2,694.94 amounts as "assessed" and not "paid when due." At the time MEEB filed the two suits, however, the amounts attributable to "attorney[']s fees and costs for preparing and filing the complaint," as argued by plaintiff (Docket Entry # 60, p. 24), were not due and plaintiff had not failed to pay the amounts "when due." (Ex. 15 & 16). The amounts in paragraph six in the April 2005 unit 105 suit and paragraph five in the April 2005 unit 104 suit were therefore false representations of the

character and the status of the debts in violation of section 1692e(2)(A) insofar as they included the attorney's fees and costs for preparing the complaints.  MEEB's invoices reflect the amounts as $1,138.00 for preparing and filing the April 2005 unit 104 suit and a slightly larger amount for preparing and filing the April 2005 unit 105 suit.

The violation did not, however, result in an economic or pecuniary injury because plaintiff remained responsible for these reasonable attorney's fees.  (Ex. C, § 5.3).  In light of plaintiff's demeanor and lack of credibility, this court finds that the violation also did not result in any emotional or mental injury to plaintiff.  He was at all relevant times aware that he was responsible for the collection costs.[116]

Paragraphs 34 and 35 in the complaint likewise assert that the state court complaints violated section 1692e because "the amounts claimed had not been 'duly assessed' and had not been paid when due" even though plaintiff had no notice that the amounts were due "much less a reasonable opportunity to pay same." (Docket Entry # 1, ¶ 34).  These complaints all use the same language contained in the April 2005 unit 104 and the April 2005 105 suits that describes the common expenses and charges as "assessed" and "not paid when due."  (Ex. 10, 14, 65, 66, 72 &

---

[116]   <u>See</u> fn. 115.

78).[117]  MEEB's practice was to include "the legal fees for filing the complaint" and "the overdue assessments" in the amount identified as the common expenses and charges in the lawsuits it filed.  (Tr. 2, p. 61).[118]

For reasons discussed above, MEEB therefore violated section 1692e(2)(A) by including the following legal fees for filing the complaints in the following suits at a time when such fees had neither been "duly assessed" or not paid "when due":  (1) the $1,440.00 legal fees in the "assessed common expenses and charges" of $1,866.14 in the October 2005 unit 105 suit (Ex. 10 & 23); (2) the $1,454.00 legal fees in the "assessed common expenses and charges" of $3,771.04 in the June 2006 unit 105 suit (Ex. 14 & 23); (3) the $1,196.00 legal fees in the "assessed common expenses and charges" of $26,966.42 in the June 2007 unit 105 suit (Ex. 65 & 23); (4) the $1,143.00 legal fees in the "assessed common

---

[117]  Plaintiff fails in his burden to establish a section 1692e(2)(A) violation relative to the June 2006 unit 104 suit. He did not offer the complaint into evidence or otherwise sufficiently establish the delinquent amount stated therein.

[118]  In making this statement, Brooks was also testifying in response to questions about the legal fees included in the $2,567.37 figure in the April 2005 unit 104 suit.  Legal fees for filing that suit consisted of charges for drafting the 60 day delinquency letter, drafting the notice of intent to collect rent letter and reviewing documents as well as fees for a title examiner and a court filing.  This court draws the reasonable inference that MEEB's practice encompassed the inclusion of these fees as "the legal fees for filing the complaint" (Tr. 2, p. 61) and therefore includes these charges and fees in calculating the legal fees included for filing the other suits.

expenses and charges" of $34,012.07 in the October 2007 unit 105 suit (Ex. 66 & 23); (5) the $1,195.00 legal fees in the "assessed common expenses and charges" of $10,351.33 in the July 2008 unit 104 suit (Ex. 72 & 23); and (6) the $305.00 legal fees in the "assessed common expenses and charges" of $2,401.68 in the September 2008 unit 104 suit (Ex. 78 & 23). Chapter 93A liability, if any, based on these untimely and timely suits is addressed later in this opinion. Likewise, actual damages and statutory damages under section 1692k are addressed later in this opinion.

Plaintiff next argues in the post trial brief that including legal fees and costs in the amounts in paragraphs five in the April 2005 unit 104 suit and paragraph six in the April 2005 unit 105 suit but not identifying their inclusion of "legal fees and costs" was a false representation of "the character" of the debt under section 1692e(2)(A). (Docket Entry # 60, § 1(a), p. 24). The next paragraph in each complaint, however, clarifies that the amount included legal fees and costs to file the complaint. It states that plaintiff "is liable for attorneys' fees and costs." (Ex. 15, ¶ 6; Ex. 16, ¶ 7). Furthermore, the paragraphs at issue state that plaintiff was assessed the amount "pursuant to . . . the applicable provisions of the Condominium's documents." (Ex. 15, ¶ 5; Ex. 16, ¶ 6). The next paragraph in each complaint refers to the "the applicable provisions of the Condominium

118

documents" and states that plaintiff is liable for the attorney's fees "in accordance with said provisions." (Ex. 15, ¶ 6; Ex. 16, ¶ 7). Hence, from the standpoint of the least sophisticated consumer, there was no false representation of the character of the debt.

Plaintiff also complains that paragraph seven in the April 2005 unit 105 suit and paragraph six in the April 2005 unit 104 suit do not reflect whether each figure in the preceding paragraph included the late fees due at the time of the April 28, 2005 filing of each complaint. Plaintiff submits that the failure made the representations "ambiguous and confusing." (Docket Entry # 60). In each of the two complaints, the paragraph that follows the paragraph at issue unambiguously states that, "Interest and late fees have been charged for these overdue payments of common expenses." (Ex. 15, ¶ 6; Ex. 16, ¶ 7). The late fees were due on the fifteenth of each month. Accordingly, late fees for April had been charged and were overdue at the time MEEB drafted and filed the complaints. The least sophisticated consumer would not be confused or mislead about whether the amount included late fees for April 2005. Hence, the representation was not a false characterization of the debt under section 1692e(2)(A) or even a deceptive or misleading representation under section 1692e.

The final purported violation of section 1692e(2)(A) in the post trial brief appears in paragraph seven in the April 2005 unit

104 suit and paragraph eight in the April 2005 unit 105 suit.  The language of each paragraph is identical.  It reads, "Pursuant to M.G.L. c. 183A, § 6(c), the Plaintiffs did give the Defendants notice by certified and first class mail of the *aforesaid delinquency*, such delinquency having *existed for at least sixty days*."  (Ex. 15, ¶ 7; Ex. 16, ¶ 8) (emphasis added).  Plaintiff submits that the language is a false representation of the character and legal status of the debt under section 1692e(2)(A) because the amount "had not been delinquent for at least sixty days."  (Docket Entry # 60, § 1(a), pp. 24-25).

First, defendant's position that use of the word delinquency "recited the language of M.G.L. c. 183A, § 6(c)" (Docket Entry # 61, ¶ 40, p. 20) is misguided because it ignores the adjective "aforesaid."  Section 6(c) does not contain the word "aforesaid." Moreover, the least sophisticated consumer would not interpret "aforesaid delinquency" to mean the language in section 6(c) that reads, "the amount of delinquency."  Mass. Gen. L. ch. 183A, § 6(c).

Second, the common understanding of "aforesaid" is "said or mentioned earlier or previously."  Random House Dictionary of the English Language (2nd ed. 1987) (defining "aforesaid"); United Truck Leasing Corp. v. Cornucopia Natural Foods, Inc., 1997 WL 839909, at *3 (R.I.Super. April 23, 1997) (defining "aforesaid" in similar manner); City of Allentown v. Pennsylvania Public Utility

<u>Commission</u>, 96 A.2d 157, 158 (Pa.Super. 1953) (defining
"aforesaid" in similar manner).  Prior to paragraph seven in the
April 2005 unit 104 suit and paragraph eight in the April 2005
unit 105 suit, neither complaint uses the word "delinquency."  In
previous paragraphs, however, each complaint defines the
designated amounts ($2,567.37 in the unit 104 suit and $2,694.94
in the unit 105 suit) as "'common expenses'" followed by the
language "which have not been paid when due."  (Ex. 15, ¶ 5; Ex.
16, ¶ 6).  The next paragraph refers to "these overdue payments of
common expenses."  (Ex. 15, ¶ 6; Ex. 16, ¶ 7).  The complaint
therefore defines the $2,567.37 figure and the $2,694.94 figure as
common expenses and adds the description that such common expenses
are "overdue" and "not paid when due," in other words, a
delinquency.  <u>See</u> <u>Random House Dictionary of the English Language</u>
(2nd ed. 1987) (defining "delinquency" as inter alia "something,
as a debt, that is past due or otherwise delinquent"); <u>see</u>
<u>generally</u> <u>Grider v. Cavazos</u>, 911 F.2d 1158, 1163 (5th Cir. 1990)
("[d]elinquent is a word the meaning of which is universally
understood by lawyer and layman alike when used in reference to a
debt").  Reading each complaint as a whole, <u>see</u> <u>Miller v. Javitch,</u>
<u>Block & Rathbone</u>, 561 F.3d 588, 595 (6th Cir. 2009) (assessing
section 1692e claim and noting that lower "court properly assessed
the complaint's meaning as read in its entirety"), "aforesaid
delinquency" in paragraph seven of the unit 104 suit and paragraph

eight of the unit 105 suit refers to the overdue payments of the common expenses in the amount of $2,567.37 in paragraph five of the unit 104 suit and $2,694.94 in paragraph six of the unit 105 suit.  The least sophisticated consumer reading each complaint would interpret the words in this manner.

Neither amount, however, was delinquent for at least 60 days because each amount included inter alia attorney's fees incurred in March and April 2005.  (Tr. II, p. 69 & Ex. 23).  The representations that the amounts were delinquent for at least 60 days in the unit 104 and the unit 105 suits were therefore false representations of the character and legal status of the debts. Although the FDCPA claim is untimely, MEEB nevertheless made a false representation of the character as well as the legal status of the debts in violation of section 1692e(2)(A).

Under the facts, however, these two false representations did not result in any financial damage to plaintiff.  Plaintiff remained responsible for the amounts.  (Ex. C, § 5.3); Mass. Gen. L. ch. 183A, § 6(c).  The fact that the amounts were not overdue for 60 days was inconsequential.

E.  Communications with Mortgagees

Plaintiff argues that defendant engaged in a number of secret communications with plaintiff's mortgagees without his consent. According to plaintiff, such conduct provides further evidence of defendant's "bad faith."  (Docket Entry # 60, § 1(b)).  Citing 17

exhibits (Ex. 17, 38 41, 42, 45, 46, 47, 48, 53, 54, 55, 59, 60, 68, 69, 71 & 77), plaintiff asserts that defendant collected payments from plaintiff's mortgagees without obtaining plaintiff's permission in violation of section 1692c(b) and without advising the mortgagees that plaintiff disputed the attorney's fees in violation of section 1692e(8).[119]   (Docket Entry # 60, § 1(b)). These secret communications were also "deceptive, misleading, and extortive" in violation of sections 1692d, 1692e and 1692f, according to plaintiff.   (Docket Entry # 60, § 1(b)).   With respect to this argument, plaintiff submits that defendant did not provide the mortgagees with the amount of the six month, priority lien under section 6(c) of chapter 183A thereby causing the mortgagees to pay "the full amount of the lien rather than the amount that was prior to their mortgages."   (Docket Entry # 60, § 1(b)).

   1.   Section 1692c(b)

   Section 1692c(b) proscribes the debt collector's

-----

[119]   The argument portion of plaintiff's post trial brief (Docket Entry # 60, § 1(b)) does not reference these exhibits but it does reference fact paragraph 16.   Fact paragraph 16 identifies these exhibits as the secret communications.   (Docket Entry # 60, p. 13).

   Plaintiff acknowledges that the "the pre-suit notices to the mortgagees required under G.L.c. 183A, § 6(c) are likely permissible under 15 U.S.C. § 1692n."   (Docket Entry # 60, § 1(b)).   Accordingly, he does not challenge the notices defendant sent to the mortgagees under section 6(c) of chapter 183A.   Two of the above 17 exhibits fall under this category.   (Ex. 53 & 71).

communications with third parties except to obtain location information as provided in section 1692b.  15 U.S.C. § 1692c(b). The language reads as follows:

(b) Communication with third parties

Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, *his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector*.

15 U.S.C. § 1692c(b) (emphasis added).  There is a dearth of authority regarding the application of this section to a debt collector's direct communications with a first mortgagee where, as here, the communications lie outside a foreclosure proceeding. Cf. Acosta v. Campbell, 2009 WL 190089, at *5 (11th Cir. Jan. 28, 2009) (affirming summary judgment of section 1692c(b) claim because confidential payoff letter sent by the defendant, a law firm, at request of second mortgagee's attorney during foreclosure action was not a "communication" under section 1692c(b)) (unpublished).[120]

Turning to the statutory language, the italicized portion lists the individuals that a debt collector may contact without obtaining the debtor's permission.  All of the aforementioned

---

[120]  See fn. 89 & 103.

exhibits plaintiff cites involve Bayview, Aegis, M & T or MERS. These entities do not fall under any of the excepted categories.[121] Where, as here, "'Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'" TRW Inc. v. Andrews, 534 U.S. 19, 28 (2001); see, e.g., Muzuco v. Re$ubmitIt, LLC, 2012 WL 3242013, at *4 (S.D.Fla. Aug. 7, 2012) (using this principle to find that debt collector's communication with debtor's bank fell within plain meaning of section 1692c(b) because bank did not fall under one of the excepted categories).

Citing Resler v. Messerli & Kramer, PA, 2003 WL 193498 (D.Minn. Jan. 23, 2003), defendant asserts that the communications did not violate section 1692c(b).  (Docket Entry # 61, ¶¶ 20 & 22).  Resler relied on the language in section 1692c(a) that excepts a communication given with "'the express permission of a court of competent jurisdiction'" to dismiss a section 1692c(a)(2) claim.[122]  Id. at *4.  The Resler court reasoned that because

---

[121]  Pondview, as opposed to plaintiff's mortgagees, is the "creditor" within the meaning of section 1692c(b) with respect to the debt in the unit 104 and 105 accounts.

[122]  Section 1692c(b) also contains the language allowing a communication given "with the express permission of a court of competent jurisdiction."  See Mertens v. Hewitt Associates, 508 U.S. 248, 260 (1993) (agreeing with the petitioners "that language used in one portion of a statute . . . should be deemed to have the same meaning as the same language used elsewhere in the statute"); Hanif v. Attorney General of U.S., 694 F.3d 479,

"Minnesota law requires service of a garnishment levy on the judgment debtor" and a default judgment "was in effect that court's permission to follow the collection procedures outlined in Minnesota law, including service of the levy directly on the judgment debtor." Id. With all due respect, this court disagrees with the Resler court's interpretation of section 1692c(a).

The plain language of section 1692c(b) refers to "the express permission of a court." 15 U.S.C. § 1692c(b). "Express" commonly means "directly stated" or "to put (thought) into words." See Random House Dictionary of the English Language 683 (2ⁿᵈ ed. 1987) (defining "express" as inter alia "to put (thought) into words"); Black's Law Dictionary 601 (7ᵗʰ ed. 1999) (defining "express" as "directly stated"). A court issues a direct or express statement in a judicial opinion or order. In contrast, a state law connotes the express permission of the legislative body that wrote the law. Interpreting "express permission of a court" to mean "express permission" in a law also fails to afford "court" its plain and ordinary meaning. See Black's Law Dictionary 356 (7ᵗʰ ed. 1999) (defining "court" as "[a] government body consisting of one or more judges"); see, e.g., House v. Bank United, 2002 WL 32496179, at *1-3 (W.D.N.Y. March 28, 2002) (dismissing section 1692c(b)

_____

484 (3ʳᵈ Cir. 2012) (absent contrary indication, "we must presume that Congress intended to give those terms the meaning ascribed to them elsewhere in the statute"). As discussed below, however, section 1692c(b) contains additional language not present in section 1692c(a).

claim because "the notice was ordered by" state court judge in context of foreclosure proceedings and debt collector therefore "had the express permission of [the judge] to make the publication").

Furthermore, the provision at issue in this case, section 1692c(b), as opposed to the provision at issue in <u>Resler</u>, section 1692c(a), contains the additional phrase, "a consumer reporting agency if otherwise *permitted by law*."  15 U.S.C. § 1692c(b) (emphasis added).  Thus, Congress knew how to state "permitted by law" in section 1692c(b) yet chose not to use that phrase when setting out the exception for "the express permission of a court." <u>See</u> <u>Lawson v. FMR LLC</u>, 670 F.3d at 68 (First Circuit and "Supreme Court precedent require that we examine the broader statutory framework, including particularly the nearby language"). Defendant's interpretation transports and substitutes the language "permitted by law," i.e., permitted by chapter 183A, § 6(c), for the phrase "express permission of a court."  The argument is unavailing.

Section 1692n also provides defendant no support to extend the reach of section 1692c(b).  The more specific statutory language at issue, section 1692c(b), controls over the more general language in section 1692n.  <u>See</u> <u>In re Lazarus</u>, 478 F.3d 12, 19 (1st Cir. 2007) ("[i]n statutory construction, the more specific treatment prevails over the general").

Defendant additionally contends that plaintiff gave his prior consent for the communications "in light of the requirements of M.G.L. c. 183A." (Docket Entry # 61, ¶ 34, p. 19). Accordingly, defendant did not violate section 1692c(b). It is true that section 1692c(b) only prohibits communications "without the prior consent of the consumer given directly to the debt collector." 15 U.S.C. § 1692c(b). Here, plaintiff never gave his prior consent to communicate with his mortgagees to MEEB let alone "*directly* to" MEEB. 15 U.S.C. § 1692c(b) (emphasis added). In short, the requirements of a state statute do not constitute the prior consent of a debtor given directly to a debt collector.

Turning to the exhibits that plaintiff identifies as communications in violation of section 1692c(b), a number of the exhibits are communications sent by Bayview, M & T and attorneys representing MERS *to* MEEB. (Ex. 17, 41, 46, 48, 54 & 77). The terms of the statute state, "a debt collector may not communicate" with third parties. 15 U.S.C. § 1692c(b). They do not state, "a third party may not communicate" with the debt collector. The plain language of section 1692c(b) does not expressly prevent the third party or a mortgagee from communicating with the debt collector. Rather, it is the "debt collector" that "may not communicate" with the third party. 15 U.S.C. § 1692c(b). Plaintiff's construction would interpret the statute to apply to communications by the third party to the debt collector. The

128

plain language does not allow such a construction.  Similarly, the court in McLain found that a violation of section 1692c(b) occurs when "an improper communication *to* third parties is made" as opposed to when the debt collector requests a court for "leave to make proper contact regarding the debt."  McLain v. Gordon, 2010 WL 3340528, at *6 (W.D.Wash. Aug. 24, 2010) (emphasis added).  Accordingly, no section 1692c(b) violation occurred by virtue of these letters (Ex. 17, 41, 46, 48, 54 & 77).

The remaining exhibits prior to February 2008 consist of letters written by MEEB to Bayview, Aegis, M & T or MERS' attorney.  (Ex. 38, 42, 45, 47, 55, 59, 60 & 68).  The letters all respond to requests by the particular mortgagee for a payoff amount or confirm a payment.  These communications fall within the reach of section 1692c(b).  Although untimely, MEEB's communications (Ex. 38, 42, 45, 47, 55, 59, 60 & 68) violated section 1692c(b) and therefore provide a basis for a per se chapter 93A violation.[123]

The remaining alleged section 1692c(b) violations consist of the timely May 13, 2008 letter from MEEB to Heiger and a letter

---

[123]   It is therefore not necessary to address the other arguments plaintiff raises in this section of the post trial brief (Docket Entry # 60, § 1(b)) that these same letters violated sections 1692d, 1692e and 1692f.  Even if these letters violated these sections, this court finds that such violations would not result in an additional injury to plaintiff or a change to the chapter 93A damages award.  The award would remain the same.

from another Harmon attorney to MEEB dated July 31, 2008.  (Ex. 48

& 69).  The second timely communication was from Harmon to MEEB.

It was not a communication by the debt collector, MEEB.  (Ex. 48).

As previously discussed, section 1692c(b) states that, "a debt

collector may not communicate" with certain third parties.  The

language does not prohibit a third party from communicating with

the debt collector.  The July 31, 2008 letter therefore fails to

provide a basis to impose liability on MEEB under section

1692c(b).

The first letter, however, is a communication by the debt

collector, MEEB, to MERS' attorney.  (Ex. 69).  MERS' attorney

does not fall into one of the categories of permissible

individuals in section 1692c(b).  Defendant's bona fide error

defense addresses errors in Pondview ledgers as opposed to errors

in sending a communication to the attorney of a mortgage servicer.

The communication therefore violates section 1692c(b).

Turning to the amount of damages for this timely FDCPA

violation, plaintiff is "entitled to actual damages, statutory

damages of up to $1,000, and 'the costs of the action, together

with a reasonable attorney's fee as determined by the court.'"

French v. Corporate Receivables, Inc., 489 F.3d at 403 (quoting

section 1692k(a)(3)).  An award of actual damages may "include

damages for emotional distress caused by the debt collector's

statutory violation."[124]  Sweetland v. Stevens & James, Inc., 563

F.Supp.2d 300, 303 (D.Me. 2008) (collecting authority); see Thomas

v. Smith, Dean & Associates, Inc., 2011 WL 2730787, at *3 (D.Md.

July 12, 2011) (actual damages under section 1692k include

"damages for embarrassment and emotional distress") (collecting

cases).  A causal connection is required with respect to an award

of actual damages.  See 15 U.S.C. § 1692k(a)(1) (allowing award of

"actual damage[s] sustained by [the plaintiff] *as a result of*" the

debt collector's failure "to comply with any provision" of the

FDCPA) (emphasis added); see also Johnson v. Eaton, 80 F.3d 148,

152 (5th Cir. 1996) (section 1692k requires debt collector to

compensate debtor "for any monetary damage, emotional distress or

other injury that the debtor can prove the debt collector

caused").

    Plaintiff did not experience a financial loss as a result of

MEEB's non-compliance with section 1692c(b).  There is also

little, if any, evidence that plaintiff suffered emotionally as a

result of the May 13, 2008 letter.  He did not testify to

experiencing any loss as a result of this letter.  He began taking

Valium and Paxil years before this letter.  He did not testify

---

[124]  MEEB raises a number of arguments attacking the ability
of plaintiff to recover damages for emotional distress.  (Docket
Entry # 61, ¶¶ 54-56).  MEEB's failure to raise an argument to
limit such damages to severe emotional distress waives the issue.
See fn. 81 & 113.

about seeking medical treatment as a result of the letter.[125]
Contrary to plaintiff's position, he did not lose his home or
experience a destroyed social community as a result of MEEB's
failure to comply with section 1692c(b).  Plaintiff therefore
failed to prove by a preponderance of the evidence that he
suffered actual damages as a result of MEEB's failure to abide by
section 1692c(b).[126]  Statutory damages under section 1692k(a)(2),
which apply to the action as a whole, are addressed later in this
opinion.

  2.  Section 1692e(8)

  Plaintiff next asserts that these secret communications all
failed to notify the mortgagees that plaintiff disputed the
attorney's fees in violation of section 1692e(8).  (Docket Entry #
60, § 1(b)).  Section 1692e(8) proscribes the communication of
"credit information" which is "known to be false, including the
failure to communicate that a disputed debt is disputed."  15
U.S.C. § 1692e(8).  It is one of a list of examples of the general

_____

    [125]  This court recognizes that it is not necessary for an
FDCPA plaintiff to seek medical treatment in order to recover
emotional distress damages.  See Ortega v. Collectors Training
Institute of Illinois, Inc., 2011 WL 241948, at *6 (S.D.Fla. Jan.
24, 2011) (noting "that failing to seek medical treatment . . .
did not preclude recovery of emotional distress damages under the
FDCPA").

    [126]  For the same reasons, the lack of a causal connection to
a loss demonstrates that plaintiff is not entitled to chapter 93A
damages.  See Hershenow v. Enterprise Rent-A-Car Company of
Boston, Inc., 840 N.E.2d 526, 533 (Mass. 2006).

prohibition against false and misleading representations in section 1692e.  It reads as follows:

> (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

15 U.S.C. § 1692e(8).

By its terms, the language of the statute prohibits communications of "credit information."  15 U.S.C. § 1692e(8). "The duty to report a debt under this section [therefore] arises only if one elects to report credit information."  Jacques v. Solomon & Solomon P.C., 2012 WL 3581172, at *4 (D.Del. Aug. 21, 2012).

Here, none of the communications plaintiff summarily references (Ex. 17, 38, 41, 42, 45, 46, 47, 48, 53, 54, 55, 59, 60, 68, 69, 71 & 77) involves a communication of plaintiff's credit information.  Defendant therefore did not make a communication that triggered the requirement under section 1692e(8) to report that the debt was disputed.  See id. (dismissing section 1692e(8) claim because the plaintiff did "not allege that Northland reported the debt to any credit agency"); Edwards v. Velocity Investments, LLC, 2011 WL 4007394, at *7 (N.D.Ohio Sept. 8, 2011) (allowing summary judgment of section 1692e(8) claim because there was "no evidence indicating that defendants ever reported any false credit information about plaintiff"); Redhead v. Winston & Winston, P.C., 2002 WL 31106934,

at *3 (S.D.N.Y. Sept. 20, 2002) (dismissing section 1692e(8) claim because the plaintiff "failed to allege any facts . . . establishing that the Winston Defendants communicated or threatened to communicate any credit information concerning him"); see generally Brady v. Credit Recovery Co., Inc., 160 F.3d 64, 67 (1st Cir. 1998) (dicta noting that section 1692e(8) requires a debt collector who knows or should know "debt is disputed to disclose its disputed status to persons inquiring about a consumer's credit history").  The section 1692e(8) claim is therefore devoid of merit.

   3.  Deceptive, Misleading and Extortive Mortgagee
Communications

   Plaintiff's final argument regarding defendant's communications with plaintiff's mortgagees maintains that MEEB was "deceptive, misleading, and extortive in its communications to McDermott's mortgagees in violation of 15 U.S.C. §§ 1692d, 1692e, and 1692f."  (Docket Entry # 60, § 1(b), pp. 25-26).  Plaintiff submits that MEEB gave plaintiff's mortgagees the amount of the full lien held by Pondview as opposed to the requested amount of the priority lien under section 6(c).  As a result, the mortgagees paid the full amount rather than the lower amount of the priority lien, according to plaintiff.[127]

_____

   [127]  The paragraph in the post trial brief that sets out this argument does not cite to any communication on the part of MEEB except for the September 22, 2006 letter.  (Ex. 46).  It does

134

The argument assumes that the mortgagees requested the amount of the six month priority lien.[128]  The only direct evidence of a request for the amount of the priority lien is the September 22, 2006 letter from Harmon.  (Ex. 46).  Under the facts, MEEB adequately responded to that letter.[129]  No violation of sections 1692d, 1692e, and 1692f occurred by virtue of this communication. A number of other letters from MEEB to various mortgagees or their attorneys simply refer to a "request," a "conversation" or a "condominium lien" as opposed to a request for the priority amount.  (Ex. 42, 45, 47, 53, 55, 68 & 69).[130]

The January 31, 2007 letter from MEEB to Harmon does include the amount of the priority lien and attaches a ledger.  (Ex. 59). In response and contrary to plaintiff's argument, Aegis paid the amount MEEB represented as the priority lien, $2,226.83.  (Ex. 60).  Thus, although this letter contravenes section 1692c(b),

---

cite to paragraph 16 in the facts which, in turn, cites the aforementioned 17 exhibits, a number of which constitute payments as opposed to communications by MEEB.  Having found section 1692c(b) violations with respect to a number of these exhibits, see fn. 123, the analysis addresses the remaining exhibits plaintiff summarily cites.

[128]  Plaintiff cites the September 22, 2006 letter as the basis to argue that the mortgagees' principal concern was the priority lien.  (Docket Entry # 60, p. 26).  The letter, however, asks for both "the entire amount" owed by plaintiff and "the claimed six month priority amount."  (Ex. 46).

[129]  See fn. 65 and related text.

[130]  These letters already provide a basis for per se chapter 93A liability.  See fn. 123.

there is insufficient evidence that the mortgagee made a payment of the full amount as plaintiff suggests.

The remaining letters plaintiff cites consist of payments or correspondence to MEEB attaching a payment.  (Ex. 17, 41, 48, 54 & 77).  They do not reflect that MEEB engaged in conduct the natural consequence of which was to harass, oppress or abuse plaintiff in violation of section 1692d.  They also fail to evidence a misrepresentation of an amount of a priority lien.  They do not evidence of a false and misleading representation under section 1692e and do not provide a basis to impose liability on MEEB under this section.  In addition, the letters were not an unfair or unconscionable means to collect the unit 104 or unit 105 debt under section 1692f.

Turning to the remaining timely letter, the July 30, 2008 letter is a cover letter accompanying a payment by Harmon.  (Ex. 77).  It does not sufficiently evidence a misrepresentation by MEEB of an amount of a priority lien.  The July 1, 2008 letter does not include a representation of the amount of the priority lien.  (Ex. 71).

In sum, limited to the argument plaintiff presents, which concerns the requests for priority amounts and MEEB's representations of a six month priority lien, MEEB's conduct does not violate sections 1692d, 1692e or 1692f in the manner alleged.

F.   Failure to Send 30 Day Notices

136

In the next section of the post trial brief, plaintiff argues that defendant's repeated failure to send plaintiff's mortgagees the 30 day notice at least 30 days before filing suit provides additional evidence of defendant's "bad faith intent to escalate" legal fees.  (Docket Entry # 60, § 1(c)).  Plaintiff also complains about MEEB's failure to send any 30 day letter before the April 2005 unit 104 suit thereby allowing MEEB to "run up its fees and costs."  (Docket Entry # 60, § 1(c), p. 29).

To support the argument, plaintiff challenges Brooks' explanation for not sending the mortgagees notice 30 days in advance because the statute (chapter 183A, section 6(c)) does not support Brooks' interpretation.  Brooks relied on language in the statute that requires notice 30 days prior to filing suit "provided that the first mortgagee has informed the organization of unit owners of its name and mailing address."  Mass. Gen. L. ch. 183A, § 6(c); (Tr. I, pp. 71-74) (Docket Entry # 61, ¶ 21, p. 17).  Plaintiff submits "there is no possible good faith construction of G.L. c. 183A, § 6(c) which would justify MEEB's procedure of sending out the thirty day notices of intent at the same time it filed an enforcement lawsuit."  (Docket Entry # 60, § 1(c)).  MEEB did not send the 30 day notice in advance because it derived its legal fees from filing and prosecuting the lawsuits as opposed to sending out the pre-suit notices, according to plaintiff.  (Docket Entry # 60, § 1(c)).

A number of reasons refute plaintiff's position.  First, Brooks convincingly testified that MEEB was attempting to resolve the matter and therefore waited to send out the notice to avoid additional legal fees.  Second, the statute provides support, albeit not entirely, for MEEB's interpretation.

Massachusetts law requires a plaintiff to name the mortgagee as a party when filing suit to protect a chapter 183A, section six lien.  See Mass. Gen. L. ch. 254, § 5.  The applicable provision imposing the 30 day notice requirement reads as follows:

> Furthermore, thirty days prior to the filing of an action by the organization of unit owners to enforce its lien for delinquent common expenses, the organization of unit owners shall send a notice stating its intention to file said action to the first mortgagee by certified and first class mail, *provided that the first mortgagee has informed the organization of unit owners of its name and mailing address*.

Mass. Gen. L. ch. 183A, § 6(c) (emphasis added).  A "[f]ailure to send notice to the first mortgagee of . . . [the] intent to file action to enforce the lien, does not affect the priority lien for an amount up to six months' common expenses" but the failure "does exclude attorneys' fees and costs from the priority amount." Davey v. Moorshead, 2001 WL 197943, at *2 n.14  (Mass.App.Ct. Feb. 28, 2001).

Brooks and other MEEB attorneys sent out the notice of intent to file suit less than 30 days before filing suit because of an honest and good faith belief that the first mortgagees had not informed Pondview of their names and mailing addresses within the

meaning of section 6(c).  Under the facts, plaintiff's first mortgagees did not apprise Pondview of their names and mailing addresses.  MEEB's pattern of sending the 30 day notice of intent to file suit in and around the time MEEB filed suit was therefore not intended to escalate its legal fees.  It was based on a reading of the statute that the language supports.

In light of the above, MEEB did not intend to violate the 30 day notice requirement, did not act in bad faith and did not send out the late notices to escalate its legal fees.  As to the chapter 93A claim, such conduct does not rise to the level of an unfair or deceptive act or practice.

Third, plaintiff cites sections 1692d and 1692f as the FDCPA violations based on MEEB's conduct of not sending the mortgagees the required notice 30 days before filing suit.  (Docket Entry # 61, § 1(c), p. 29).  Even if MEEB did not comply with section 6(c) by sending the first mortgagees notice 30 days before filing suit, its failure to comply with state law does not necessarily establish a violation of the FDCPA.  "The FDCPA was designed to provide basic, overarching rules for debt collection activities; it was not meant to convert every violation of a state debt collection law into a federal violation."  <u>Carlson v. First Revenue Assurance</u>, 359 F.3d 1015, 1018 (8th Cir. 2004); <u>see Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC</u>, 480 F.3d 470, 474 (7th Cir. 2007) ("§ 1692f creates its own rules" and "does not so

much as hint at being an enforcement mechanism for other rules of state and federal law"); see also Akar v. Federal National Mortgage Association, 843 F.Supp.2d 154, 164 (D.Mass. 2012).

Moreover, liability under sections 1692d and 1692f does not depend on MEEB's intent.  What is determinable under section 1692d "is *not* the debt collector's intent, but the natural consequence of his actions."  Taylor v. Heath W. Williams, L.L.C., 510 F.Supp.2d 1206, 1216 (N.D.Ga. 2007) (citing Horkey v. J.V.D.B. & Assocs., Inc., 333 F.3d 769, 774 (7th Cir. 2003)) (emphasis added).  Section 1692f likewise examines the misconduct from the objective viewpoint of the least sophisticated consumer.

Turning to sections 1692d and 1692f respectively, section 1692d proscribes "conduct the natural consequence of which is to harass, oppress or abuse any person in connection with the collection of a debt."  15 U.S.C. § 1692d.  Filing an enforcement action, without more, "is not sufficient to state a claim under Section 1692d."  Williams v. Zucker, Goldberg & Ackerman, LLC, 2011 WL 843943, at *5 (D.N.J. March 8, 2011); see Harvey v. Great Seneca Financial Corp., 453 F.3d 324, 330 (6th Cir. 2006) (even "viewed from the perspective of an unsophisticated consumer, the filing of a debt-collection lawsuit without the immediate means of proving the debt does not have the natural consequence of harassing, abusing, or oppressing a debtor" under section 1692d).  Whether conduct harasses, oppresses or abuses the least

sophisticated consumer is ordinarily "a question for the jury."
Jeter v. Credit Bureau, Inc., 760 F.2d 1168, 1179 (11th Cir.
1985); accord Harvey v. Great Seneca Financial Corp., 453 F.3d at
330.

The non-exhaustive list of examples of oppressive conduct in
section 1692d concern tactics that have the natural tendency to
embarrass, upset, or frighten a debtor.  See generally Harvey v.
Great Seneca Financial Corp., 453 F.3d at 330.  The first four
examples respectively prohibit the use of violence, the use of
obscene language, the publication of a list of consumers who
refuse to pay a debt and the advertisement of the sale of a debt
to coerce payment.  15 U.S.C. § 1692d(1)-(4).  The last two
examples proscribe repeatedly and continuously causing the
telephone to ring with the intent to annoy, harass or abuse and
placing telephone calls without disclosing the caller's identity.
15 U.S.C. § 1692d(5)-(6).

MEEB's conduct of repeatedly sending the notices of intent to
file suit close to the time it filed suit is more akin to the type
of conduct that does not violate section 1692d.  See Barney v.
LVNV Funding LLC, 2012 WL 2995471, at *3 (N.D.Ohio July 23, 2012)
(serving deposition notice falls within the natural inconvenience
of debt collection); Bryant v. Bonded Accounts Serv./Check
Recovery, Inc., 208 F.R.D. 251, 256 (D.Minn. 2000) (dunning letter
asking, "WILL YOU BE REFUSED CREDIT BECAUSE OF THIS UNPAID ACCOUNT

141

WE HAVE FOR COLLECTION?," did not violate section 1692d).  It is not harassing or coercive to the least sophisticated consumer to send, on a repeated basis, letters to a first mortgagee asking for payment.  The letters were not threatening in any manner.  MEEB's failure to send the letters earlier does not have the natural consequence of embarrassing plaintiff or oppressing or abusing him even if the failure increased the litigation costs.  The additional costs of ordering title examinations, preparing complaints and ordering service were reasonable costs and part of an ordinary collection action.  See Johnson v. Capital Management Services, 2011 WL 6012509, at *5 (W.D.N.Y. Dec. 1, 2011) ("[s]ection 1692d is meant to protect debtors from oppressive and outrageous conduct, but not from every negative consequence of debt collection"); Bieber v. Association Collection Services, 631 F.Supp. 1410, 1417 (D.Kan. 1986) (noting that "[s]ome inconvenience or embarrassment to the debtor is a natural consequence of debt collection").

In sum, filing suit rather than waiting for a mortgagee's payment does not constitute harassing, abusive or oppressive conduct within the meaning of section 1692d.  It is not abusive to collect or charge the costs of an ordinary collection action where, as here, the condominium documents gave Pondview the ability to charge those costs to plaintiff.  From the viewpoint of the least sophisticated consumer, MEEB's conduct relative to the

untimely letters to plaintiff's mortgagees as well as the failure
to send a letter prior to the April 2005 unit 104 and the April
2005 unit 105 suits do not violate section 1692d.

Turning to section 1692f, plaintiff simply and summarily
states that the conduct "was an 'unfair or unconscionable means to
collect or attempt to collect any debt' in violation of 15 U.S.C.
§ 1692f."  (Docket Entry # 60, § 1(c), p. 29).  The general
proscription in section 1692f that plaintiff cites addresses the
use of "unfair and unconscionable means" to collect the debt.  15
U.S.C. § 1692f.  The statute does not define either "unfair" or
"unconscionable."  See Beler v. Blatt, Hasenmiller, Leibsker &
Moore, LLC, 480 F.3d at 473 (statute "does not say" what "is
'unfair or unconscionable'").  Resorting to a dictionary, the
LeBlanc court notes that, "The plain meaning of 'unfair' is
'marked by injustice, partiality, or deception.'"  LeBlanc v.
Unifund CCR Partners, 601 F.3d 1185, 1200 (11th Cir. 2010)
(quoting Merriam-Webster Online Dictionary (2010)).  "The term
'unconscionable' means 'having no conscience'; 'unscrupulous';
'showing no regard for conscience'; 'affronting the sense of
justice, decency, or reasonableness.'"  Id. (quoting Black's Law
Dictionary 1526 (7th ed. 1999)).

To the extent plaintiff argues that MEEB did not comply with
section 6(c) by sending the letter 30 days before filing suit,
MEEB's noncompliance with state law does not constitute a

violation of section 1692f's prohibition of unfair and unconscionable collection methods.[131]  See Fick v. American Acceptance Co., LLC, 2012 WL 1074288, at *3 (N.D.Ind. March 28, 2012) (dismissing plaintiff's claim that "defendants violated Section 1692f when they filed a lawsuit in state court without being licensed" as a collection agency "as required by" Indiana state statute).  The gravamen of plaintiff's argument is that MEEB delayed sending the first mortgagees the 30 day notice letters to increase its legal fees and costs.  MEEB's subjective motivation is irrelevant to its liability under section 1692f.

Viewing the conduct through the lens of the least sophisticated consumer, it was neither unfair nor unconscionable to send the mortgagees the letters at or around the time MEEB filed suit.  Avoiding the cost of preparing and filing the complaint does not increase the fees to such an extent that the failure to send the notice earlier was unconscionable or unfair. Filing suit as a means to collect unpaid condominium fees is an ordinary, usual and expected consequence of not paying the required charges.  It is also expressly authorized under the Declaration of Trust.  (Ex. B, ¶ 5.3(C)).  There was little if any injustice or unscrupulous behavior in failing to wait the additional time period.  Similarly, not sending the letter at all

---

[131]  MEEB, in turn, asserts that it complied with section 6(c) because the mortgagees never informed Pondview of their names and addresses.  (Docket Entry # 61, ¶ 21, p. 17).

144

before the April 2005 suits was neither unfair nor unconscionable. Accordingly, MEEB did not violate section 1692f by not sending or by delaying sending the mortgagees the 30 day notice 30 days before filing suit.[132]  See generally Rizzo v. Pierce & Associates, 351 F.3d 791, 794 (7th Cir. 2003) (finding nothing unfair or unconscionable under section 1692f in collection of late fees because "note and mortgage explicitly require payment of all sums which would then be due had no acceleration occurred"); Turner v. J.V.D.B. & Associates, Inc., 330 F.3d 991, 998 (7th Cir. 2003) (collection letter furnishing information required under section 1692g was not "an 'unfair or unconscionable means' of debt collection" under section 1692f even "when directed toward  . . . consumer whose debt had been discharged in bankruptcy").

G.   Filing Multiple Lawsuits

     1.   Sections 1692d and 1692f

     In perhaps plaintiff's best argument, he contends that the filing of multiple lawsuits to collect the same debt was abusive and oppressive under section 1692d and a violation of section 1692f.  Plaintiff asserts that Brooks' rationale for filing multiple suits because it protected the six month priority lien

---

[132]  In light of the absence of MEEB's liability under section 1692f here and elsewhere, it is not necessary to address MEEB's section 1692f(1) argument (Docket Entry # 61, ¶ 16, p. 16).  In addition, as discussed above and elsewhere, this court has considered the argument that the condominium documents and section 6(c) allows certain conduct.

145

"was ludicrous." (Docket Entry # 60, § 1(d)). According to plaintiff, the more rational construction of section 6(c) is that Pondview only gets one six month priority period for the lien. (Docket Entry # 60, § 1(d)).

MEEB submits that it filed the multiple lawsuits to protect the priority of the successive, six month liens of its client, Pondview. (Docket Entry # 61, ¶ 54, p. 9). MEEB maintains that chapter 183A, section six, allows an organization of unit owners such as Pondview to file additional lawsuits to protect the priority liens for common expenses. (Docket Entry # 61, ¶ 41, p. 21).

Except for the statute itself, the only case law or legal authority cited by either plaintiff or MEEB consists of a 1988 Massachusetts Superior Court decision that is not published in the North Eastern Reporter, the Massachusetts Reports, the Reports of Massachusetts Appellate Division or any electronic legal database such as Westlaw or Lexis. MEEB did not attach a copy of the decision to its post trial brief.

Recent Massachusetts case law does not support MEEB's position. In particular, after discussing the language and purpose of section 6(c), the Massachusetts Appellate Division court in Drummer Boy rejected the association's position that it could extend the six month lien by filing successive suits. Drummer Boy Homes Ass'n, Inc. v. Britton, 2011 WL 2981374, at *2

146

(Mass.App.Div. July 20, 2011); see also In re Longyear Properties, LLC, 2011 WL 6010219, at *1 (Bkrtcy.D.Mass. Dec. 1, 2011) (noting that earlier ruling "rejected the Trust's so-called 'rolling lien theory' and ruled instead that the Trust's liens on each unit enjoy priority over Citizens' mortgage only to the extent of a single six-month lien"); see generally In re Ames, 447 B.R. 680, 682 (Bkrtcy.D.Mass. 2011) (outlining and explaining general procedure under section 6(c)).[133]

The issue therefore devolves into whether the filing of multiple lawsuits to collect the same debt violates either section 1692d or section 1692f.  A recent decision in the Western District of New York is instructive with respect to a section 1692d claim based on filing successive lawsuits.  See Curto v. Palisades Collection, LLC, 2011 WL 5196708, at *6 (W.D.N.Y. Oct. 31, 2011) ("successive filings may be in violation of § 1692d, if their natural consequence is to harass, oppress, or abuse Plaintiff in connection with the collection of the debt").  As explained in Curto:

> Bringing suit where a prior collection action has been
> dismissed with prejudice could constitute violations under §
> 1692d (harassment or abuse) or § 1692f (unfair practices).
> See Parkins v. Arrow Fin. Servs., LLS, No. 07 C 410, 2008 WL
> 94798 (N.D.Il. Jan. 8, 2008) ("[T]hreatening of a lawsuit
> which the debt collector knows or should know is unavailable
> or unwinnable by reason of a legal bar such as the statute of
> limitations is the kind of abusive practice the FDCPA was
> intended to eliminate.").  While a consumer would legally

---

[133]   See fn. 61.

prevail on each successive claim on the basis of res
judicata, these proceedings would nevertheless serve to
harass him and compel him to expend resources defending
himself in court. <u>Hess</u>, 637 F.3d at 124.[134]  Accordingly,
this Court must consider whether any of Defendants'
collection actions were dismissed on the merits such that
successive filings would constitute abuse, harassment, or an
unfair practice. <u>See</u> <u>Havens-Tobias v. Eagle</u>, 127 F.Supp.2d
889, 897-98 (S.D.Ohio 2001) (merely bringing collection
action on disputed suit not deceptive, unconscionable, or
unfair); <u>Parkins</u>, 2008 WL 94798 (denying summary judgment
where a debt collector filed state court complaint to recover
time-barred debt).

<u>Id.</u> at *5.

In contrast and as previously noted, filing a single
collection lawsuit, even without the immediate means to prove the
debt, does not violate either section 1692d or section 1692f.  <u>See</u>
<u>Harvey v. Great Seneca Fin. Corp.</u>, 453 F.3d at 330; <u>Kavalin v.</u>
<u>Global Credit & Collection Corp.</u>, 2011 WL 1260210, at *5 (W.D.N.Y.
March 31, 2011).  Furthermore, the court in <u>Curto</u> denied the
debtor's summary judgment motion.  <u>Curto v. Palisades Collection,</u>
<u>LLC</u>, 2011 WL 5196708, at *6 ("this Court is unprepared to say that
bringing one lawsuit after another, and failing to fully prosecute
any of them, cannot rise to the level of abusive or oppressive
behavior in violation of § 1692d").  The four successive lawsuits
in <u>Curto</u> consisted of two dismissals because the defendants failed
to accurately ascertain Curto's residence and one dismissal

---

[134]  <u>Hess</u> is not directly on point because it involved filing
suit in a distant forum in violation of the FDCPA's venue
provision, section 1692k.  <u>Hess v. Cohen & Slamowitz LLP</u>, 637
F.3d 117 (2nd Cir. 2011).

because of the defendants' failure to appear.  Id.  The Curto court could not determine the basis for the final dismissal which, in any event, was not relevant because the record did not show that the defendants filed a fifth lawsuit.  Id.

Here, over the course of three and a half years, MEEB filed four lawsuits to collect the debt on unit 104 and five lawsuits to collect the debt on unit 105.  A brief summary of the lawsuits with respect to each unit places the filings in context.

With respect to the unit 104 lawsuits, MEEB filed the April 2005 unit 104 suit on Pondview's behalf seeking to collect common expenses and charges in the amount of $2,567.47.  MEEB filed the second unit 104 suit in June 2006 to collect six months of charges and common expenses preceding the filing of the June 2006 unit 104 suit.  By check dated August 29, 2006, M & T paid the amount of the alleged priority lien ($3,454.00).  (Ex. 45 & 54).  Pondview credited the amount to the unit 104 account thereby avoiding any further duplication, if any, of fees sought in the April 2005 unit 104 suit.  Shortly thereafter, MEEB dismissed the June 2006 unit 104 suit.

The April 2005 unit 104 suit remained pending.  As previously discussed in depth, MEEB filed a motion for default and a motion for summary judgment.  A bench trial commenced in February 2006.

In February 2007, MERS paid the amount of MEEB's alleged priority lien ($2,226.83) with a check to Pondview.  As a result

149

of the payment, MEEB did not file a third unit 104 suit in the first six months of 2007.

The judgment in the April 2005 unit 104 suit issued on March 28, 2007.  The judgment ($22,622.99) included an award of modestly reduced legal fees ($18,803.00) as well as delinquent condominium related charges ($3,106.17) and prejudgment interest ($713.82).

Plaintiff's failure to pay condominium fees and related charges after the March 28, 2007 judgment led to the need for a third unit 104 suit.  The July 2008 unit 104 suit sought ($10,351.33) consisting of the legal fees *from* April 2007 through June 6, 2008 ($5,404.00) and condominium related charges incurred *after* the March 2007 judgment though June 6, 2008 ($4,947.33).

On July 31, 2008, MERS paid Pondview a check ($34,813.40).  On behalf of Pondview, MEEB filed a voluntary notice of dismissal of the April 2005 unit 104 suit.

MEEB filed the last unit 104 suit in Essex Superior Court on September 17, 2008.  MEEB did not bill Pondview for filing the complaint.  MEEB's invoices show only a modest charge of $305.00 for preparing the 60 day delinquency letters to MERS and plaintiff and the 30 notice of intent letter to MERS.  Thereafter, MEEB did not bill Pondview for any work relative to unit 104 until June 2009.  The status of the July 2008 and the September 2008 unit 104 suits remains unclear.  MEEB did not escalate its legal fees in either suit.

150

The unit 104 suits each sought to collect different charges incurred at different times.  MEEB's conduct involved filing successive but not overlapping suits to collect legitimately imposed charges.  Once Bayview paid the charges, MEEB promptly dismissed the suit.  The repetitive filings were not abusive given the differences between the charges each suit sought to collect. None of the four unit 104 suits were frivolous or misrepresented the debt.  See Eichman v. Mann Bracken, LLC, 689 F.Supp.2d 1094, 1100-1101 (W.D.Wis. Feb. 25, 2010).  MEEB was not seeking to collect the same charges twice or recover fees awarded or denied from a previous lawsuit dismissed with prejudice.  Accordingly, this court finds that the multiple filings of the four unit 104 suits does not violate either section 1692d or section 1692f.[135]

Turning to the unit 105 lawsuits, MEEB filed the April 2005 unit 105 suit on Pondview's behalf seeking to collect common expenses and charges in the amount of $2,694.94.  Bayview, the mortgagee, paid the full amount of accrued common expenses on May 20, 2005, except for the two $25.00 late fees for the May condominium fee and loan payback charge.  Brooks filed a dismissal of the suit shortly after receiving Bayview's check in the amount of $3,800.27.

---

[135]   The foregoing conduct related to filing the four unit 104 suits also does not violate section 1692d or section 1692f when considered in conjunction with MEEB's filings of the five unit 105 suits.

The continued accrual of unpaid common expenses led MEEB to file a second unit 105 suit in October 2005.  The October 2005 unit 105 suit sought to collect common expenses and charges in the amount of $1,866.14.  Bayview paid the full amount of accrued common expenses on December 15, 2005, with a check in the amount of $3,015.55.  In late December 2005, MEEB filed a stipulated dismissal of the October 2005 unit 105.

In 2006, plaintiff accrued additional charges for unpaid condominium fees, special assessment charges and late fees.  As a result, MEEB filed the June 2006 unit 105 suit seeking to collect unpaid common expenses in the amount of $3,771.04.  The August 2006 counterclaim led to additional and reasonable legal fees.  In April 2007, the Lynn District Court rescheduled the April 11, 2007 trial.

Plaintiff's nonpayment of condominium related charges and legal fees posted to the unit 105 account continued throughout 2007.  Rather than seek leave to file a supplemental complaint in the June 2006 unit 105 suit, see Mass. R. Civ. P. 15(d), MEEB filed the June 2007 unit 105 suit.[136]  In light of the amount of the common expenses and charges sought ($26,966.42) and MEEB's invoices (Ex. 23), the June 2007 unit 105 suit sought legal fees

---

[136]  A May 2007 foreclosure notice and a perceived need to obtain another six month priority lien led to the filing thereby dispelling any bad faith on the part of MEEB relative to a chapter 93A claim.

and to a lesser extent condominium charges that MEEB previously
included and/or incurred in the June 2006 unit 105 suit.

In September 2007, a foreclosure took place on unit 105.[137]
(Tr. V, p. 84).  The perceived need to protect Pondview's six
month priority lien caused MEEB to file another unit 105 suit on
October 11, 2007.  The October 2007 unit 105 suit sought
$34,012.07 in common expenses including legal fees.  In light of
the large amount ($34,012.07) and MEEB's invoices (Ex. 23), the
amount sought included legal fees incurred in connection with the
June 2006 unit 105 suit and sought in the June 2007 unit 105 suit.

The June 2008 decision in the June 2006 unit 105 suit
reflects that MEEB, on behalf of Pondview, sought legal fees in
the amount of $29,792.70 in that suit.  The Justice awarded
Pondview $14,000.00 in legal fees.  On July 10, 2009, MEEB
received and applied the $24,500.00 payment toward the outstanding
legal fees for unit 105.

MEEB's 2007 through 2009 invoices do not show the dismissal
of the June and October 2007 unit 105 suits.[138]  Although not all

---

[137] This finding is based on plaintiff's testimony.  It is
not clear whether unit 105 was sold at that time.  MEEB's
invoices show that it prepared a "foreclosure sale bidder letter
to Bank counsel" for unit 105 on October 23, 2007.  (Ex. 23).
The same invoices note an "identification of new owner" of unit
105 on November 26, 2007.  (Ex. 23).

[138] The charges incurred do not indicate any intention on
the part of MEEB to escalate its legal fees in violation of
chapter 93A.  With respect to any independent chapter 93A
violation, this court finds that MEEB's dismissal of the April

of the legal fees duplicated those sought in the prior unit 105 suits, a significant portion of the amounts sought duplicated the prior legal fees sought.  Based on the totality of the conduct, MEEB's filing of the June 2007 and the October 2007 unit 105 suits seeking overlapping amounts of the same legal fees had the natural consequence to harass as well as to abuse the least sophisticated consumer.[139]  The conduct therefore violated section 1692d.[140]

MEEB fails to establish the affirmative, bona fide error defense under section 1692k(c).  See Gathuru v. Credit Control Services, Inc., 623 F.Supp.2d at 122 (discussing section 1692k(c)

_____

and October unit 105 suits and other evidence in the record shows that MEEB did not engage in the bad faith plaintiff alleges with the intent to escalate its attorney's fees.

[139]  The complaint alleges that "at least two" of the lawsuits filed by MEEB "sought the same relief for the same claims."  (Docket Entry # 1, ¶ 45).

[140]  Unlike the last two unit 104 suits, none of the unit 105 suits fall within the one year limitations period of the FDCPA. Accordingly, statutory damages under the FDCPA, 15 U.S.C. § 1692k(a)(2)(A), do not apply.  The section 1692d violations based on the duplicate fees sought in the June and October 2007 unit 105 suits nonetheless support a per se violation of chapter 93A. As previously indicated, the conduct does not rise to the level of an independent chapter 93A violation.  In light of finding a section 1692d violation, it is not necessary to address the existence of a section 1692f violation based on the same conduct. The same injury and damages result from the same misconduct. This court finds no section 1692f violation based on the other conduct plaintiff alleges in this section of his brief (Docket Entry # 61, § 1(d)).  In addition, even assuming for purposes of argument that MEEB's conduct in filing the two unit 105 suits violated section 1692f, this court would still not find MEEB's conduct a willful or knowing violation of section two of chapter 93A.

and noting that, "FDCPA provides an affirmative defense to debt collectors").  The defense does not apply to a debt collector's mistaken interpretation of the federal law of the FDCPA.  <u>Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA</u>, 130 S.Ct. at 1608.  Three principles used to support the holding in <u>Jerman</u> lead to the conclusion that section 1692k(2) does not encompass mistakes based on state law.  They are that:  (1) "'ignorance of the law will not excuse any person, either civilly or criminally,'" <u>Id.</u> at 1611; (2) "when Congress has intended to provide a mistake-of-law defense to civil liability, it has often done so more explicitly than" in section 1692k(c), <u>Id.</u> at 1612; and (3) section 1692k(c)'s use of the term "procedures" indicates a mechanical kind of process whereas "legal reasoning is not a mechanical or strictly linear process."  <u>Id.</u> at 1614.

Here, any error on the part of MEEB in interpreting the reach of the priority lien in section 6(c) is an error based on state law.  Such legal errors do not provide a basis for a section 1692k(c) defense.

    2.  <u>Section 1692c(a)(2)</u>

Plaintiff next submits that MEEB communicated with plaintiff at a time when it knew he was represented by an attorney in violation of section 1692c(a)(2).  Plaintiff submits that this provides further evidence of MEEB's bad faith.  (Docket Entry # 60, § 1(d)).

155

Plaintiff's counsel entered appearances in the April 2005 unit 104 suit and the June 2006 unit 105 suit in April 2007. Plaintiff bases the section 1692c(a)(2) violations on three 60 day delinquency letters MEEB sent in October 2007 and June and September 2008 to plaintiff.  (Docket Entry # 60, ¶ 19, fact para. 19, p. 15) (citing only exhibits 49, 50 & 76); (Docket Entry # 60, § 1(d), p. 30) (citing fact para. 19 as basis for MEEB's post-counsel communications).  Plaintiff contends that MEEB's direct communications with plaintiff when it knew he was represented by an attorney are evidence of MEEB's bad faith.  (Docket Entry # 60, § 1(d), p. 30 & ¶ 19, p. 15).

Chapter 183A, section 6(c), requires Pondview to send the 60 day letters to the "unit owner," i.e., plaintiff.  See Mass. Gen. L. ch. 183A, § 6(c).  MEEB argues that because state law, i.e., section 6(c), required the communications, it did not violate section 1692c(a)(2).  (Docket Entry # 61, ¶¶ 18-19, pp. 16-17).

Section 1692c(a)(2) prohibits a debt collector from communicating with a consumer in connection with collecting a debt "if the debt collector knows the consumer is represented by an attorney."  15 U.S.C. § 1692c(a)(2).  MEEB knew of plaintiff's representation by an attorney by the end of April 2007 with respect to unit 105 debt and the unit 104 debt in light of the appearances of counsel in the above two enforcement suits. Section 6(c) of chapter 183A, however, requires Pondview to send

156

"the unit owner" the 60 day notice.  <u>Drummer Boy Homes Ass'n, Inc.</u> <u>v. Britton</u>, 2011 WL 2981374, at *2 (when "portion of a unit owner's share of the common expenses has been delinquent for at least sixty days, the condominium association must notify the unit owner") (citing chapter 183A, section 6(c))

Turning to one of the cases cited by MEEB, the decision notes that, "A 1999 Federal Trade Commission report indicates that the 'cease communication' provision in section 1692c(a) of the FDCPA does not prevent collectors or creditors from filing suit against the consumer."[141]  <u>Hulse v. Ocwen Federal Bank, FSB</u>, 195 F.Supp.2d 1188, 1211 (D.Or. 2002).  The court in <u>Hulse</u> therefore found no violation of section 1692c(a)(2) based on a foreclosure notice letter sent directly to the plaintiffs as opposed to their attorney.  <u>Id.</u> at 1210-1211; <u>accord</u> <u>Vitullo v. Mancini</u>, 684 F.Supp.2d 747, 758-769 (E.D.Va. 2010) (citing <u>Hulse</u>, 195 F.Supp. at 1210-11, for principle that pursuit of state foreclosure remedies does not violate section 1692c(a)(2)).  Although MEEB cites both <u>Hulse</u> and <u>Vitullo</u> (Docket Entry # 61, ¶¶ 18-19, pp. 16-17), neither case relies on the language of the statute.  <u>See</u> <u>Zimmerman v. Puccio</u>, 613 F.3d 60, 71 (1st Cir. 2010) ("as with any act of Congress, '"our analysis begins with the language of the statute"'").

_____

[141]  MEEB does not argue that it acted in conformity with a Federal Trade Commission advisory opinion.  <u>See</u> 15 U.S.C. § 1692k(e).

Turning to the statutory language, section 1692c(a)(2), like the previously discussed language in section 1692c(b), excuses any communication with the debtor's attorney if the communication was made with "the express permission of a court of competent jurisdiction."  15 U.S.C. § 1692c(a).  Again, the plain language refers to "the express permission of a court."  15 U.S.C. § 1692c(b).  It does not refer to the permission of a state law or contain the "permitted by law" language in subsection 1692c(b).  For reasons previously explained, interpreting "express permission of a court" to mean "express permission" in a state law fails to afford "court" its plain and ordinary meaning.  See Black's Law Dictionary 356 (7th ed. 1999).  Furthermore, the fact that the next subsection of section 1692c expressly allows a communication that is "otherwise permitted by law" evidences a Congressional intention not to allow such an exception in section 1692c(a)(2).  See In re 229 Main Street Limited Partnership, 262 F.3d at 5-6 (recognizing presumption that Congress acts intentionally "in the disparate inclusion or exclusion" of terms in statutory sections).  Accordingly, the language of section 1692c(a)(2) provides MEEB no relief based on its argument that state law requires it to send the communication to the "unit owner" as opposed to the unit owner's attorney.

In addition, the state law (section 6(c) of chapter 183A) is inconsistent with the requirement in section 1692c(a)(2) not to

158

send the consumer the letter when the debt collector knows he is represented by an attorney with respect to the debt.  Thus, although the FDCPA does not displace or "annul" state law, it does prevent the enforcement of state "laws that are inconsistent with any provision" of the FDCPA "to the extent of the inconsistency." 15 U.S.C. § 1692n.  Here, it is inconsistent to send the "unit owner" the 60 day letter required by section 6(c) when section 1692c(a)(2) requires MEEB to send the communication to plaintiff's attorney after April 2007.

MEEB therefore violated section 1692c(a)(2) by sending plaintiff the 60 day delinquency letters on October 10, 2007, June 30, 2008, and September 16, 2008, to plaintiff.  (Ex. 49, 50 & 76).  On the other hand, this court finds that sending these notices in conformity with state law evidences an absence of any bad faith on the part of MEEB.[142]  Contrary to plaintiff's assertion that the communications were "intended to annoy [plaintiff]," state law justified the communications and dispels any suggestion of bad faith let alone warrant a finding of willfulness under chapter 93A.

In addition, the October 10, 2007 letter does not provide a basis for FDCPA liability because it is untimely.  See 15 U.S.C. § 1692k(d).  As a per se violation of chapter 93A, sending the

_____

[142]  The conduct therefore does not amount to or support an independent chapter 93A violation under the standard set out below.

letter to plaintiff as opposed to his attorney did not result in any loss of property or a personal injury loss such as emotional distress.  See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533.  Rather, the clear and concise letter apprised plaintiff of MEEB's activity in a direct and immediate manner.

Turning to the two, timely letters, plaintiff did not sustain any emotional distress, mental anguish, monetary or property loss "as a result of" the section 1692c(a)(2) violation.  15 U.S.C. § 1692k(a)(1).  He did not incur additional attorney's fees as a result of MEEB's failure to send the June 30 and September 16, 2008 letters to plaintiff's attorney.  Plaintiff's prior familiarity with 60 day letters belies the existence of any emotional distress as a result of MEEB sending the letter to him as opposed to his counsel.  Plaintiff did not testify to experiencing emotional distress as a result of MEEB's failure to comply with section 1692c(a)(2) by sending the letter to him as opposed to his attorney.  Cf. Donahue v. NFS, Inc., 781 F.Supp. 188, 194 (W.D.N.Y. 1991) (awarding $100.00 actual damages because plaintiff's "affidavit and testimony show" she "had suffered from hyperventilation, irritability, nervousness and anxiety when she received" three collection notices but "was able to work, sleep and eat").  Plaintiff's September 2008 visit to the hospital with chest pains was most probably the result of the foreclosure

proceedings on unit 104 and the loss of his parents' place as opposed to a result of MEEB's June 30 and September 16, 2008 letters to him.[143]   Statutory damages under section 1692k(a)(2) are addressed later in this opinion.

As a final matter, the complaint cites section 1692c(a)(2) and alleges that, after April 2007, MEEB "filed and served most of the above lawsuits directly on McDermott."[144]   (Docket Entry # 1, ¶ 46).   Plaintiff fails to establish by a preponderance of the evidence that MEEB served these state court lawsuits on plaintiff as opposed to his attorney.   MEEB filed the complaints at issue (Ex. 65, 66, 72 & 78) either in Lynn District Court or Essex Superior Court.   Plaintiff did not provide a copy of any summons for these suits or a docket sheet indicating that service was made on plaintiff as opposed to plaintiff's attorney.   Plaintiff did not testify to being served or to receiving these four complaints. The four state court complaints do not include a certificate of service that would reflect service on plaintiff as opposed to his attorney.   As the finder of fact, this court finds the evidence insufficient to establish that plaintiff satisfied his burden to prove by a preponderance of the evidence that MEEB served these

---

[143]   For the same reasons, plaintiff did not meet his burden to demonstrate that these two per se deceptions caused him a loss.   See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533.

[144]   The post trial brief does not develop this argument.

lawsuits on plaintiff.  Accordingly, there is insufficient evidence to show a section 1692c(a)(2) violation based on the lawsuits filed after April 2007 (Ex. 65, 66, 72 & 78).

H.  Section 1692h

In addition to the four arguments plaintiff raises in the post trial brief, the trial brief separately argues that MEEB violated section 1692h.  (Docket Entry # 60, p. 19).  Plaintiff submits that MEEB knew that plaintiff disputed its attorney's fees because he made it clear on the checks and accompanying correspondence that Pondview should not apply the checks to MEEB's attorney's fees.

Section 1692h prevents a debt collector from applying payments to any debt that is disputed when a consumer owes multiple debts.  15 U.S.C. § 1692h.  The section also requires the debt collector to apply "payment[s] in accordance with the consumer's direction."  15 U.S.C. § 1692h.

Turning to the latter basis, under the facts Pondview complied with plaintiff's directions on the checks and accompanying correspondence.  After MEEB became Pondview's attorney in or around March 23, 2005, neither MEEB nor Pondview applied a payment made by plaintiff to any debt in a manner that contravened plaintiff's instructions on the checks and accompanying correspondence.  As explained in the factual background, Bailey complied with the instructions plaintiff made

162

on the checks and correspondence accompanying those checks.

Plaintiff also contends that MEEB "contrived . . . to have the mortgagees' payments made out to Pondview, and to show the application of the payments only on ledgers that it had Pondview prepare for the pre-suit notices and affidavits in order [for MEEB] to evade this obligation" under section 1692h.  (Docket Entry # 60, p. 19).  Whether these mortgagee payments violate section 1692h initially turns upon the language of the statute.  See Zimmerman v. Puccio, 613 F.3d at 71.

Section 1692h, captioned "Multiple Debts," reads as follows:

§ 1692h.  Multiple debts

If any consumer owes multiple debts and makes any single payment to any debt collector with respect to such debts, such debt collector may not apply such payment to any debt which is disputed by the consumer and, where applicable, shall apply such payment in accordance with the consumer's directions.

15 U.S.C. § 1692h.  By its terms, section 1692h applies to "any consumer" who "owes multiple debts" and "makes any single payment to any debt collector with respect to such debts."  15 U.S.C. § 1692h.  In other words, the consumer who owes the debt must also make the payment with respect to such debt.  Here, the mortgagees who made the payments did not owe the multiple debts and the payments they made were not "with respect to" their non-existent multiple debts.  Consistent with this interpretation, the FDCPA's definition of the term "consumer" means a person "obligated or allegedly obligated to pay any debt."  15 U.S.C. § 1692a(3).

163

Although plaintiff's mortgagees may wish to protect their interest in the mortgaged property, they are not obligated to pay the debt plaintiff, as the "unit owner" under section 6(c), incurred to Pondview for outstanding common expenses.

The statute's purpose confirms that section 1692h applies to consumers who owe the multiple debts and who make the payment with respect to "such debts." 15 U.S.C. § 1692h. The overall purpose of the FDCPA is "to eliminate abusive debt collection practices" while not competitively disadvantaging debt collectors who refrain from such practices.[145] 15 U.S.C. § 1692(e). Extending the reach of section 1692h to apply to all payments made by a debtor's mortgagees does not directly effect or eliminate the abusive practices of the debtor's debt collector. Plaintiff's argument seeking to apply the statute to payments made by plaintiff's mortgagees is therefore without merit.

I. Section 1692i

As a final matter, the complaint identifies an additional FDCPA violation not raised in the post trial brief. (Docket Entry # 1, ¶ 35). Specifically, paragraph 35 alleges that MEEB violated section 1692i by filing the September 2008 unit 104 suit in Essex Superior Court.[146] MEEB points out (Docket Entry # 61, ¶ 23, p.

---

[145] The FDCPA also seeks to "promote consistent State action to protect consumers against debt collectors." 15 U.S.C. § 1692(c).

[146] See fn. 29.

17) that state law requires it to file a suit enforcing section 6(c) of chapter 183A "in the superior court for the county where such land lies or in the district court in the judicial district where such land lies."  Mass. Gen. L. ch. 254, § 5.

Section 1692i provides that:

(A) Venue

Any debt collector who brings any legal action on a debt against any consumer *shall* . . .  bring such action *only* in the judicial district or similar legal entity (A) in which such consumer signed the contract sued upon; or (B) in which such consumer resides at the commencement of the action.

15 U.S.C. § 1692i (emphasis added).  Congress' purpose in enacting section 1692i "was 'to prevent debt collectors from bringing collection suits in forums located at great distances from debtors' residences.'"  Harrington v. CACV of Colorado, LLC, 508 F.Supp.2d at 134.

At the time MEEB commenced the September 2008 unit 104 suit, plaintiff resided in Lynn.  Lynn is part of the judicial district of the district court of southern Essex.  Mass. Gen. L. ch. 218, § 1 ("district court of southern Essex, held at Lynn" includes "Lynn, Swampscott, Saugus, Marblehead and Nahant").  MEEB filed the September 2008 unit 104 suit in Essex Superior Court which sits in Salem, Lawrence and Newburyport, Massachusetts.  Mass. Gen. L. ch. 212, § 14.  It is not located in the judicial district in which plaintiff resides.

The plain language of section 1692i uses the mandatory term

165

"shall."  15 U.S.C. § 1692i.  The statute therefore imposes a
mandatory requirement to bring "any legal action on a debt
against" a consumer such as plaintiff "*only* in the judicial
district or similar legal entity . . . in which such consumer
resides."  15 U.S.C. § 1692i (emphasis added).  For reasons
previously discussed, the bona fide error defense does not
encompass a mistake of law regarding proper venue.  The statutory
language of section 1692i does not expressly allow for filing suit
in a judicial district permitted under state law.  Furthermore,
"Numerous courts have rejected the argument that 'judicial
district or similar legal entity' merely incorporates state venue
provisions."  Harrington v. CACV of Colorado, LLC, 508 F.Supp.2d
at 133-134 (quoting section 1692i and collecting authority).
Filing the September 2008 unit 104 suit in Essex Superior Court
therefore violated section 1692i.

Plaintiff fails to provide any evidence of damages caused by
this violation.  The Lynn District Court was six or seven miles
from plaintiff's residence.  There was no testimony, however,
about the distance from Essex Superior Court to plaintiff's
residence.  Even if this court took judicial notice of the
distance, there was little if any evidence that plaintiff traveled
to the Essex Superior Court courthouse.  Plaintiff did not testify
to experiencing any emotional distress as a result of the filing

in Essex Superior Court.[147]   Statutory damages are addressed in the
next section.[148]

## J.   Statutory Damages

Section 1692k(a)(2) gives the court discretion to award
statutory damages up to $1,000.00.   See Savino v. Computer Credit,
Inc., 164 F.3d 81, 86 (2nd Cir. 1998) ("decision whether to award
statutory damages" and the amount "of the award are matters
committed to the sound discretion of the district court").   The
language allows an award "in the case of any action by an
individual . . . damages as the court may allow, but not exceeding
$1,000."   15 U.S.C. § 1692k(a)(2)(A).   Section 1692k(b) dictates
that the court "*shall* consider, among other relevant factors[,] .
. . the frequency and persistence of noncompliance by the debt
collector, the nature of such noncompliance, and the extent to
which such noncompliance was intentional."   15 U.S.C. § 1692k(b)
(emphasis added).

"Generally, courts have awarded less than the $1,000
statutory maximum damages 'where there is no repeated pattern of
intentional abuse or where the violation was technical.'"   Mira v.

---

[147]   For the same reasons, plaintiff fails to demonstrate
that this per se deception under chapter 93A caused a loss.   See
Hershenow v. Enterprise Rent-A-Car of Boston, Inc., 840 N.E.2d at
533.

[148]   The absence of an actual damages award under section
1692a(1) makes it unnecessary to address MEEB's related section
1692a(1) argument (Docket Entry # 61, ¶ 51, p. 22).

Maximum Recovery Solutions, Inc., 2012 WL 4511623, at *3 (E.D.N.Y. Aug. 31, 2012) (collecting cases); see, e.g., Arthur v. Robert James & Associates Asset Management, Inc., 2012 WL 1122892, at *2 (S.D.Ohio April 3, 2012) (single FDCPA violation warranted "$100.00 in statutory damages").  In contrast, "Awards of the statutory maximum are typically granted in cases where the defendants' violations are egregious."  Cook v. First Revenue Assur., LLC, 2012 WL 272894, at *2 (E.D.N.Y. Jan. 9, 2012).

Here, MEEB committed a number of timely FDCPA violations. See Mira v. Maximum Recovery Solutions, Inc., 2012 WL 4511623, at *3 ("at least three personal contacts with threats of legal action and noncompliance with the FDCPA" warranted $1,000.00 maximum award); Gilmore v. Account Management, Inc., 2009 WL 2848278, at *10 (N.D.Ga. April 27, 2009) (awarding maximum amount of $1,000.00 "[i]n light of Defendant's repeated violations of the FDCPA over a period of several months").  The conduct was relatively persistent although far less persistent than plaintiff asserts.  Cf. Coles v. Lieberman, Michaels & Kelly, LLC, 2011 WL 3176467, at *3 (W.D.N.Y. July 27, 2011) ("calling Plaintiff five times in May and June 2010" was "not so persistent or egregious as to warrant" maximum amount and finding $250.00 appropriate).  On the other hand, the the noncompliance at issue was not intentional.  See 15 U.S.C. § 1692k(b) ("court shall consider . . . extent to which such noncompliance was intentional").  On balance and considering all

of the relevant factors, a maximum award of $800.00 is
appropriate.

II.   CHAPTER 93A

Plaintiff submits that MEEB's violations of the FDCPA
constitute per se violations of chapter 93A.  Plaintiff also seeks
chapter 93A liability based on an independent violation because
MEEB's collections actions were intended to escalate its
attorney's fees.  Plaintiff additionally requests triple but no
less than double the amount of actual damages because MEEB acted
willfully and/or knowingly and it refused to tender any relief in
response to the demand letter "when it knew or should have known
that its actions violated the FDCPA."  (Docket Entry # 60, § 3).

MEEB argues that chapter 93A does not apply because the
matter is a private dispute and it was not engaged in trade or
commerce.  (Docket Entry # 61, ¶¶ 46-47).  Plaintiff disagrees.

Section two of chapter 93A applies "to unfair or deceptive
acts or practices in the conduct of any trade or commerce."  Mass.
Gen. L. ch. 93A, § 2(a).  Furthermore, the statute "is
inapplicable to a private dispute between a condominium unit
owners' association and a member of that association for failure
to pay condominium fees."  Berish v. Bornstein, 770 N.E.2d 961,
979 (Mass. 2002) (citing Office One, Inc. v. Lopez, 769 N.E.2d
749, 759 (Mass. 2002)).  Both Berish and Office One involved
private disputes between the volunteer trustees of a condominium

169

trust and a unit owner, board member or developer.  See Berish v. Bornstein, 770 N.E.2d at 966-968 & 971-972; Office One, Inc. v. Lopez, 769 N.E.2d at 759.  Each case rejects the application of a chapter 93A because, "Transactions that are principally private in nature do not fall within the purview of G.L. c. 93A."  Office One, Inc. v. Lopez, 769 N.E.2d at 759 (internal ellipses and quotations marks omitted); accord Berish v. Bornstein, 770 N.E.2d at 979.

Berish and Office One are distinguishable because this case involves the condominium associations's debt collector, MEEB, against a unit owner.  In addition, unlike Berish and Office One, this case involves a per se chapter 93A violation based on the FDCPA.  Thus, while instructive outside the context of a per se violation based on the FDCPA, Berish and Office One are not determinative of whether MEEB and plaintiff were engaged in a private transaction as opposed to "trade or commerce" within the meaning of section 2(a) of chapter 93A.

Here, plaintiff relies on the fact that violations of the FDCPA on the part of attorney debt collectors are per se violations of section two.  He also relies on regulation 3.16(4). (Docket Entry # 1, ¶ 74).

Section 2(c) of chapter 93A provides that, "The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter."  Mass. Gen. L. ch. 93A, §

2(c).  Section 2(c) gives the Attorney General of the Commonwealth
the power "to promulgate substantive rules of law."  Purity
Supreme, Inc. v. Attorney General, 407 N.E.2d 297, 299 (Mass.
1980) (finding that the regulation at issue, enacted under section
2(c), carries "the force of law normally accorded to an agency's
regulations").  Exercising this power, the Attorney General of the
Commonwealth enacted 940 C.M.R. § 3.16 ("regulation 3.16").  The
regulation states that:

> . . . an act or practice is a violation of M.G.L. c.93A, § 2
> if:
>
> (1) It is oppressive or otherwise unconscionable in any
> respect; or
>
> (2) *Any person or other legal entity subject to this act*
> fails to disclose to a buyer or prospective buyer any fact,
> the disclosure of which may have influenced the buyer or
> prospective buyer not to enter into the transaction; or
>
> (3) It fails to comply with existing statutes, rules,
> regulations or laws, meant for the protection of the public's
> health, safety, or welfare promulgated by the Commonwealth or
> any political subdivision thereof intended to provide the
> consumers of this Commonwealth protection; or
>
> (4) It violates the Federal Trade Commission Act, the Federal
> Consumer Credit Protection Act or other Federal consumer
> protection statutes within the purview of M.G.L. c. 93A, § 2.

940 C.M.R. 3.16 (emphasis added).

Plaintiff grounds the chapter 93A claim on per se FDCPA
violations declared as violations of section 2(a) under regulation
3.16(4).[149]  In contrast to the restrictive language in subsection

───────────────

[149]  As discussed in the next section, this theory of chapter
93A liability is well established.

171

two of regulation 3.16 that restricts itself to a person "subject to the act," subsection four omits this language and simply declares a violation of a federal consumer protection statute is an act or practice in violation of section two.  See generally In re 229 Main Street Limited Partnership, 262 F.3d at 5-6 (Congress acts intentionally "in the disparate inclusion or exclusion" of terms in statutory sections).  The language "act or practice" in regulation 3.16 therefore refers to "acts or practices in the conduct of any trade or commerce" in section 2(a).

The FDCPA is federal consumer protection statute within the meaning of regulation 3.16(4).  See 15 U.S.C. § 1692(e); F.T.C. v. Check Investors, Inc., 502 F.3d at 165 (purpose of FDCPA is "'"to protect consumers from a host of unfair, harassing, and deceptive collection practices without imposing unnecessary restrictions on ethical debt collectors"'"); In re Pharmaceutical Industry Average Wholesale Price Litigation, 491 F.Supp.2d at 84.  Indeed:

> The types of federal statutes that courts have found to be consumer protection statutes under section 3.16(4) include: the Truth in Savings Act (TISA),[150] *Fair Debt Collection Practices Act (FDCPA)*, and Truth in Lending Act (TILA)[151] . . . [which] all focus on the conduct of buyers and sellers in the marketplace, and specifically reference the protection of consumers in these transactions.

In re Pharmaceutical Industry Average Wholesale Price Litigation, 491 F.Supp.2d at 84 (emphasis added).  The focus on the

---

[150]   12 U.S.C. §§ 4301 et seq.

[151]   15 U.S.C. §§ 1601 et seq.

marketplace is inherent in the FDCPA because it only applies to a

"debt collector."  A debt collector  means "any person who uses

any instrumentality of interstate commerce or the mails *in any*

*business* the principal purpose of which is the collection of any

debts . . .."  15 U.S.C. § 1692a(6) (emphasis added).

Finally, direct precedent in this district, albeit not cited

by either party, instructs that a per se violation of chapter 93A

based on the FDCPA and 3.16(4) does not require proof that the

defendants are engaged in trade or commerce.  See Andrews v. South

Coast Legal Services, Inc., 582 F.Supp.2d 82, 89-90 (D.Mass.

2008).  The Andrews court rejected the defendants' argument that

they were not engaged in "trade or commerce" under section two

because:

> Regulations promulgated under ch. 93A, in particular 940
> C.M.R. 3.16(4), make a violation of the Federal Consumer
> Credit Protection Act, of which the FDCPA is a part, a per se
> violation of ch. 93A.  These regulations have the force of
> substantive law.  See Purity Supreme, Inc. v. Attorney
> General, 380 Mass. 762, 763, 407 N.E.2d 297, 299 (1980).
> Since Andrews has alleged a violation of the FDCPA, she also
> has alleged sufficient facts to establish an unfair and
> deceptive act or practice in violation of Mass. Gen. Laws ch.
> 93A.  See Martin v. Sands, 62 F.Supp.2d 196, 201 (D.Mass.
> 1999) (violation of the FDCPA is a per se violation of ch.
> 93A).

Id.  Distinguishing cases relied upon by the defendants because

they did not involve the FDCPA, the Andrews court denied a motion

to dismiss "[s]ince a violation of the FDCPA is a per se violation

of ch. 93A."  Id. at 90.

Here too, neither Berish nor Office One involve a per se

chapter 93A violation based on the FDCPA.  Regulation 3.16(4), which carries the force of law, establishes that a violation of the FDCPA is a violation of section two of chapter 93A thus supporting section nine liability.[152]

B.   Per Se Violations of the FDCPA

Plaintiff alleges chapter 93A violations based on timely as well as untimely violations of the FDCPA.  MEEB asserts that the common law litigation privilege applicable to chapter 93A claims bars all liability under the statute.

The FDCPA and chapter 93A diverge with respect to liability based upon litigation activities.  "[T]he FDCPA does not contain an exemption from liability for common law privileges."  Allen ex rel. Martin v. LaSalle Bank, N.A., 629 F.3d at 369; accord Akar v. Federal National Mortgage Association, 843 F.Supp.2d at 164 ("'FDCPA applies to the litigation activities of attorneys who qualify as debt collectors'") (quoting Sayyed v. Wolpoff & Abramson, 485 F.3d 226, 232 (4th Cir. 2007)); Harrington v. CACV of Colorado, LLC, 508 F.Supp.2d at 135.  For reasons more fully explained by the court in Sayyed, "The statutory text makes clear that there is no blanket common law litigation immunity from the requirements of the FDCPA."  Id. at 230-234 (analyzing statutory text); Akar v. Federal National Mortgage Association, 843

_____

[152]   As discussed infra, section nine carries with it the additional requirement of an injury.

F.Supp.2d at 164 (quoting Sayyed, 485 F.3d at 230); see also
Heintz v. Jenkins, 514 U.S. at 293-294.

In contrast, "Under Massachusetts law, an attorney's
statements are absolutely privileged 'where such statements are
made by an attorney engaged in his function as an attorney whether
in the institution or conduct of litigation or in conferences and
other communications preliminary to litigation.'" Blanchette v.
Cataldo, 734 F.2d 869, 877 (1st Cir. 1984) (quoting Sriberg v.
Raymond, 345 N.E.2d 882, 884 (Mass. 1976)); Shirokov v. Dunlap,
Grubb & Weaver, PLLC, 2012 WL 1065578, at *22 (D.Mass. March 27,
2012) (same).  The privilege applies "not only in defamation
cases, but as a general bar to civil liability based on the
attorney's statements." Blanchette v. Cataldo, 734 F.2d at 877;
see, e.g., Doe v. Nutter, McClennen & Fish, 668 N.E.2d 1329, 1331
(Mass.App.Ct. 1996) (affirming dismissal of chapter 93A claim and
other state law claims based on litigation privilege).  As shown
by the cases MEEB cites, which include Blanchette and Nutter,
McLennan & Fish, the privilege therefore ordinarily applies to
chapter 93A claims.

The privilege serves the commendable "public policy of
permitting attorneys complete freedom of expression and candor in
communications in their efforts to secure justice for their
clients." Sriberg v. Raymond, 345 N.E.2d at 884.  Determining if
it applies entails "a fact-specific analysis" on "a case-by-case

175

basis." <u>Giuffrida v. High Country Investor, Inc.</u>, 897 N.E.2d 82,
98 (Mass.App.Ct. 2008).  As the proponent of the privilege, MEEB
has the burden to establish it.  See <u>Shirokov v. Dunlap, Grubb &</u>
<u>Weaver, PLLC</u>, 2012 WL 1065578, at *22 ("as the parties asserting
the privilege, the defendants have the burden of establishing
entitlement to the privilege").

As previously explained with respect to the per se chapter
93A violations, the Attorney General of the Commonwealth is
authorized to issue regulations to enforce chapter 93A's
prohibition against unfair or deceptive acts or practices.  Mass.
Gen. L. ch. 93A, § 2(c));  <u>Barnes v. Fleet National Bank, N.A.</u>, 370
F.3d 164, 176 (1st Cir. 2004).  Regulation 3.16(4) "states that
violation of 'Federal consumer protection statutes' constitutes  a
per se violation of Chapter 93A, § 2(a)."  <u>Id.</u>  Notably, the plain
and unambiguous language of the regulation does not expressly or
impliedly create an exception for litigation activity.

Moreover, the only additional requirement for per se
violations identified by the Massachusetts Supreme Judicial Court
("SJC") in <u>Hershenow</u> is causation.  See <u>Hershenow v. Enterprise</u>
<u>Rent-A-Car Company of Boston, Inc.</u>, 840 N.E.2d at 532-533; <u>Haddad</u>
<u>v. Gonzales</u>, 576 N.E.2d 658, 665 (Mass. 1991).  The causation
requirement arises from language in section 9(1) as opposed to
language in section two.  The SJC has yet to create an exception
to per se chapter 93A liability for a federal consumer protection

statute encompassed by regulation 3.16(4) based on the litigation privilege. This federal court declines to restrict the reach of this category of chapter 93A liability by applying the litigation privilege and thereby sharply curtail per se chapter 93A liability of debt collectors who violate the FDCPA. Accordingly, the privilege does not apply to the per se chapter 93A claims based on the FDCPA violations.

MEEB also argues that plaintiff fails to establish actual damages under the FDCPA and chapter 93A. (Docket Entry # 61, § 52, p. 23). As previously noted, an FDCPA violation "constitutes a per se violation of ch. 93A." French v. Corporate Receivables, Inc., 489 F.3d at 403 n.1 (citing Barnes v. Fleet Nat. Bank, 370 F.3d at 176); Barnes v. Fleet Nat. Bank, 370 F.3d at 176 (collecting cases wherein FDCPA claims constitute per se violations of chapter 93A).[153] Establishing a violation of the FDCPA does not, however, automatically lead to an award of damages under chapter 93A. See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533. A plaintiff seeking a remedy under chapter 93A, section nine, must still demonstrate that a per se violation of the FDCPA "caused a loss." Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533

---

[153] In finding that a violation of the FDCPA constitutes a per se violation of chapter 93A, the Barnes court relied on regulation 3.16(4), the same Massachusetts regulation relied upon by plaintiff.

("a plaintiff seeking a remedy under G.L. c. 93A, § 9, must demonstrate that even a per se deception caused a loss"); Kassner v. Chase Home Finance, LLC, 2012 WL 260392, at *9 (D.Mass. Jan. 27, 2012) ("[a] plaintiff seeking a remedy under Mass. Gen. L. c. 93A, § 9, must still demonstrate that even a per se deception caused an actual loss"); Mass. Gen. L. ch. 93A, § 9(1) (creating cause of action for "[a]ny person . . . *who has been injured* by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder") (emphasis added); see Haddad v. Gonzalez, 576 N.E.2d at 665 (actual damages "consist of all damages foreseeably flowing from an unfair or deceptive act or practice"); DiMarzo v. American Mutual Ins. Co., 449 N.E.2d 1189, 1200 (Mass. 1983) (under chapter 93A, "the plaintiff is entitled to recover for all losses which were the foreseeable consequences of the defendant's unfair or deceptive act or practice).

The SJC in Hershenow rejected the plaintiff's argument that a per se chapter 93A violation based on a state consumer protection statute within the reach of regulation 3.16(3) was by itself a "'per se injury' and that no more [was] needed to establish injury under G.L. c. 93A, § 9." Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533. Here too, a per se chapter 93A violation based on a federal consumer protection

statute such as the FDCPA[154] within the reach of regulation 3.16(4) does not constitute a per se injury under chapter 93A, section 9(1).

An injury under section 9(1) occurs when the unfair or deceptive act (the FDCPA violation) "caused loss of money, loss of property," "a personal injury loss such as emotional distress" or "'the invasion of any legally protected interest of another.'" Id. at 533; see also Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 57 (1st Cir. 1998) (dicta noting that the term "injury" with respect to section nine "is a broader term" than "'loss of money or property' under § 11" "and includes, for example, emotional distress").  Thus, by enacting the 1979 amendments to chapter 93A, the Legislature clarified its intent "to permit recovery when an unfair or deceptive act caused a personal injury loss such as emotional distress, even if the consumer lost no 'money' or 'property.'"  Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533(citing Haddad v. Gonzalez, 576 N.E.2d at 665).

With these principles in mind, this court turns to the untimely FDCPA violations established above and the amount of damages, if any, plaintiff established under chapter 93A, section

---

[154]  A violation of the FDCPA does not require the plaintiff to show actual damages.  Som v. Daniels Law Offices, P.C., 573 F.Supp.2d at 356.

nine.[155]   Taking the FDCPA violations in chronological order, the
first violation consists of the incorrect amount of the unit 105
debt in the "initial communication" in violation of section
1692g(a)(1).   The March 23, 2005 letter overstated the amount by
$75.00.   (Ex. 9).   There is insufficient evidence to show that
Bayview's May 2005 payment included the overstated $75.00 amount
and, hence, that Bayview added the $75.00 to plaintiff's mortgage.
There is also insufficient evidence that MEEB received the
additional $75.00 in the form of legal fees.[156]   Rather, Bayview's
payment reflects the legal fees and costs in MEEB's invoices and
the overdue condominium related charges.   Accordingly, the
overstatement was not causally connected to a monetary loss or
injury.   Plaintiff did not lose any property as a result of the
violation.   As to any emotional or mental suffering, plaintiff
disavowed receiving the letter and therefore disavowed any
emotional and mental suffering as a result of the letter.   He also
knew he was in arrears on late fees dating back eight months and
condominium fees dating back to December 1, 2004.   In addition, he
knew about Pondview's stated policy to take legal action against
the unit owner after three consecutive months of non-payment of

---

[155]   Plaintiff's argument that he is entitled to damages
measured by MEEB's unjust enrichment is addressed later in this
opinion.

[156]   Plaintiff's request to measure damages based on a
disgorgement of MEEB's profits is addressed later in this
opinion.

condominium fees and late fees.  He also knew he was responsible for the court costs.  (Ex. 1-4).  The per se deception of the section 1692g(a)(1) violation therefore did not cause plaintiff any emotional distress or mental anguish.

Turning to the April 2005 unit 104 and unit 105 suits, MEEB violated section 1692e(2)(A)'s prohibition against falsely representing "the character . . . or legal status" of the debt because the complaints depicted the assessed amounts as having "not been paid when due."  (Ex. 15 & 16).  Each suit stated that the assessed amounts "have not been paid when due."  (Ex. 15 & 16).  The figures, however, included attorney's fees and costs that were not due at that time.  MEEB additionally violated the same prohibition by stating that the delinquency, i.e., the assessed amounts, had "existed for at least sixty days."  (Ex. 15 & 16).  The violations resulted in larger amounts for the "common expenses" figure stated in paragraph five of the April 2005 unit 104 suit and paragraph six in the April 2005 unit 105 suit. Respectively, the amounts were larger by $1,138.00 and $1,869.00[157] MEEB committed the same section 1692e(2)(A) violations with respect to six of the seven other suits resulting in the aforementioned increases in the "common expenses" figure stated in the first fact paragraph in each of the six complaints.

---

[157] The $1,869.00 figure consists of the legal fees for unit 105 for filing the complaint up to and including the April 28, 2005 filing date.

Here, plaintiff fails to show that these per se violations caused him a monetary or a property loss.  See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533 (a chapter 93A plaintiff "must demonstrate" that "a per se deception caused a loss").  Plaintiff was at all relevant times responsible for the attorney's fees and costs.  The fees and costs became due within a short period of time.  The fact that MEEB falsely represented the character or legal status of the debt because the attorney's fees and costs were not due at the time MEEB filed each suit or because they were not delinquent for at least 60 days did not cause plaintiff a pecuniary injury. Plaintiff never lost the use of any money by, for example, paying the amounts that were not due at that time.

As to an emotional or mental injury, plaintiff adequately establishes a causal connection between the per se deceptions and an emotional or mental injury with respect to the April 2005 suits and the October 2005 and June 2006 unit 105 suits.  These four suits all significantly overstated the amount of the common expenses that were "not paid when due" and were not "duly assessed" because they included the legal fees for filing the complaints.  In contrast, the subsequent suits did not significantly overstate the amount of common expenses in relation to the actual amount of common expenses and, by that time, this court finds that plaintiff fully expected the inclusions.

182

Turning to the amount of damages plaintiff suffered vis-à-vis these first four suits, plaintiff was in a vulnerable state as a result of the recent deaths of his parents.  On the other hand, he received the March 23 and 31, 2005 letters and therefore experienced less of a shock or surprise by virtue of the common expenses figure in the two April 2005 suits.  With respect to all four suits, plaintiff knew he was responsible for the legal fees even though such fees had not been duly assessed or not paid when due at the time MEEB filed these suits.  On balance, this court finds that the per se deceptions caused an emotional and mental injury in the amount of $4,500.00.

The next per se chapter 93A violation based on the FDCPA consists of the false representations of the amount of the debt in the May 2, 2005 letter in violation of section 1692e(2)(A).  MEEB overstated the amount of the legal fees for unit 104 by $195.00 and for unit 105 by $167.00.  Again, there is insufficient evidence of a monetary injury or property loss.  The evidence fails to establish that Bayview's May 2005 payment included the overstated $167.00 amount for unit 105 and, hence, that Bayview added the $167.00 to plaintiff's mortgage.  There is also insufficient evidence that MEEB received the additional amounts of $195.00 and $167.00 in the form of legal fees.  The facts demonstrate that these fees are not contained in MEEB's invoices for March, April and May of 2005.  Ledgers reflecting the Bayview

183

payment for unit 105 show the same amounts of legal fees in MEEB's invoices for March, April and May 2, 2005.  Accordingly, plaintiff fails to demonstrate that these per se violations caused him a financial loss.  They did not cause him a property loss.

Plaintiff nonetheless was emotionally and mentally impacted by the May 2, 2005 letter.  Shortly after receiving it, he telephoned MEEB and asked to speak with Brooks.  See generally Sweetland v. Stevens & James, Inc., 563 F.Supp.2d at 303 (noting that the plaintiff contacted her attorney after debt collector's telephone threatening calls as support for finding emotional distress damages, albeit under section 1692k, resulting from violation and awarding $2,500.00 in actual damages).  Plaintiff was concerned because the letter stated that he owed several thousand dollars.  Because of the overstated and false representations of the amount of the legal fees for each unit, plaintiff actually owed less money than the stated amount.  Specifically, plaintiff actually owed $195.00 less than the $1,389.00 amount of legal fees for unit 104 and $167.00 less than the $1,772.00 amount of legal fees for unit 105.  Taking into account plaintiff's relatively unconvincing demeanor and other circumstances, including his depression, this court finds that plaintiff experienced emotional distress damages in the amount of $500.00.

Turning to the first May 17, 2005 letter, MEEB incorrectly

stated the amount of the debt by including two, duplicate legal fees for March 2005.  The letter added the attorney's fees for unit 104 ($348.00) and unit 105 ($536.00) twice to the balance as of May 17, 2005.  (Ex. 22).  MEEB therefore made two false representations of the amount of the debt in violation of section 1692e(2)(A).  Plaintiff knew he was responsible for the legal fees and the duplication had no effect on plaintiff's emotional state.  MEEB also promptly corrected the errors in the second May 17, 2005 letter.  (Ex. 24).  On balance, this court finds that plaintiff did not experience any mental or emotional injury.  He also did not experience a loss of money or property.  In short, he failed in his burden to demonstrate the necessary causal connection between MEEB's false representation and a loss.  Likewise, he failed in his burden to show the necessary causal connection to an injury with respect to the understated legal fees "THROUGH 5/17/05" in the May 17, 2005 letter.

The May 17, 2005 letter also included a dismissal fee of $150.00 in the ledger for each unit that was a false representation of the amount of the debt.  See 15 U.S.C. § 1692e(2)(A).  Brooks changed the dismissal fee to the correct amount ($75.00) on May 27, 2005, for unit 105.  MEEB did not include the $150.00 dismissal fee on its invoices and Bayview did not pay the fee or add it to plaintiff's mortgage.  MEEB charged $75.00 for the dismissal which Bayview paid and added to

185

plaintiff's mortgage.  The mortgage for unit 105, which included the condominium rider, allowed Bayview to add the dismissal fee to the debt secured by the security agreement.  Hence, MEEB's violation of section 1692e(2)(A) by stating the false amount of the dismissal fee as $150.00 as opposed to $75.00 in the unit 105 ledger attached to the letter did not result in any monetary or property loss to plaintiff.  Based on the evidence, this court also finds that the violation did not cause any emotional or mental loss to plaintiff.  With respect to this violation, plaintiff's emotional distress and depression at this time resulted solely from the loss of his parents.

As to the inclusion of the $150.00 dismissal fee in the attached unit 104 ledger, plaintiff did not suffer a pecuniary loss because the dismissal fee eventually paid ($275.00)[158] was greater than the $150.00 fee.  MERS paid the $275.00 fee as part of the July 31, 2008 payment of $34,813.40.  In accordance with the terms of the mortgage, including the condominium rider, MERS added the amount to the debt under the security agreement.  In light of plaintiff's demeanor on cross examination and his failure to testify about the dismissal fee as causing an emotional loss, MEEB's per se deception did not cause any emotional or mental loss to plaintiff.  As noted above, plaintiff's emotional distress and

---

[158]  See footnote 80 and related text.  Plaintiff does not discuss, let alone raise an argument, that the $275.00 dismissal fee violated section 1692e(2)(A).  See fn. 81 & 113.

depression at this time resulted from the loss of his parents, including the loss of his mother five months earlier.

The next FDCPA violation occurred in the two, October 4, 2005 letters.  Both letters, one a 60 day letter and the other a notice of intent to collect rent letter, included the false representation of the amount of the debt "incurred though the date of this letter."  (Ex. 25 & 26).  The stated amount in each letter was $1,098.14.  MEEB violated section 1692e(2)(A) because the letters stated the debt as $1,098.14 when in fact the debt was actually $1,380.14 as of October 4, 2005.  The fact that MEEB understated as opposed to overstated the amount of the debt evidences a lack of any financial or emotional loss.  Moreover, plaintiff did not testify that these letters or MEEB's misconduct of understating the amounts caused him to experience any emotional or mental harm.  He did not visit any medical professional at or around this time.  He took antidepressant medication prior to this violation as well as prior to all the other FDCPA violations committed by MEEB.  Given the absence of a causal connection to a loss, plaintiff is not entitled to a chapter 93A damages award based on these per se deceptions in the two October 4, 2005 letters.[159]

---

[159]  The absence of the necessary causal connection here and elsewhere also precludes a damages award in the amount of $25.00 under section 9(3) of chapter 93A.  See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533 n.18.

The next per se chapter 93A violation results from the
section 1692c(b) violations based on MEEB's letters to Bayview,
Aegis, M & T or MERS' attorney.  (Ex. 38, 42, 45, 47, 55, 59, 60 &
68).  The letters either respond to payoff requests or confirm a
payment.  Plaintiff asserts that the communications led to
payments in excess of the priority amounts as well as payments of
attorney's fees.  (Docket Entry # 60, ¶ 16, pp. 13-14 & § 1(b)).
With respect to four of the letters (Ex. 42, 47, 55 & 68), there
is insufficient evidence that the letters caused any of the
recipients to make a payment or caused any negative impact to
plaintiff.  These letters are not temporally tied to any payment
on the part of the recipient.

The November 30, 2005 letter to Bayview identified the amount
of outstanding unit 105 debt.  (Ex. 38).  Plaintiff did not
receive the letter.  Bayview paid the amount ($3,015.55) by check
dated December 15, 2005, made payable to Pondview.  (Ex. 41).
Pondview credited the amount to plaintiff's unit 105 account and
Bayview added the amount to the mortgage.  Plaintiff was
responsible for the entire amount, including the attorney's fees,
by virtue of The Declaration of Trust and chapter 183A, section
six.  MEEB's per se deception, i.e., the communication to M & T in
violation of section 1692c(b), therefore did not cause plaintiff a
monetary loss or a loss of property.  Plaintiff's unconvincing
demeanor belies the existence of any emotional distress or mental

anguish caused by MEEB's communication to M & T in violation of section 1692c(b).

The same reasoning applies to the January 31, 2007 communication (Ex. 59) and the February 15, 2007 communication (Ex. 60) confirming the $2,226.83 payment (Ex. 60).  Plaintiff thus fails in his burden to demonstrate that these per se deceptions caused him a loss of money or property or an emotional or other injury within the meaning of section 9(1) of chapter 93A.

The August 18, 2006 letter communicated the amount of the unit 104 debt to M & T as $3,454.00.[160]  (Ex. 45).  Shortly thereafter, M & T paid $3,454.00 by check dated August 29, 2006, made payable to Pondview.  M & T added the amount to plaintiff's mortgage.[161]  Pondview credited the entire amount to the unit 104 account.  Again, by virtue of the Declaration of Trust and chapter 183A, plaintiff was responsible for the entire amount. Plaintiff's unconvincing demeanor belies the existence of any emotional distress or mental anguish.  Plaintiff thus fails in his burden to show that the per se deception of the communication caused a monetary, property or emotional loss.  See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533

---

[160]  The factual background identifies the amounts included in this figure.

[161]  Plaintiff makes no argument and provides no evidence that he paid a greater amount due to any interest paid on the mortgage.  See fn. 81 & 113.

("a plaintiff . . . must demonstrate that even a per se deception caused a loss").

Turning to the next per se violation, MEEB filed the multiple unit 105 suits in June 2007 and October 2007 seeking significant amounts of duplicate legal fees in violation of section 1692d. The misconduct caused plaintiff emotional distress.  See generally Gathuru v. Credit Control Services, Inc., 623 F.Supp.2d at 123-124.  Again, however, plaintiff did not seek medical attention as a result of this misconduct.  He took antidepressant medication years before these violations.  On the other hand, the amount of duplicate legal fees sought was significant.  Plaintiff was in an emotionally vulnerable state in light of his parents' deaths, the pending foreclosure of unit 105 and the actual foreclosure of unit 105 in September 2007.  On balance and given the discrepancies in plaintiff's testimony, this court finds an award of $5,000.00 in mental anguish and emotional distress damages causally connected to these per se violations.[162]

Plaintiff also testified to incurring several thousand dollars in copying costs as a result of the ongoing litigation over the condominium assessments.  These costs foreseeably flow from MEEB filing the nine lawsuits.  See Haddad v. Gonzalez, 576

---

[162]  In making this chapter 93A damages award here and elsewhere, this court has considered MEEB's argument relative to third party fees.  (Docket Entry # 61, ¶ 51, p. 22).  The argument is moot inasmuch as this court did not award any such fees paid to MEEB.

N.E.2d at 665 ("actual damages in this context consist of all damages foreseeably flowing from an unfair or deceptive act or practice").  Two of those lawsuits included the proscribed harassing and abusive conduct of seeking duplicate legal fees in a significant amount in violation of section 1692d.  Out of pocket costs are compensable under chapter 93A.  See Wendt v. Barnum, 2007 WL 1783870, at *2 (Mass.App.Div. June 18, 2007) (actual damages under chapter 93A allow "the court to consider out-of-pocket expenses").  Recognizing that certain suits generated greater activity and that the violation involves two of the nine lawsuits, an award of $400.00 is appropriate.

Except for these out of pocket copying costs, there was no causal connection between the per se unfair or deceptive conduct and a monetary loss or loss of property.  It is true that the May 2007 foreclosure notice provided an impetus to MEEB's decision to file the June 2007 unit 105 suit because of its perceived need to protect a six month priority lien.[163]  Plaintiff, however, failed in his burden to show that the inclusion of the multiple legal fees in the June 2007 unit 105 suit caused the September 2007 foreclosure and loss of property.  See Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 840 N.E.2d at 533 ("a plaintiff seeking a remedy under G.L. c. 93A, § 9, must

---

[163]  As previously indicated, although the decision was reasonable and made in good faith it was not legally correct.

demonstrate that even a per se deception caused a loss"); <u>Haddad</u>
<u>v. Gonzalez</u>, 576 N.E.2d at 665 (actual damages consist of damages
"foreseeably flowing" from the "unfair or deceptive act or
practice").  Rather, this court draws the reasonable inference and
the factual finding that the September 2007 foreclosure arose
solely because of the lender's decision and plaintiff's failure to
pay the mortgage debt.  MEEB's per se deception did not cause
plaintiff's failure to pay his mortgage debt or contribute to the
foreclosure decision.

Turning to the next per se chapter 93A violation, MEEB
violated section 1692c(a)(2) by sending plaintiff, as opposed to
his attorney, the 60 day delinquency letters on October 10, 2007,
and June 30 and September 16, 2008.  For reasons previously
explained, these three per se unfair or deceptive practices did
not cause plaintiff a loss.  <u>See</u> <u>Hershenow v. Enterprise</u>
<u>Rent-A-Car Company Of Boston, Inc.</u>, 840 N.E.2d at 533.

As a final matter, plaintiff seeks a disgorgement of MEEB's
profits as the measure of his economic damages under an unjust
enrichment theory of recovery.  MEEB asserts that unjust
enrichment or disgorgement of profits does not apply given the
absence of a special or fiduciary relationship or an intentional
interference with contractual relations.

In Massachusetts, "An accounting of profits-an approximation
of the defendant's 'unjust enrichment'-often joined with an

192

injunction, has been a well understood feature of actions for 'business torts' such as unfair competition (passing off), and trade name, trademark, and copyright infringement." <u>National Merchandising Corp. v. Leyden</u>, 348 N.E.2d 771, 775 (Mass. 1976) (interference with contractual relations); <u>see</u>, <u>e.g.</u>, <u>Melo-Tone Vending, Inc. v. Sherry, Inc.</u>, 656 N.E.2d 312, 315 (Mass.App.Ct. 1995) ("tainted profits" resulting from intentional interference with contract were appropriate measure of damages and doubled under chapter 93A based on willful conduct).  The measure of damages for business torts "such as the misappropriation of trade secrets entitles a plaintiff to recover full compensation for his lost profits and requires a defendant to surrender the profits which he realized from his tortious conduct." <u>Jet Spray Cooler, Inc. v. Crampton</u>, 385 N.E.2d 1349, 1356 (Mass. 1979).  As explained by the SJC in <u>Jet Spray</u>, "'Public policy requires that unfair competitors must not be allowed to profit by their wrongful methods and that those who have been injured by them should receive adequate compensation for the loss or injury they have suffered.'" <u>Id.</u>

Disgorgement of profits is also an appropriate measure of damages for a willful breach of fiduciary. <u>See</u> <u>Berish v. Bornstein</u>, 770 N.E.2d at 978 ("measure of recovery for a wilful breach of fiduciary duty that results in personal financial gain to the trustee may include disgorgement of the amount of the

193

gain"). Similarly, an employee who breaches a fiduciary duty of loyalty may also be required to forfeit his compensation. See Boston Children's Heart Foundation, Inc. v. Nadal-Ginard, 73 F.3d 429, 435 (1st Cir. 1996); Chelsea Industries, Inc. v. Gaffney, 449 N.E.2d 320, 326-327 (Mass. 1983). Likewise, when "a corporate fiduciary obtains a gain or advantage through a violation of his duty of loyalty, a court may properly order restitution of the gain, so as to deny any profit to the wrongdoer and prevent his unjust enrichment." Demoulas v. Demoulas Super Markets, Inc., 677 N.E.2d 159, 195 (Mass. 1997).

Here, plaintiff suffered only a minimal economic injury causally connected to the FDCPA violations. The damages sought by plaintiff in the form of all of MEEB's attorney's fees is not appropriate under the facts. Furthermore, there was no fiduciary relationship between Pondview and plaintiff let alone between MEEB and plaintiff. See Office One, Inc., v. Lopez, 769 N.E.2d. at 759 ("members of a governing board of a condominium association, in the capacity of the trustees here, owe no fiduciary duty to individual condominium unit owners"). Although plaintiff asserts that MEEB tortuously interfered with plaintiff's relationship with Pondview (Docket Entry # 60, p. 33), plaintiff never pled an interference with contractual relations claim. Disgorgement of profits is not a proper measure of damages under the

circumstances.[164]

C.  Independent Violations of Chapter 93A

As previously discussed, the post trial brief argues that the FDCPA violations are unfair and deceptive acts in violation of chapter 93A.  It does not identify an independent chapter 93A violation.  Without elucidating the independent chapter 93A violation, the complaint alleges that MEEB's actions are unfair and deceptive acts under chapter 93A "independent" and "irrespective of" the FDCPA violations.  (Docket Entry # 1, ¶ 75). The chapter 93A demand letter focuses on the FDCPA violations as unfair and deceptive acts under chapter 93A, section two.  (Ex. 79).

Plaintiff nevertheless repeatedly argues that MEEB acted in bad faith.  According to plaintiff, MEEB engaged in intentional and deliberate conduct all designed to escalate its legal fees. (Docket Entry # 60).  The facts do not support an egregious or intentional escalation of legal fees.  Although the relationship between MEEB and plaintiff extended a number for years, the section two violations were not as extensive.  As a means to establish a willful or knowing violation under section 9(3) of chapter 93A, it is unsuccessful.  Under the facts, MEEB's per se chapter 93A violations were neither willful nor knowing violations

---

[164]  It is therefore not necessary to address MEEB's alternative argument that plaintiff's adequate remedy at law precludes this measure of damages.

of section two.  See generally Heller v. Silverbranch Construction Corp., 382 N.E.2d 1065, 1070 (Mass. 1978) (willful or knowing "is directed against callous and intentional violations of the law and permits" multiple damages where "the defendant wilfully or knowingly employed an unfair or deceptive practice"); Smith v. Jenkins, 818 F.Supp.2d 336, 345 (D.Mass. 2011) ("[w]illful and knowing means that one not only knows in fact that what was represented was not true, but knew that he did not know whether such a representation was true before making it").  Out of an abundance of caution, this court turns to whether these allegations create a viable independent chapter 93A claim.

Substantive liability under chapter 93A "requires a showing of conduct that (1) falls within the penumbra of some common-law, statutory, or other established concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers or other business persons."  Jasty v. Wright Medical Technology, Inc., 528 F.3d 28, 37 (1st Cir. 2008) (internal quotations marks, brackets and citations omitted); accord Rodi v. Southern New England School of Law, 532 F.3d 11, 19 (1st Cir. 2008).  For example, "making a loan that the lender knows cannot be paid back may be an 'unfair or deceptive act or practice'" under section 2(a) thereby "giving the borrower a cause of action." Frappier v. Countrywide Home Loans, Inc., 645 F.3d 51, 56 (1st Cir. 2011) (discussing Commonwealth v. Fremont Investment

196

& Loan, 897 N.E.2d 548 (Mass. 2008)).

Under the facts, MEEB's conduct was neither unfair nor deceptive.  Its communications with plaintiff's mortgagees seeking to enforce the rights of its client, Pondview, falls significantly short of this threshold.

MEEB did not engage in filing frivolous, baseless or meritless suits for an ulterior motive.  See Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co., 986 F.2d 607, 611 (1st Cir. 1993) (abuse of process claim "with nothing more does not state a violation of Chapter 93A"); Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc., 884 F.2d 1510, 1514 (1st Cir. 1989).  MEEB's conduct was not threatening, oppressive or coercive or otherwise unethical or unscrupulous.  See generally Abraham v. American Home Mortgage Servicing, Inc., 2012 WL 4482236, at *4 (D.Mass. Sept. 27, 2012) ("[b]ecause Deutsche Bank was entitled to foreclose on Abraham's home, its conduct cannot subject it to liability under Chapter 93A").  The Declaration of Trust and chapter 183A allowed MEEB to collect the legal fees and other overdue condominium charges.  Although MEEB misread the reach of the priority lien under chapter 183A, section 6(c), its conduct constituted no more than a good faith dispute that the priority lien was owed by plaintiff's mortgagees.  See Duclersaint v. Federal National Mortgage Association, 696 N.E.2d 536, 540 (Mass. 1998) (noting that "a good faith dispute as to whether

197

money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made"). In short, any alleged independent chapter 93A violation based upon MEEB's alleged bad faith conduct of escalating its legal fees is not supported by the facts and lacks merit.[165]

Plaintiff additionally requests up to three but not less than two times the amount of actual damages because of MEEB's refusal to tender any relief in response to the chapter 93A demand letter. The December 11, 2008 demand letter stated that plaintiff's damages exceeded $200,000.00 and warned MEEB that, absent a reasonable written settlement offer within 30 days, plaintiff will be entitled to up to three times the amount of actual damages.

Section 9(3) in pertinent part states that:

> recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two.

Mass. Gen. L. ch. 93A, § 9(3). The bad faith refusal to offer relief in response to a demand letter "is an attempt to promote prelitigation settlements by making it unprofitable for the defendant either to ignore the plaintiff's request for relief or to bargain with the plaintiff with respect to such relief in bad

---

[165] It is therefore not necessary to address whether the litigation privilege bars any independent chapter 93A claim.

faith."  Heller v. Silverbranch Construction Corp., 382 N.E.2d at
1070.  "The standard is objective and requires the defendant to
investigate the facts and consider the legal precedents."  Id.

The eight page, single spaced response to the demand letter
evidences that MEEB fully investigated the facts.  MEEB did not
ignore the demand letter.  The letter details the facts and frames
a number of reasonable, albeit unsuccessful, legal defenses to per
se chapter 93A liability based upon the FDCPA violations.  In
light of such defenses, MEEB did not act in bad faith by failing
to tender a settlement offer or enter into bargaining negotiations
in response to the demand letter.  MEEB's letter denies certain
facts and elaborates upon other alleged facts which objectively
justify the failure to offer a settlement amount.

As a final remaining issue, on September 29, 2011, this court
denied as moot plaintiff's motion in limine seeking to preclude
the entry into evidence of the "rulings, findings, or judgments"[166]
in state court to prove claim or issue preclusion.[167]  (Docket
Entry # 30).  The ruling stated that this court will address the
preclusion issues including plaintiff's arguments, if necessary.
To complete the record, this court turns to plaintiff's arguments

---

[166]  The April 2005 unit 104 suit and the June 2006 unit 105
suit constitute the state court suits in which the courts issued
findings in addition to judgments.

[167]  As explained in the September 29, 2011 Order, defendant
did not properly file its alleged motion in limine to preclude
litigation on previously determined issues.

(Docket Entry # 30) in the context of defendant's opposition to the motion (Docket Entry # 37).[168]

Massachusetts law governs "the preclusive effect of a Massachusetts judgment."  Iantosca v. Step Plan Services, Inc., 604 F.3d 24, 30 (1st Cir. 2010).  Issue preclusion bars relitigation of the same "issues even in the context of a suit based on an entirely different claim."  In re Sonus Networks, Inc., Shareholder Derivative Litigation, 499 F.3d 47, 56 (1st Cir. 2007).  In order to apply the doctrine, Massachusetts law requires that:

> (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication.

Id.  In addition, "the issue decided in the prior adjudication must have been essential to the earlier judgment."  Id. Defendant, as the "party invoking the doctrine of issue preclusion[,] has the burden of demonstrating that the doctrine applies."  Day v. Kerkorian, 814 N.E.2d 745, 750 (Mass.App.Ct. 2004).

Defendant's 12 requests in the opposition are moot because

---

[168]   Defendant relies on issue preclusion as opposed to claim preclusion.  (Docket Entry # 37; Docket Entry # 21, p. 5).  It is therefore not necessary to address the latter doctrine.

this court independently made similar findings.[169]  Furthermore, a number of the requests include "issues" that were neither decided nor essential to the decisions.  Hence, defendant either fails in its burden to establish issue preclusion or the request on the particular issue is moot.  Correspondingly, it is therefore not necessary to address the arguments plaintiff raises in the motion in limine (Docket Entry # 30) seeking to bar the introduction of evidence for purposes of claim or issue preclusion.

III.  Prejudgment Interest

     Plaintiff seeks prejudgment interest at a rate of 12%.  (Docket Entry # 60, p. 37).  Defendant does not address the issue in the post trial brief.

     "[P]rejudgment interest is a substantive remedy governed by state law when state-law claims are brought in federal court."  Tobin v. Liberty Mutual Insurance Co., 553 F.3d 121, 146 (1st Cir. 2009).  Massachusetts General Laws chapter 231, section 6B ("section 6B"), imposes a 12% per annum prejudgment interest rate "for pecuniary damages for personal injuries."  Mass. Gen. L. ch. 231, § 6B.  An award of prejudgment interest on the chapter 93A compensatory award is therefore appropriate.  See Gore v. Arbella Mutual Insurance Co., 932 N.E.2d 837, 853 (Mass.App.Ct. 2010) (awarding prejudgment interest under section 6B on chapter 93A

---

     [169]  Footnotes 57 and 73 contain explanations with respect to requests 11 and 12.

compensatory award).   Prejudgment interest under section 6B

ordinarily runs "from the date of commencement of suit to the date

on which judgment is entered."   Tobin v. Liberty Mutual Insurance

Co., 553 F.3d at 146.

With the exception of the statutory damages award ($800.00)

under section 1692k, the damages award arises under the chapter

93A claim.   Prejudgment interest awarded under a "chapter 93A

action may only be applied to the actual damages suffered, not to

the multiple punitive damage award.'"   Smith v. Jenkins, 818

F.Supp.2d 336, 348 (D.Mass. 2011) (quoting Trenwick America

Reinsurance Corp. v. IRC, Inc., 2011 WL 2009919, at *1 (D.Mass.

May 23, 2011)).   An award of prejudgment interest at the 12% per

annum rate therefore applies to the $10,400.00 chapter 93A award

accruing from the February 3, 2009 filing of the complaint.

Excluding February 3, 2009, see Rule 6(a)(1), Fed. R. Civ. P., and

including today, amounts to 1,360 days.   The applicable

calculation is "the amount of single damages multiplied by the

daily interest rate (annual rate ÷ 365) multiplied by the number

of days from date interest began to run."   48 Jordan Shapiro, Marc

Perlin & John Connors, Massachusetts Practice Series § 7:27

(2009).   The calculation ($10,400.00 x (12% ÷ 365 = .0003287) x

1,360) yields a prejudgment interest award of $4,649.

In sum, the final judgment will therefore include the $800.00

statutory damages award under section 1692k(a)(2), the $10,400.00

damages award under chapter 93A and the $4,649.00 prejudgment interest award.  This court will address the issues of a reasonable attorney's fee award, <u>see</u> Mass. Gen. L. ch. 93A, § 9(4), after entry of a final judgment.

CONCLUSION

In accordance with the foregoing discussion, plaintiff is entitled to $800.00 in damages under Count One and $10,400.00 in damages under Count Two including prejudgment interest in the amount of $4,649.00.  A final judgment will issue.  This court will conduct a status conference to set a briefing schedule for the attorney's fees issues on December 17, 2012, at 2:30 p.m.

                     /s/ Marianne B. Bowler
                    **MARIANNE B. BOWLER**
                    United States Magistrate Judge